UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
_____

RIMMAX WHEELS, LLC,
a Delaware limited liability company,

       Plaintiff,

v.                                                                                          Case No. _____

RC COMPONENTS, INC.,
a Kentucky corporation,

       Defendant.
_____

**COMPLAINT**
_____

Plaintiff, RiMMax Wheels, LLC, for and as its Complaint against RC Components, Inc., alleges:

**I. INTRODUCTION**

1. This action arises from an agreement between plaintiff and defendant, wherein defendant promised to manufacture for plaintiff unique free spinning rims for motorcycle wheels called "spinners" that plaintiff invented. Defendant also promised plaintiff that defendant would not use the confidential information and proprietary technology plaintiff disclosed to defendant for any purpose other than manufacturing plaintiff's invention. Plaintiff kept its part of the agreement and paid about $100,000 to defendant. However, defendant did not honor the agreement. Defendant failed to deliver to plaintiff all spinners for which plaintiff paid, and defendant used plaintiff's confidential information and proprietary technology to make and sell spinners under defendant's brand name to plaintiff's customers and others. Per a written agreement between plaintiff and defendant, this action is brought pursuant to Delaware state laws to redress breach of contract, fraud, and intentional interference with contractual relations. Plaintiff seeks

1

compensatory damages, punitive damages, attorneys fees, costs, and any other relief deemed just by this Honorable Court.

## II. JURISDICTION AND VENUE

2. This Court is vested with jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1332 and 1367.

3. There is diversity of citizenship, and the amount in controversy exceeds the jurisdictional limit.

4. A substantial part of the events or omissions giving rise to plaintiff's claims occurred within the judicial district of the U.S. District Court for the District of Delaware.

5. Venue of this action is vested in this Court pursuant to various federal statutes, including 28 U.S.C. § 1391, and Delaware's long-arm statute, 10 Del. C. § 3104.

6. Defendant's website claims it has dozens of Delaware dealers carrying its motorcycle products. Defendant's website claims it serves the motorcycle market in Delaware, via its ongoing relationships and provision of regular advice to its dozens of dealers in Delaware.

7. Defendant has an established distribution network that likely results in substantial sales of its products in Delaware, in that it has a regular and anticipated flow of products from manufacture to distribution to retail sale in Delaware.

8. Defendant transacted business with plaintiff in Delaware, by communicating with plaintiff via telephone, fax, and mail at plaintiff's Delaware address. Defendant sent some spinners to plaintiff at plaintiff's Delaware address.

9. Defendant signed an agreement with plaintiff agreeing Delaware law controls a dispute between them, anticipating it would be hailed into a court located in Delaware.

10. This Court has personal jurisdiction over defendant because defendant's contacts with Delaware fall within the requirements set forth by Delaware's long arm statute, and meet the demands of due process.

### III. PARTIES

11. Plaintiff RiMMax Wheels, LLC is a Delaware limited liability company formed in 2002. It designs unique free spinning rims for motorcycle wheels called "spinners". The two men forming this company are Michael Rivers, Jr. (an engineer) and Marc Mathis (holding a master's degree in business administration). This company operates, and Rivers and Mathis reside, within the jurisdiction of the U.S. District Court for the District of Delaware.

12. Defendant RC Components, Inc. [hereinafter "RC"] is a Kentucky corporation formed in 1994, and located at 373 Mitch McConnell Way, Bowling Green, Kentucky 42101. Its registered agent and founder is Richard "Rick" Ball. RC manufacturers wheels, pully rotors, calipers, and frames for the motorcycle industry. RC advertises it employs 100 people, has a 55,000 square foot manufacturing facility operating 24 hours per day to provide efficient production, has a million dollars in inventory, and offers new product design, machining prototypes and production design.

### IV. ALLEGATIONS OF FACT FOR ALL CAUSES OF ACTION

13. In or about 2002, Rivers and Mathis invented the spinners. They then took steps to obtain patents on their spinners. Rivers and Mathis also established the company they call RiMMax, LLC, a Delaware limited liability company.

14. In 2002, plaintiff contacted Ball at RC via e-mail and told Ball plaintiff was looking for a manufacturer of its spinner.

3

15. Ball referred plaintiff to Jim Cooper, RC's sales manager.

16. Plaintiff told Cooper that before plaintiff could discuss its spinner with RC or any of its representatives RC must sign a written agreement promising plaintiff that RC would not use the confidential information and proprietary technology plaintiff disclosed to RC for any purpose other than manufacturing plaintiff's invention.

17. Plaintiff faxed the written agreement to RC.

18. On August 20, 2002, plaintiff and RC entered into a written agreement wherein RC promised not to disclose plaintiff's information to others or to use plaintiff's information in a way that would "unfairly take advantage of knowledge" about plaintiff's spinners, which plaintiff was disclosing to RC for the sole purpose of RC manufacturing plaintiff's spinners.

19. Cooper signed the agreement on behalf of RC, noting he was authorized to sign it on behalf of RC because he was RC's sales manager.

20. Plaintiff then contacted Ball, advised Ball that Cooper signed the agreement, and informed Ball a patent application was pending,

21. Ball invited plaintiff, in the persons of Rivers and Mathis, to visit RC's operations in Kentucky and to discuss the work plaintiff wanted RC to perform for plaintiff.

22. Plaintiff, in the persons of Rivers and Mathis, traveled to RC's facility in Kentucky. When they arrived, they were met by Ball and an RC engineer named Chuck.

23. During this meeting, Ball and Chuck received some of plaintiff's confidential information and proprietary technology.

24. During this meeting Ball "encouraged" Rivers and Mathis to discuss plaintiff's marketing plans and "discouraged" Rivers and Mathis by telling them they likely would only be able to sell one set of spinners per week.

25. After Rivers and Mathis returned to Delaware, on or about October 2, 2002, RC faxed to plaintiff a quote or "pricing" sheet for design, tooling and prototype manufacturing.

26. This "pricing" sheet lists various tasks RC would perform for plaintiff if plaintiff paid to RC $7,227.50, as a deposit to pay for all the design work and to begin production of plaintiff's spinners.

27. This "pricing" sheet tells plaintiff RC will charge plaintiff $80 per hour for RC's design work.

28. On or about October 3, 2002. plaintiff accepted RC's offer and sent the $7,227.50 to RC.

29. As RC was engaged in the design, tooling and prototype manufacturing phase, RC frequently telephoned plaintiff at its Delaware office, speaking with Rivers about the technical aspects of plaintiff's spinners. This phase of the manufacturing process required plaintiff to disclose to RC all of plaintiff's confidential information and proprietary technology about the technical aspects of plaintiff's invention.

30. RC delivered to plaintiff the prototype spinner about a month after the date promised.

31. On or about January 7, 2003, plaintiff took the prototype spinner to the International Motorcycle Show in New York. There was great excitement and "a lot of buzz" at the Show about plaintiff's new product.

32. Shortly after the Show, plaintiff began receiving orders for its spinners.

33. Plaintiff called RC, spoke with Ball, advised Ball orders were placed for the spinners, and asked Ball to begin manufacturing plaintiff's spinners.

34. Ball told plaintiff it had received inquiries about plaintiff's spinners from some of its customers, and asked plaintiff if RC could make spinners for RC's customers, including Harley Davidson.

35. Plaintiff declined RC's invitation to enter into this business arrangement, and informed RC that plaintiff already was marketing plaintiff's spinners, including via advertisements in Cycle Dreams Magazine.

36. RC told plaintiff that RC would make 54 sets of spinners for plaintiff, and deliver the sets to plaintiff by late April 2003, if plaintiff gave to RC $80,000.

37. Plaintiff accepted RC's offer and paid RC $80,000.

38. RC asked plaintiff to send to RC plaintiff's detailed order list and customer shipping addresses so that RC could ship the spinners to plaintiff's customers.

39. Plaintiff sent this information to RC, instructing RC to ship the spinners in a box with plaintiff's logo.

40. April 2003 passed without RC keeping its promise to make plaintiff's spinners.

41. Plaintiff contacted RC and advised RC that plaintiff's customers were furious about not receiving their spinners. Plaintiff told RC time was of the essence in delivering the spinners for which plaintiff had paid RC.

42. Ball responded by acknowledging the spinners had not been made, and promising to make and ship the spinners within a few weeks.

43. RC eventually made and shipped 20 sets of plaintiff's spinners to plaintiff's customers.

44. However, RC ignored plaintiff's specific direction about the packaging. RC shipped plaintiff's spinners in RC logo boxes, making it appear to the recipient that the spinner was an RC product rather than plaintiff's product.

45. Because RC failed to honor its promise to make 54 sets of spinners by late April 2003 and was shipping plaintiff's spinners in RC boxes, on July 2, 2003, plaintiff sent RC a letter canceling the contract, requesting return of $31,096.80, and

6

demanding return of all confidential information and proprietary technology plaintiff gave to RC for the sole purpose of RC manufacturing plaintiff's invention.

46. RC refuses and has failed to deliver 34 of the 54 sets of plaintiff's spinners for which plaintiff paid in full.

47. RC refuses and has failed to return to plaintiff the $31,096.80 demanded.

48. RC refuses and has failed to return to plaintiff the confidential information and proprietary technology plaintiff gave to RC.

49. Plaintiff recently discovered RC has been communicating with plaintiff's customers, telling them to buy spinners from RC rather than plaintiff, and selling plaintiff's spinners to plaintiff's customers and other third parties without plaintiff's knowledge or consent.

50. Plaintiff recently discovered RC is advertising it sells spinners.

51. The spinners RC advertises it sells, and that it does sell, is the same spinner invented by plaintiff and on which plaintiff has patents.

52. Plaintiff did not give to RC the right or permission to contact plaintiff's customers or others for the purpose of selling to them spinners under RC's logo or brand name.

53. Plaintiff did not give to RC the right or permission to sell spinners.

54. Plaintiff did not give to RC the right or permission to use plaintiff's confidential information and proprietary technology to RC's economic benefit.

55. Per the August 20, 2002 written agreement between plaintiff and RC, RC is prohibited from using plaintiff's confidential information and proprietary technology in any manner that would "unfairly take advantage of knowledge" about plaintiff's spinners.

## FIRST CAUSE OF ACTION: BREACH OF CONTRACT

56.     All foregoing paragraphs are re-stated and incorporated herein by reference.

57.     There was a legally binding agreement between plaintiff and defendant. There was an offer, acceptance, consideration for the offer and acceptance, and sufficiently specific terms that determine the obligations of each party.

58.     Plaintiff fully performed all its obligations under the agreement, by paying to defendant the amounts requested to do the work plaintiff requested.

59.     Defendant breached the agreement when it failed to timely deliver to plaintiff 54 sets of spinners for which plaintiff had paid.

60.     Defendant breached the agreement when it failed to return to plaintiff $31,096.80 for spinners defendant failed to deliver to plaintiff.

61.     Defendant breached the agreement when it failed to return to plaintiff its confidential information and proprietary technology.

62.     Defendant breached the agreement when it unfairly took advantage of plaintiff's knowledge and began selling spinners under the RC logo or brand name.

63.     Defendant breached the agreement when it used plaintiff's confidential information and proprietary technology for purposes other than manufacturing plaintiff's invention.

64.     Defendant's failure to perform its contractual duties constitutes a breach of contract.

65.     Defendant's breach of contract caused injuries and losses to plaintiff, and plaintiff claims compensatory and punitive damages in an amount according to proof.

**SECOND CAUSE OF ACTION: FRAUD**

66. All foregoing paragraphs are re-stated and incorporated herein by reference.

67. Defendant made false representations of fact that were important to plaintiff.

68. Defendant falsely represented that it would not use plaintiff's confidential information and proprietary technology for any purpose other than to manufacture plaintiff's invention. Defendant used plaintiff's property for defendant's economic benefit and to plaintiff's detriment.

69. Defendant falsely represented that it needed plaintiff's detailed order list and customer shipping addresses so that it could ship the spinners directly to plaintiff's customers. Defendant did not ship 54 sets of spinners to plaintiff's customers and used this property of plaintiff to sell spinners directly to plaintiff's customers, resulting in an economic benefit for defendant and to plaintiff's detriment.

70. Defendant knew or believed that these representations it made to plaintiff were false.

71. Defendant had the intent to induce plaintiff to act on the false representations.

72. Plaintiff acted in justifiable reliance on defendant's false representations.

73. Plaintiff has been damaged as a result of this reliance, and claims compensatory and punitive damages in an amount according to proof.

## THIRD CAUSE OF ACTION:

## INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

74. All foregoing paragraphs are re-stated and incorporated herein by reference.

75. Plaintiff had agreements with third parties to deliver to them sets of spinners.

76. Defendant was aware of these agreements.

77. Defendant intentionally and improperly induced or otherwise intentionally caused third parties not to perform their contracts with plaintiff when defendant told these third parties not to purchase spinners from plaintiff and to purchase spinners from defendant.

78. Defendant is responsible to plaintiff for the loss suffered as a result of the third parties' breach of their contracts with plaintiff.

79. Defendant intentionally and improperly induced or otherwise intentionally prevented plaintiff from performing its contracts with third parties or made the performance of plaintiff's contracts with third parties more costly when defendant failed to timely deliver 54 sets of spinners and completely failed to deliver 34 of the 54 sets for which plaintiff had paid.

80. Defendant is responsible to plaintiff for the loss suffered as a result of the prevention or interference with these contracts.

81. Defendant purposely and improperly induced or otherwise purposely caused third parties not to enter into or continue prospective contractual relations with plaintiff when defendant failed to timely deliver 54 sets of spinners and when defendant sold spinners under defendant's logo or brand name.

82. Defendant is responsible to plaintiff for the loss suffered as a result of the prevention or interference with these contractual relations.

83. Defendant's interference with plaintiff's contractual relations caused injuries and losses to plaintiff, and plaintiff claims compensatory and punitive damages in an amount according to proof.

## REQUEST FOR RELIEF

**WHEREFORE,** plaintiff respectfully requests this Honorable Court advances this case on the docket, orders a speedy trial, and causes this case to be in every way expedited, and, upon hearing, enter judgment for plaintiff on its Complaint against defendant, and provide the following relief:

A. Order defendant to make whole plaintiff from the adverse effects of the unlawful acts and practices complained of herein by providing relief that includes compensatory damages, punitive damages, pre- and post-judgment interest, and any other damages as provided by law to compensate plaintiff for injuries, damages and other losses suffered as a result of defendant's unlawful conduct;

B. Issue an injunction to stop defendant from using plaintiff's confidential information and proprietary technology in any way;

C. Order defendant to return to plaintiff all of plaintiff's confidential information and proprietary technology;

D. Order defendants to reimburse plaintiff for plaintiff's costs, disbursements, and attorneys' fees reasonably incurred in this action;

E. Retain jurisdiction over this action to assure full compliance with the Orders of the Court;

F. Order such other and further relief as the Court deems just and reasonable under the circumstances.

12

**PLAINTIFF HEREBY REQUESTS A TRIAL BY A SIX-PERSON JURY.**

Dated this 12th day of January 2006.

        Plaintiff's Attorneys:

        WILLIAMS & CROSSE

        <u>s/Kester I.H. Crosse, Esq.</u>
        Kester I.H. Crosse [Bar I.D. 638]

        1214 King Street
        Suite 300
        Wilmington, DE  19801
        Telephone: (302) 652-3141
        E-Mail: kesterih@aol.com

        SULTON LAW OFFICES

        <u>s/Anne T. Sulton, Esq.</u>
        Anne T. Sulton

        Post Office Box 2763
        Olympia, WA 98507
        Telephone: (609) 468-6029
        E-Mail: annesulton@comcast.net