**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

---

RIMMAX WHEELS, LLC,
a Delaware limited liability company,

Plaintiff,

v. Civil Action 06-029-SLR

RC COMPONENTS, INC.,
a Kentucky corporation,

Defendant.

---

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO TRANSFER**

---

Dated this 26th day of June 2006

Plaintiff's Attorneys

**Lead Attorney:**

WILLIAMS & CROSSE

Kester I.H. Crosse [Bar I.D. 638]
1214 King Street
Suite 300
Wilmington, DE 19801
Telephone: (302) 652-3141
E-Mail: kesterih@aol.com

**Co-Counsel / Appearing Pro Hac Vice:**

SULTON LAW OFFICES

Anne T. Sulton
Post Office Box 2763
Olympia, WA 98507
Telephone: (609) 468-6029
E-Mail: annesulton@comcast.net

**TABLE OF CONTENTS**


| | | Page |
|---|---|---|
| I. | Table of Citations | 3 |
| II. | Statement of the Nature and Stage of Proceeding | 4 |
| III. | Summary of Argument | 5 |
| | A. This Court Is The Proper Venue For This Action | 5 |
| | B. The Balance Of Factors Favors Plaintiff's Choice | 5 |
| IV. | Statement of Facts | 5 |
| V. | Argument | 13 |
| VI. | Conclusion | 16 |
| VII. | Appendix / Attachments | |
| | B-1) Exhibits | |
| | 1: RiMMax Business License | |
| | 2: Confidentiality Agreement Between RiMMax and RC | |
| | 3: RC Handwritten Communication Re RiMMax Order From Rick Ball | |
| | 4: RC Typed Communication Re RiMMAX Order | |
| | 5: Checks from RiMMax To RC For Over $100,000 | |
| | B-2) Page From RC Website Describing Size And Sophistication Of Business | |
| | B-3) Pages From Bowling Green Chamber Of Commerce Re RC Size | |
| | B-4) RC Ad Showing It Is Selling Spinners | |
| | B-5) Sample Pages From RC Website About Its Dealers in Delaware | |

## I. TABLE OF CITATIONS


| | Page |
|---|---|
| **Cases:** | |
| *Boone v. Oy Partek Ab*, 724 A.2d 1150, 1158 (Del. Super. Ct. 1997) | 13 |
| *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) | 13 |
| *Hanson v. Denckla*, 357 U.S. 235, 253 (1958) | 13 |
| *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) | 13 |
| *Jeffreys v. Exten,* 784 F. Supp. 146, 151 (D. Del. 1992) | 13 |
| *Jumara v. State Farm Insurance Co.*, 55 F.3d 873 (3d Cir. 1995) | 15 |
| *LaNuova v. Bowe Co.*, 513 A.2d 764, 768 (Del. 1986) | 13 |
| *Peregrine Myanmar v. Segal*, 89 F.3d 41, 47 (2d Cir. 1996) | 16 |
| *Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22 (1988) | 15 |
| *World Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980) | 13 |
| **Statutes and Other Authorities:** | |
| 28 U.S.C. §§ 1332 | 13 |
| 28 U.S.C. §§ 1367 | 13 |
| 28 U.S.C. § 1391 | 5, 13 |
| 28 U.S.C. § 1404 | 15 |
| 10 Del. C. § 3104 | 5, 13, 14 |
| Federal Rules of Civil Procedure Rule 26(a)(1) | 4, 16 |

## II. Statement of the Nature and Stage of Proceeding

**Nature:**

This action arises from an agreement between plaintiff and defendant, wherein defendant promised to manufacture for plaintiff unique free spinning rims for motorcycle wheels called "spinners" that plaintiff invented. At pages 2 and 3 of the their agreement, the plaintiff and defendant expressly stated: **"This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without reference to the principles of conflict of laws."** [Exhibit B-1-2.]

Defendant also promised plaintiff that defendant would not use the confidential information and proprietary technology plaintiff disclosed to defendant for any purpose other than manufacturing plaintiff's invention. Plaintiff kept its part of the agreement and paid over $100,000 to defendant. However, defendant did not honor the agreement. Defendant failed to deliver to plaintiff all spinners for which plaintiff paid, and defendant used plaintiff's confidential information and proprietary technology to make and sell spinners under defendant's brand name to plaintiff's customers and others. Per a written agreement between plaintiff and defendant, this action is brought pursuant to Delaware state laws to redress breach of contract, fraud, and intentional interference with contractual relations. Plaintiff seeks compensatory damages, punitive damages, attorneys fees, costs, and any other relief deemed just by this Honorable Court.

**Stage:**

Plaintiff made its Rule 26(a)(1) disclosures and sent copies of documents to defendant. Plaintiff has served a discovery request on defendant and a response is due on or about June 27, 2006. Plaintiff and defendant had a settlement conference with the Magistrate Judge and follow up conferences are scheduled.

## III. Summary of Argument

A. This Court Is The Proper Venue For This Action

Venue of this action is vested in this Court pursuant to 28 U.S.C. § 1391, and Delaware's long-arm statute, 10 Del. C. § 3104. There is diversity of citizenship, and the amount in controversy exceeds the jurisdictional limit. A substantial part of the events or omissions giving rise to plaintiff's claims occurred within the judicial district of the U.S. District Court for the District of Delaware. Furthermore, at pages 2 and 3 of the their agreement, the plaintiff and defendant expressly stated: **"This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without reference to the principles of conflict of laws."** [Exhibit B-1-2.]

B. The Balance Of Factors Favors Plaintiff's Choice

The convenience of the parties and witnesses, and the interests of justice, favor leaving this case in Delaware. Defendant voluntarily made the decision to reach into Delaware to solicit plaintiff's business and to steal plaintiff's money and ideas. It should answer for its wrongdoing in the place where the injuries occurred.

## IV. Statement of Facts

1. Plaintiff's lead attorney is Kester I.H. Crosse. He is licensed to practice law in Delaware. Attorney Crosse is based in Wilmington, Delaware. Attorney Anne Sulton is licensed in Wisconsin and Colorado. She is based in Olympia, Washington and appears *pro hac vice*. There is no patent attorney of record in this case. This is not a patent case.

2. Plaintiff RiMMax Wheels, LLC is a Delaware limited liability company formed in 2002. It designs unique free spinning rims for motorcycle wheels called "spinners". The two men forming this company are Michael Rivers, Jr. (an engineer) and Marc Mathis (holding a master's degree in business administration). This company

operates, and Mathis resides, within the jurisdiction of the U.S. District Court for the District of Delaware. [Exhibit B-1-1.]

3. Defendant RC Components, Inc. [hereinafter "RC"] is a Kentucky corporation formed in 1994, and located at 373 Mitch McConnell Way, Bowling Green, Kentucky 42101. Its registered agent and founder is Richard "Rick" Ball. RC manufacturers wheels, pully rotors, calipers, and frames for the motorcycle industry. RC advertises it employs 100 people, has a 55,000 square foot manufacturing facility operating 24 hours per day to provide efficient production, has a million dollars in inventory, and offers new product design, machining prototypes and production design. [Exhibits B-2 and B-3.]

4. In or about 2002, Rivers and Mathis invented the spinners. They then took steps to obtain patents on their spinners. Rivers and Mathis also established the company they call RiMMax, LLC, a Delaware limited liability company. [Exhibit B-1-1.]

5. In 2002, plaintiff contacted Ball at RC via e-mail and told Ball plaintiff was looking for a manufacturer of its spinner.

6. Ball referred plaintiff to Jim Cooper, RC's sales manager.

7. Plaintiff told Cooper that before plaintiff could discuss its spinner with RC or any of its representatives RC must sign a written agreement promising plaintiff that RC would not use the confidential information and proprietary technology plaintiff disclosed to RC for any purpose other than manufacturing plaintiff's invention.

8. Plaintiff faxed the written agreement to RC.

9. On August 20, 2002, plaintiff and RC entered into a written agreement wherein RC promised not to disclose plaintiff's information to others or to use plaintiff's information in a way that would "unfairly take advantage of knowledge" about plaintiff's

spinners, which plaintiff was disclosing to RC for the sole purpose of RC manufacturing plaintiff's spinners. [Exhibit B-1-2.]

10. Cooper signed the agreement on behalf of RC, noting he was authorized to sign it on behalf of RC because he was RC's sales manager. [Exhibit B-1-2.]

11. Plaintiff then contacted Ball, advised Ball that Cooper signed the agreement, and informed Ball a patent application was pending,

12. Ball invited plaintiff, in the persons of Rivers and Mathis, to visit RC's operations in Kentucky and to discuss the work plaintiff wanted RC to perform for plaintiff.

13. Plaintiff, in the persons of Rivers and Mathis, traveled to RC's facility in Kentucky. When they arrived, they were met by Ball and an RC engineer named Chuck.

14. During this meeting, Ball and Chuck received some of plaintiff's confidential information and proprietary technology.

15. During this meeting Ball "encouraged" Rivers and Mathis to discuss plaintiff's marketing plans and "discouraged" Rivers and Mathis by telling them they likely would only be able to sell one set of spinners per week.

16. After Rivers and Mathis returned to Delaware, on or about October 2, 2002, RC faxed to plaintiff a quote or "pricing" sheet for design, tooling and prototype manufacturing.

17. This "pricing" sheet lists various tasks RC would perform for plaintiff if plaintiff paid to RC $7,227.50, as a deposit to pay for all the design work and to begin production of plaintiff's spinners. [Exhibits B-1-3 and B-1-4.]

18. This "pricing" sheet tells plaintiff RC will charge plaintiff $80 per hour for RC's design work.

19. On or about October 3, 2002. plaintiff accepted RC's offer and sent the $7,227.50 to RC. [Exhibit B-1-5.]

20. As RC was engaged in the design, tooling and prototype manufacturing phase, RC frequently telephoned plaintiff at its Delaware office, speaking with Rivers about the technical aspects of plaintiff's spinners. This phase of the manufacturing process required plaintiff to disclose to RC all of plaintiff's confidential information and proprietary technology about the technical aspects of plaintiff's invention.

21. RC delivered to plaintiff the prototype spinner about a month after the date promised.

22. On or about January 7, 2003, plaintiff took the prototype spinner to the International Motorcycle Show in New York. There was great excitement and "a lot of buzz" at the Show about plaintiff's new product.

23. Shortly after the Show, plaintiff began receiving orders for its spinners.

24. Plaintiff called RC, spoke with Ball, advised Ball orders were placed for the spinners, and asked Ball to begin manufacturing plaintiff's spinners.

25. Ball told plaintiff it had received inquiries about plaintiff's spinners from some of its customers, and asked plaintiff if RC could make spinners for RC's customers, including Harley Davidson.

26. Plaintiff declined RC's invitation to enter into this business arrangement, and informed RC that plaintiff already was marketing plaintiff's spinners, including via advertisements in Cycle Dreams Magazine.

27. RC told plaintiff that RC would make 54 sets of spinners for plaintiff, and deliver the sets to plaintiff by late April 2003, if plaintiff gave to RC over $90,000 more. [Exhibit B-1-5.]

28. Plaintiff accepted RC's offer and paid RC a total of over $100,000. [Exhibit B-1-5.]

29. RC asked plaintiff to send to RC plaintiff's detailed order list and customer shipping addresses so that RC could ship the spinners to plaintiff's customers.

30. Plaintiff sent this information to RC, instructing RC to ship the spinners in a box with plaintiff's logo.

31. April 2003 passed without RC keeping its promise to make plaintiff's spinners.

32. Plaintiff contacted RC and advised RC that plaintiff's customers were furious about not receiving their spinners. Plaintiff told RC time was of the essence in delivering the spinners for which plaintiff had paid RC.

33. Ball responded by acknowledging the spinners had not been made, and promising to make and ship the spinners within a few weeks.

34. RC eventually made and shipped 20 sets of plaintiff's spinners to plaintiff's customers.

35. However, RC ignored plaintiff's specific direction about the packaging. RC shipped plaintiff's spinners in RC logo boxes, making it appear to the recipient that the spinner was an RC product rather than plaintiff's product.

36. Because RC failed to honor its promise to make 54 sets of spinners by late April 2003 and was shipping plaintiff's spinners in RC boxes, on July 2, 2003, plaintiff sent RC a letter canceling the contract, requesting return of $31,096.80, and demanding return of all confidential information and proprietary technology plaintiff gave to RC for the sole purpose of RC manufacturing plaintiff's invention.

37. RC refuses and has failed to deliver 34 of the 54 sets of plaintiff's spinners for which plaintiff paid in full.

38. RC refuses and has failed to return to plaintiff the $31,096.80 demanded.

39. RC refuses and has failed to return to plaintiff the confidential information and proprietary technology plaintiff gave to RC.

40. Plaintiff recently discovered RC has been communicating with plaintiff's customers, telling them to buy spinners from RC rather than plaintiff, and selling

plaintiff's spinners to plaintiff's customers and other third parties without plaintiff's knowledge or consent.

41. Plaintiff recently discovered RC is advertising it sells spinners. [Exhibit B-4.]

42. The spinners RC advertises it sells, and that it does sell, is the same spinner invented by plaintiff and on which plaintiff has patents.

43. Plaintiff did not give to RC the right or permission to contact plaintiff's customers or others for the purpose of selling to them spinners under RC's logo or brand name.

44. Plaintiff did not give to RC the right or permission to sell spinners.

45. Plaintiff did not give to RC the right or permission to use plaintiff's confidential information and proprietary technology to RC's economic benefit.

46. Per the August 20, 2002 written agreement between plaintiff and RC, RC is prohibited from using plaintiff's confidential information and proprietary technology in any manner that would "unfairly take advantage of knowledge" about plaintiff's spinners.

47. There was a legally binding agreement between plaintiff and defendant. There was an offer, acceptance, consideration for the offer and acceptance, and sufficiently specific terms that determine the obligations of each party.

48. Plaintiff fully performed all its obligations under the agreement, by paying to defendant the amounts requested to do the work plaintiff requested.

49. Defendant breached the agreement when it failed to timely deliver to plaintiff 54 sets of spinners for which plaintiff had paid.

50. Defendant breached the agreement when it failed to return to plaintiff $31,096.80 for spinners defendant failed to deliver to plaintiff.

51. Defendant breached the agreement when it failed to return to plaintiff its confidential information and proprietary technology.

52. Defendant breached the agreement when it unfairly took advantage of plaintiff's knowledge and began selling spinners under the RC logo or brand name.

53. Defendant breached the agreement when it used plaintiff's confidential information and proprietary technology for purposes other than manufacturing plaintiff's invention.

54. Defendant's failure to perform its contractual duties constitutes a breach of contract.

55. Defendant's breach of contract caused injuries and losses to plaintiff, and plaintiff claims compensatory and punitive damages in an amount according to proof.

56. Defendant made false representations of fact that were important to plaintiff.

57. Defendant falsely represented that it would not use plaintiff's confidential information and proprietary technology for any purpose other than to manufacture plaintiff's invention. Defendant used plaintiff's property for defendant's economic benefit and to plaintiff's detriment.

58. Defendant falsely represented that it needed plaintiff's detailed order list and customer shipping addresses so that it could ship the spinners directly to plaintiff's customers. Defendant did not ship 54 sets of spinners to plaintiff's customers and used this property of plaintiff to sell spinners directly to plaintiff's customers, resulting in an economic benefit for defendant and to plaintiff's detriment.

59. Defendant knew or believed that these representations it made to plaintiff were false.

60. Defendant had the intent to induce plaintiff to act on the false representations.

61. Plaintiff acted in justifiable reliance on defendant's false representations.

62. Plaintiff has been damaged as a result of this reliance, and claims compensatory and punitive damages in an amount according to proof.

63. Plaintiff had agreements with third parties to deliver to them sets of spinners.

64. Defendant was aware of these agreements.

65. Defendant intentionally and improperly induced or otherwise intentionally caused third parties not to perform their contracts with plaintiff when defendant told these third parties not to purchase spinners from plaintiff and to purchase spinners from defendant.

66. Defendant is responsible to plaintiff for the loss suffered as a result of the third parties' breach of their contracts with plaintiff.

67. Defendant intentionally and improperly induced or otherwise intentionally prevented plaintiff from performing its contracts with third parties or made the performance of plaintiff's contracts with third parties more costly when defendant failed to timely deliver 54 sets of spinners and completely failed to deliver 34 of the 54 sets for which plaintiff had paid.

68. Defendant is responsible to plaintiff for the loss suffered as a result of the prevention or interference with these contracts.

69. Defendant purposely and improperly induced or otherwise purposely caused third parties not to enter into or continue prospective contractual relations with plaintiff when defendant failed to timely deliver 54 sets of spinners and when defendant sold spinners under defendant's logo or brand name.

70. Defendant is responsible to plaintiff for the loss suffered as a result of the prevention or interference with these contractual relations.

71. Defendant's interference with plaintiff's contractual relations caused injuries and losses to plaintiff, and plaintiff claims compensatory and punitive damages in an amount according to proof.

## V. Argument

### A. This Court Is The Proper Venue For This Action:

Under both federal and state statutes, and the unambiguous terms of the Agreement signed by plaintiff and defendant, this case should be heard in Delaware. At pages 2 and 3 of the their agreement, the plaintiff and defendant expressly stated: **"This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without reference to the principles of conflict of laws."** [Exhibit B-1-2.]

This Court is vested with jurisdiction over plaintiff's claims pursuant to 28 U.S.C. §§ 1332 and 1367. Venue is proper under both § 1391 (a) and (c). *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *Hanson v. Denckla*, 357 U.S. 235, 253 (1958); *World Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985).

Venue also is proper under Delaware's long arm statute which confers personal jurisdiction under the facts of this case. 10 Del. C. § 3104; *Boone v. Oy Partek Ab*, 724 A.2d 1150, 1158 (Del. Super. Ct. 1997); *LaNuova v. Bowe Co.*, 513 A.2d 764, 768 (Del. 1986) (stating that the Delaware long arm statute "has been broadly construed to confer jurisdiction to the maximum extent possible under the due process clause"); *Jeffreys v. Exten,* 784 F. Supp. 146, 151 (D. Del. 1992) ("Delaware courts have construed the [long arm] statute as conferring jurisdiction to the maximum parameters of the due process clause.").

The Delaware long arm statute, provides, in pertinent part: "As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent: (1) Transacts any business or performs any character of work or service in the State; . . . (3) Causes tortious injury in the State by an act or omission in this State; (4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State." Del. Code Ann. tit. 10, § 3104(c)(1), (c)(3) and (c)(4) (2003).

Defendant's website claims it has dozens of Delaware dealers carrying its motorcycle products. Defendant's website claims it serves the motorcycle market in Delaware, via its ongoing relationships and provision of regular advice to its dozens of dealers in Delaware. [Exhibit B-5.] Defendant has an established distribution network that does result in substantial sales of its products in Delaware, in that it has a regular and anticipated flow of products from manufacture to distribution to retail sale in Delaware.

Defendant transacted business with plaintiff in Delaware, by communicating with plaintiff via telephone, fax, and mail at plaintiff's Delaware address. Defendant sent some spinners to plaintiff at plaintiff's Delaware address. Defendant signed an agreement with plaintiff agreeing Delaware law controls a dispute between them, anticipating it would be hailed into a court located in Delaware. At pages 2 and 3 of the their agreement, the plaintiff and defendant expressly stated: **"This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without reference to the principles of conflict of laws."** [Exhibit B-1-2.] This Court has personal jurisdiction over defendant because defendant's contacts with plaintiff fall

within the requirements set forth by Delaware's long arm statute, and meet the demands of due process.

**B. The Balance Of Factors Favors Plaintiff's Choice**

The State of Delaware has a very strong interest in making certain its small, start-up businesses are not illegally deprived of their money and ideas by large established out-of-state companies. RiMMax is a small, start-up company. It reflects the dreams and aspirations of two young men, trying to make an honest dollar by designing and selling a product to the motorcycle community. They gave their life savings to defendant, in the hope defendant would honor its agreement to manufacture the product they designed. Defendant illegally took their money and their ideas.

28 U.S.C. § 1404 provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." This case should not be transferred because the plaintiff and its witnesses are located in Wilmington, Delaware. Given the comparative size, sophistication and resources of the parties, defendant is in a far better position to travel to Delaware than plaintiff is to travel to Kentucky. [Exhibits B-2 and B-3.]

In *Stewart Organization, Inc. v. Ricoh Corp*., 487 U.S. 22 (1988), the Supreme Court held a district court must weigh in the balance the convenience of the witnesses and public and private interest factors relating to the concepts of fairness and justice. Therefore, as the Third Circuit held in *Jumara v. State Farm Insurance Co*., 55 F.3d 873 (3d Cir. 1995), a district court may consider all relevant factors to determine whether on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer.

The defendant claims key witnesses, two of its former employees, are unwilling to travel to Delaware. It also mentions document production as favoring transfer.

The availability of witnesses should be considered. However, defendant has not alleged, nor can it show, that no witnesses would be available to it. *Peregrine Myanmar v. Segal*, 89 F.3d 41, 47 (2d Cir. 1996). To the extent defendant's former employees are unwilling to travel to Delaware, their trial preservation depositions can be taken via videotape, which is a very good and widely used alternative to live testimony. Also, with our current technology, these witnesses' testimony can be offered live at trial via a video-conference link.

Given the Rule 26(a)(1) initial disclosures, it is clear the number of documents at issue in this case is very small, certainly far less than a total of 1,000 pages. Plaintiff already has submitted it first written discovery request to defendant, and should be receiving from defendant most of the documents within the next day or so. Plaintiff already has sent to defendant all of its Rule 26(a)(1) initial disclosure documents. Therefore, defendant cannot show how exchanging documents is so oppressive or expensive that this case should be transferred to Kentucky.

## VI. Conclusion

Based upon the foregoing reasons, and the record in this case, plaintiff respectfully requests this Honorable Court deny defendant's motion to transfer.

Dated this 26th day of June 2006

Plaintiff's Attorneys

**Lead Attorney:**

WILLIAMS & CROSSE
1214 King Street
Suite 300
Wilmington, DE 19801
Telephone: (302) 652-3141
E-Mail: kesterih@aol.com

**Co-Counsel:**

SULTON LAW OFFICES

s/Anne T. Sulton, Esq.
Anne T. Sulton

Post Office Box 2763
Olympia, WA 98507
Telephone: (609) 468-6029
E-Mail: annesulton@comcast.net

**CERTIFICATE OF SERVICE (CM/ECF)**

I hereby certify that on Monday, June 26, 2006 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Attorney Curtis S. Miller@ CMiller@MNAT.com

/s/ Anne T. Sulton
Anne T. Sulton
Attorney for Plaintiff
P.O. Box 2763
Olympia, WA 98507
Phone: 609-468-6029
Fax: n/a
Email: annesulton@comcast.net