IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

RIMMAX WHEELS, LLC, a Delaware
limited liability company,

               Plaintiff,

      v.                             C.A. No. 06-029 (SLR)

RC COMPONENTS, INC., a Kentucky
corporation,

               Defendant.


**DEFENDANT RC COMPONENTS, INC.'S**
**BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**


MORRIS, NICHOLS, ARSHT & TUNNELL LLP
William H. Sudell, Jr. (#463)
Curtis S. Miller (#4583)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
   Attorneys for RC Components, Inc.

December 1, 2006

TABLE OF CONTENTS

Page

TABLE OF CITATIONS                                                          ii

BACKGROUND                                                                  1

    I.     PROCEDURAL HISTORY.                                      1

    II.    AGREEMENT AND PURPORTED INVENTION.                    1

    III.   PLAINTIFF'S BUSINESS.                                   4

SUMMARY OF ARGUMENT                                                         5

STANDARD                                                                    6

ARGUMENT                                                                    7

    I.     RC IS ENTITLED TO SUMMARY JUDGMENT ON
           THE BREACH OF CONTRACT AND FRAUD CLAIMS.               7

        A.   Plaintiff Has No Confidential Information Or
           Proprietary Technology.                                8

        B.   Plaintiff Has Admitted That They Made Only
           Partial Payment For Their Orders, Thus Excusing
           RC's Performance.                                      12

        C.   Plaintiff's Breach Of Contract Claim Is Precluded
           By The Statute Of Frauds.                              14

    II.    PLAINTIFF HAS PROVIDED NO PROOF THAT RC
           INTERFERED WITH ITS CONTRACTUAL
           RELATIONS.                                             15

    III.   RC IS ENTITLED TO SUMMARY JUDGMENT ON
           PLAINTIFF'S CLAIM FOR LOST PROFITS
           DAMAGES.                                               17

    IV.   RIMMAX IS NOT THE REAL PARTY IN INTEREST.             20

CONCLUSION                                                                 21

# TABLE OF CITATIONS

Page(s)

Cases

Advanta USA, Inc. v. Farmers Fertilizer Co., Inc.,
    No. 2005-CA-000662-MR, 2006 WL 1561489
    (Ky. App. June 9, 2006)    18

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986)    7

Bourbon County Joint Planning Commission v. Simpson,
    799 S.W.2d 42 (Ky. Ct. App. 1990)    16, 17

Brooks v. Beatty,
    25 F.3d 1037 (1st Cir. 1994)    21

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986)    6, 7

Chase Manhattan Mortgage Corp. v. Advanta Corp.,
    Civ. A. NO. 01-507 KAJ, 2005 WL 2234608
    (D. Del. Sept. 8, 2005)    13

Compressed Gas Corp., Inc. v. U.S. Steel Corp.,
    857 F.2d 346 (6th Cir. 1988)    18, 20

David B. Lilly Co., Inc. v. Fisher,
    18 F.3d 1112 (3d Cir. 1994)    13

Harrodsburg Indus. Warehousing, Inc., LLC v. Migs, LLC,
    182 S.W.3d 529 (Ky. Ct. App. 2005)    16, 17

In re Marc C. Mathis,
    Bankr. C.A. No. 05-13885 (Bankr. D. Del. 2005)    21

James Med. Equip. v. Allen,
    Nos. 2005-CA-000128-MR, 2006 WL 2788435
    (Ky. App. Sept. 29, 2006)    18

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,
    475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)    6

Niemann v. Rogers,
    802 F. Supp. 1154 (D. Del. 1992)    13

TABLE OF CITATIONS (continued)

Page(s)

Pauline's Chicken Villa, Inc. v. KFC Corp.,
    701 S.W.2d 399 (Ky. 1986)    18, 20

Synthes (U.S.A.) v. Globus Medical, Inc.,
    No. Civ.A. 04-CV-1235, 2005 WL 2233441
    (E.D.Pa. Sept. 14, 2005)    20

Velten v. Regis B. Lippert,
    985 F.2d 1515 (11th Cir. 1993)    6

Watson v. H.J. Heinz Co.,
    Nos. 03-1433, 03-1434, 2004 WL 1254600
    (Fed. Cir. June 8, 2004)    21

Statutes And Other Authorities

Fed. R. Civ. P. 17    5, 6, 20, 21

Fed. R. Civ. P. 56    6, 7

Ky. Rev. Stat. § 355.2-201    14, 15

Ky. Rev. Stat. § 355.2-511    13, 17

## BACKGROUND

I.    PROCEDURAL HISTORY.

On January 13, 2006, Plaintiff Rimmax Wheels, LLC ("Plaintiff" or "Rimmax") filed its Complaint against RC Components, Inc. ("RC"), seeking the recovery of $31,096.80 and other unspecified damages from RC on three grounds, breach of contract, fraud, and intentional interference with contractual relations. (D.I. 1.) On February 24, 2006, RC filed its Answer, denying most of the material allegations in the Complaint. The parties have engaged in document and written discovery[1] and have conducted depositions.

On November 1, 2006, RC served two expert reports on Plaintiff, relating to Plaintiff's claim for lost profits damages and claim of ownership of confidential information and proprietary technology.

II.    AGREEMENT AND PURPORTED INVENTION.

In 2002, Plaintiff, through its principals Michael Rivers, Jr. and Marc Mathis,[2] contacted RC to request RC to manufacture a motorcycle wheel rim that has an ornamental design on the wheel face which rotates while the motorcycle is in motion ("spinners"). Messrs. Rivers and Mathis represented to RC that they had "invented" the

---

[1]    RC filed a Motion to Compel Discovery From Plaintiff Rimmax Wheels LLC on October 10, 2006 (D.I. 31), which remains pending before the Court.

[2]    The deposition transcript of Marc Mathis, conducted on September 25 and 26, 2006, shall be referenced herein as "Mathis Tr. at ____." A copy of the Mathis Tr. is attached hereto as Exhibit A. The deposition transcript of Michael Rivers, Jr., conducted on October 14, 2006, shall be referenced herein as "Rivers Tr. at ____." A copy of the Rivers Tr., together with Rivers Deposition Exhibit 1, is attached to hereto as Exhibit B.

spinners sometime in 2002. Messrs. Rivers and Mathis never assigned their purported property rights to the spinners to Rimmax.[3] Rivers Tr. at 77:23-78:8

Shortly after contacting RC, Plaintiff sent Jim Cooper, at the time the sales manager of RC,[4] an agreement titled Agreement Regarding Confidential Information and Intellectual Property (the "Agreement"). A copy of the Agreement is attached to hereto as Exhibit C. The Agreement purports to restrict RC's use of certain intellectual property, confidential and proprietary information that Plaintiff would provide to RC. Importantly, the Agreement excludes from its definition of "confidential and proprietary information," information that is "publicly and openly known and in the public domain." Without Rick Ball's (RC's founder and President) knowledge or authorization, Mr. Cooper executed the Agreement. Upon information and belief, Plaintiff was aware that Mr. Cooper did not have authority to execute the Agreement on RC's behalf.

In 2001, prior to Messrs. Rivers's and Mathis's claimed invention of the spinners, Amen Motorcycles, which, upon information and belief, is a Tennessee corporation, manufactured and assembled spinners that it installed on a motorcycle (the "Amen Spinner"). See Deposition Transcript of Rick Ball on October 2, 2006 ("Ball Tr.") at 35:19-36:9 (the Ball Tr. is attached hereto as Exhibit D). Amen Motorcycles publicly displayed the Amen Spinner at a motorcycle convention at Daytona Beach, Florida, in October of 2001 called Biketoberfest. (Id.)

On or about October 7, 2002, Plaintiff requested Mr. Ball to sign a Supply Agreement that contained restrictions on the use of allegedly confidential and proprietary

---

[3]     Neither Rimmax nor Messrs. Rivers or Mathis has a utility patent on the spinners.

[4]     Mr. Cooper is no longer employed by RC.

information similar to the Agreement. Due to this and other offensive provisions in the Supply Agreement, Mr. Ball refused to sign the Supply Agreement and sent Plaintiff a marked-up version of the Supply Agreement noting his objections to its terms. See Ball Tr. at 115:7-14.

Messrs. Rivers and Mathis subsequently visited RC's plant in Kentucky to discuss RC's manufacture of the spinners. Mathis Tr. at 56:11-23. During this meeting, Messrs. Rivers and Mathis discussed the spinners with Mr. Ball and Charles Skarsaune, a mechanical engineer and, at the time, employee of RC. As admitted by Plaintiff in its responses to RC's interrogatory requests, Messrs. Rivers and Mathis did not provide RC with any engineering specifications or detailed drawings regarding the engineering of the spinners. See Response No. 25 to Plaintiff's Reply to Defendant's First Set of Interrogatories Directed to Plaintiff (the "Interrogatory Responses") (conceding that RC designed and engineered the spinners and that "RC Components was engaged by [Plaintiff] to design and engineer the spinners"). A copy of the Interrogatory Responses is attached hereto as Exhibit E.

Plaintiff requested that RC design, engineer, and manufacture the spinners for Plaintiff. Ball Tr. at 38:2-4; Interrogatory Response No. 26. RC agreed to undertake this engagement, but no formal contract regarding the manufacture of the spinners was ever executed by the parties. Mathis Tr. at 50:22-24; Rivers Tr. at 180:21-181:3 (stating that RC never signed the Supply Agreement, which would have governed the terms of the parties business dealings). Because RC did not receive any design or engineering information from Plaintiff, Mr. Skarsaune engineered and produced a prototype of the spinners on his own. Ball Tr. at 90:2-91:4.

Based upon this verbal agreement, RC designed, engineered, and purchased inventory to manufacture the spinners. Plaintiff eventually placed 54 orders for sets of spinners (i.e., both a front and rear wheel) and RC, after it had engineered and designed the spinners, began their manufacture. Ball Tr. at 118:17-119:1. The parties are in agreement that: 1) Plaintiff paid RC between $80,000 to $85,000 for the 54 orders of spinner sets, Mathis Tr. at 88:10-89:19; Rivers Tr. at 222:18-223:22, and 2) that the least expensive spinner set would cost Rimmax $2,400 with the most expensive being approximately $3,300. Mathis Tr. at ¶ 93:3-10; Rivers Tr. at 235:5-19. RC never agreed that $80,000-$85,000 would constitute full payment for the purchase of the inventory for and manufacture of the spinners and, indeed, 54 sets of spinners at $2,400 a set (assuming for the sake of argument that Rimmax only ordered the least expensive sets), required Plaintiff to pay $129,600 to RC. Plaintiff's payment of $84,000 thus represented a partial payment for the services RC provided, inventory RC purchased and goods RC manufactured for Plaintiff. When Plaintiff failed to pay the remaining amounts for its orders, RC stopped their manufacture. Ball Tr. at 118:20-119:1, 62:6-15.

III.    PLAINTIFF'S BUSINESS.

Plaintiff was formed in August of 2002 by Messrs. Rivers and Mathis, to be a distributor of motorcycle wheels manufactured by a third-party with minimum startup capital. Mathis Tr. at 15:11-17. Plaintiff has never been profitable. Mathis Tr. at 166:15-167:3.

Through Messrs. Rivers's and Mathis's attendance at motorcycle shows, magazine advertisements, and alleged product placements in two unidentified and potentially unreleased music videos, Plaintiff developed fewer than two dozen customers. A copy of Plaintiff's customer list is attached hereto as Exhibit F.

## SUMMARY OF ARGUMENT

Based upon the evidence provided by Plaintiff and the deposition testimony of its principals, RC is entitled to summary judgment on all Counts of the Complaint.

The Court should grant RC summary judgment on the breach of contract claim because: 1) Plaintiff has failed to provide any evidence establishing that it owns any intellectual property used by RC – indeed, Plaintiff has provided no proof that it owns any intellectual property related to the allegations in the Complaint; 2) Plaintiff failed to pay in full for its orders with RC, thus excusing RC's performance on an alleged verbal contract; and 3) the statute of frauds precludes Plaintiff's action for recovery of a partial payment and related damages.

RC is entitled to summary judgment on Plaintiff's fraud claim because this claim is predicated entirely on the wholly unsubstantiated allegation that Plaintiff is the owner of certain intellectual property (which it is not) and that RC was required to deliver 34 out of 54 sets of spinners to Plaintiff when Plaintiff failed to pay in full for its orders (RC delivered 20 sets before stopping further manufacture and delivery due to Plaintiff's failure to pay).

RC is entitled to summary judgment on Plaintiff's claim for intentional interference with contractual relations because: 1) Plaintiff has provided no proof that RC improperly interfered with its contractual relations; and 2) Plaintiff's failure to pay in full for the orders it placed with RC provides RC with a complete defense to this claim as, under applicable law, RC merely acted to protect its legitimate interests.

Finally, RC is entitled to summary judgment because Plaintiff is not the real party in interest under Rule 17 (a) of the Federal Rules of Civil Procedure (the "Federal Rules"). As testified by Mr. Rivers, he and Mr. Mathis allegedly hold the proprietary

rights to intellectual property. They never assigned these rights to the Plaintiff. Accordingly, Rule 17 (a) of the Federal Rules requires this Court to grant RC summary judgment as Plaintiff is not the real party in interest in this dispute.

For these reasons, the Court should grant RC summary judgment on all Counts of the Complaint.

<u>STANDARD</u>

A court shall grant a motion for summary judgment where there is no genuine issue as to any material fact, and where the moving party is entitled to a judgment as a matter of law. <u>See</u> Fed. R. Civ. P. 56 (c). The party moving for summary judgment bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of the record which demonstrate the absence of a material issue of fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party must then go beyond the pleadings and by affidavits, depositions, or otherwise, designate facts that show there is a genuine issue for trial. Fed. R. Civ. P. 56 (e); <u>Celotex</u>, 477 U.S. at 324; <u>Velten v. Regis B. Lippert</u>, 985 F.2d 1515, 1523 (11th Cir. 1993).

In order to defeat a motion for summary judgment, Rule 56 requires the non-moving party to "do more than simply show that there is some metaphysical doubt as to the material facts." In the language of the Rule, the non-moving party must come forward with "specific facts showing that there is a genuine issue for trial." <u>Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). If the record as a whole could not lead the trier of fact to find in favor of the non-moving party, there "is no genuine issue for trial." <u>Id</u>. (quoting Fed.R.Civ.P. 56). Indeed, a mere scintilla of evidence in support of the non-moving party

is insufficient for a court to deny summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

Summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 322. After adequate time for discovery, Rule 56 (c) "*mandates* the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. (emphasis added).

ARGUMENT

I.    RC IS ENTITLED TO SUMMARY JUDGMENT ON
      THE BREACH OF CONTRACT AND FRAUD CLAIMS.

The Court should grant RC summary judgment on Counts One and Two of the Complaint, breach of contract and fraud. These Counts of the Complaint include three separate alleged wrongful acts committed by RC, failure to return Plaintiff's confidential information and proprietary technology, unauthorized use of Plaintiff's confidential information and proprietary technology and failure to deliver 34 of 54 sets of spinners Plaintiff ordered. As set forth below, the Court must grant RC summary judgment on Counts One and Two because: 1) Plaintiff has no confidential information or proprietary technology regarding the spinners; 2) Plaintiff failed to pay in full for its orders, thereby excusing RC's further performance; and 3) the statute of frauds precludes Plaintiff's action for the recovery of monies it paid to RC and related damages.

A.    Plaintiff Has No Confidential Information Or Proprietary Technology.

As set forth in the Complaint, Plaintiff predicates certain of its allegations in its breach of contract and fraud claims on the Agreement. In Count One, Plaintiff alleges that Mr. Cooper executed the Agreement, which prohibited RC from manufacturing and selling spinners without Plaintiff's permission. Specifically, Plaintiff asserts that RC "breached the [A]greement when it failed to return to plaintiff its confidential information and proprietary technology" after their business relationship ended and by using this confidential information and proprietary technology "for purposes other than manufacturing plaintiff's invention." Complaint at ¶¶ 61, 63-65. In Count Two, fraud, Plaintiff alleges that RC "falsely represented that it would not use plaintiff's confidential information and proprietary technology for any purpose other than to manufacture plaintiff's invention." Complaint at ¶ 68.

As discussed above, the Agreement excludes from its definition of Plaintiff's "confidential and proprietary information," information that is "publicly and openly known and in the public domain" and/or information that "becomes publicly and openly known and in the public domain through no fault of recipient." Pursuant to the terms of the Agreement, the technology embodied in the spinners manufactured by RC did not, and does not, include Plaintiff's confidential or priority information based on these exclusions.[5]

---

[5]    In addition, RC disputes that Plaintiff "invented" the spinners. As admitted by Plaintiff in its interrogatory responses, it was RC that designed and engineered the spinners. See Interrogatory Response No. 25. Plaintiff "brought [RC] no documentation, no writ[ing] on a napkin, no blueprint, no nothing of how to make the spinning wheel." Ball Tr. at 90:2-6.

First, Amen Motorcycles, a motorcycle manufacturer, manufactured and assembled spinners that (a) embody the same technology as the spinner Plaintiff claims it invented and (b) publicly displayed the Amen Spinner almost a year prior to Plaintiff's claimed invention. According to RC's expert, Nathan Cloud, a professional engineer with over 41 years of engineering experience, the Amen Spinner revealed the same spinner technology embodied in the spinners RC produced for Plaintiff because it is based on the same concepts, utilizes the same technology, and functions in a manner virtually identical to the spinners RC manufactured for Plaintiff. See Expert Report of Nathan Cloud (the "Cloud Report") at ¶ 8. A copy of the Cloud Report is attached to hereto as Exhibit G; Ball Tr. at 36:3-9.

Mr. Rivers conceded this point during his deposition. At his deposition, counsel for RC showed Mr. Rivers a cross-sectional drawing of the Amen Spinner and asked him the following questions:

> Q:    . . . If RC was making a spinner, a spinner hub based on this cross-sectional diagram [of the Amen Spinner, Rivers Deposition Exhibit 1[6]] and selling it, would they be selling your technology?
>
> A:    If they were using this right here [referring to the Amen Spinner]?
>
>     . . . .
>
> Q:    So could RC be selling this spinner then and they wouldn't be infringing on your technology or be using your technology?
>
> A:    They would be infringing.
>
> Q:    They would be?

_____

[6]     A copy of Rivers Deposition Exhibit 1 is attached to the Rivers Tr.

A:    They would be infringing on our technology, yes.

     . . . .

Q:    . . .  [Tell me] if the way it [the Amen Spinner] works would be the same as the way yours [the spinner manufactured by RC for Plaintiff] works?

A:    Because it would be infringing on our product, yes.

Rivers Tr. at 127:22-24, 128:1, 128:23-130:3.  Plaintiff's testimony that RC would be "infringing" on Plaintiff's technology if it manufactured and sold a spinner based on the engineering drawings for the Amen Spinner corroborates Mr. Cloud's conclusion that the Amen Spinner and the spinner Plaintiff alleges it invented are based on the same technology.

Further, Amen Motorcycles publicly displayed the Amen Spinner at a motorcycle convention at Daytona Beach, Florida, in October of 2001.  Ball Tr. at 35:16-22; see also Rivers Deposition Exhibit 3 (Amen Motorcycles' Website, discussing the date of their display of the Amen Spinner in 2001) (a copy of Rivers Deposition Exhibit 3 is attached to the Rivers Tr.).  This display was unquestionably done both openly and publicly.

These undisputed facts prove that the technology and concept of the spinners was publicly and openly known and in the public domain prior to Plaintiff's alleged invention of the spinners.  Accordingly, under the terms of the Agreement (which Plaintiff drafted), it does not have any proprietary or confidential information relating to the spinners.  See Agreement at ¶ 2(iv)(a)-(b).

In addition to the public display of the spinner in 2001, Plaintiff does not have a claim that RC breached the Agreement or committed fraud by manufacturing and selling spinners because the spinner technology became publicly and openly known through no fault of RC.  Agreement at ¶ 2(iv)(b)(stating that confidential information or proprietary

technology does not include "information [that] becomes publicly and openly known and in the public domain through no fault of [RC]").    Mr. Mathis testified during his deposition that Reflections Polishing LLC, an after-market motorcycle parts company, sells an "add-on" spinner that uses the same technology as the spinner RC manufactured for Plaintiff.  Mr. Mathis testified:

> Q:    And then these spinners you saw with Reflection Polishings, please describe them to me.
>
> A:    I would call them a spinner add-on. . . .
>
> Q:    Okay.  And how did this work differently than this spinner that Rimmax sold?
>
> A:    The only thing that I would say was different from my recollection was the fact that they began to produce and sell – it wouldn't come with a wheel. . . .
>
> Q:    But was the concept the same?  Would you have to use the same hub and bearing to make this work?
>
> A:    Definitely would probably have to use the same bearing, definitely.
>
> Q:    What about the hub?
>
> A:    It depends on how the hub was on the motorcycle. But I would assume so, yes.
>
> Q:    And did you give this technology to Reflections Polishing?
>
> A:    No, we did not.  They were purchasing product from us, so I believe what they did was they just reverse engineered it[.]
>
> Q:    Do you know if they're still selling spinners?
>
> A:    They still have them on their web site.
>
> . . .
>
> Q:    So they're in the public domain?

A:    Yes they are.

Q:    And these are based on the same technology . . . as
       the Rimmax Wheels?

A:    Yes, sir, I believe.

Mathis Tr. at 116:21-118:119:1; see also Rivers Tr. at 135:6-11 (stating that Reflections Polishings took the spinner Rimmax sold it to a machinist in order for the machinist to reverse engineer the spinner so that Reflections Polishings could manufacture and sell its own spinner wheels). Because Reflections Polishings obtained the spinner technology by reverse engineering the spinners Rimmax sold and openly displays this information on its website and through sales to the public, the spinner technology became openly known through no fault of RC. Thus, per the express terms of the Agreement, Rimmax has no confidential information or proprietary technology regarding the spinners. See Agreement at ¶ 2(iv)(b).

In sum, Plaintiff has provided no evidence that it has confidential information or proprietary technology regarding the spinners; to the contrary, all of the evidence presented has demonstrated that, under the terms of the Agreement, Plaintiff has no proprietary rights related to the spinners. Accordingly, RC is entitled to summary judgment on Plaintiff's claims for breach of contract and fraud, both of which are predicated on Plaintiff's assertion that RC wrongfully used its confidential information and proprietary technology.

B.    Plaintiff Has Admitted That They Made Only
       Partial Payment For Their Orders, Thus Excusing
       RC's Performance.

Plaintiff alleges that RC breached a contract with it when it refused to ship 34 of 54 sets of spinners Plaintiff ordered. Complaint at ¶ 59. Because Plaintiff failed to pay

for the wheels it ordered, however, RC is entitled to summary judgment on this claim as well. See Ky. Rev. St. § 355.2-511(1)[7] ("Unless otherwise agreed tender of payment is a condition to the seller's duty to tender and complete any delivery").

Prior to Plaintiff placing its orders with RC, RC sent to Plaintiff a price quote detailing the cost of the spinners. As testified by Messrs. Mathis and Rivers during their depositions, this price quote stated that a set of spinners would cost Plaintiff between $2,400 to $3,600. Mathis Tr. at 93:3-10; Rivers Tr. at 235:5-19. Even assuming that Plaintiff ordered only the least expensive spinners from RC, orders for 54 sets of spinners would have cost Plaintiff $129,600. Plaintiff, however, only paid RC between $80,000 to $85,000 for its orders. Mathis Tr. at 88:10-89:19; Rivers Tr. at 222:18-223:22. This constituted only a partial payment for the spinners it ordered and, pursuant to section 355.2-511(1) of the Uniform Commercial Code, as adopted in Kentucky (the "UCC"), the failure to pay for the remaining amount of its orders excused RC's further

---

[7] As this Court has subject matter jurisdiction over this action pursuant to diversity jurisdiction, RC submits that Kentucky law governs the tort counts, and part of the breach of contract count (with the exception of the alleged breach of the Agreement), as all of the allegedly wrongful actions took place in Kentucky, including the manufacture, sale, and shipping of the spinners. See David B. Lilly Co., Inc. v. Fisher, 18 F.3d 1112, 1118-19 (3d Cir. 1994) (holding that a federal court sitting in diversity jurisdiction applies the choice of law rules of the state in which it sits and that Delaware has adopted the "most significant relationship" test for determining which state's substantive tort laws apply)(citation omitted); Niemann v. Rogers, 802 F. Supp. 1154, 1156, 1156 n.1 (D. Del. 1992) (same); Chase Manhattan Mortgage Corp. v. Advanta Corp., Civ. A. NO. 01-507 KAJ, 2005 WL 2234608, at *12 (D. Del. Sept. 8, 2005) (same). Nevertheless, even if this Court were to conclude that Delaware and not Kentucky substantive law applied, the result would be the same as the version of the UCC adopted by Delaware contains no material relevant differences from the version adopted by Kentucky. See 6 Del. C. § 2-511 (providing that "[u]nless otherwise agreed tender of payment is a condition to the seller's duty to tender and complete any delivery").

performance and delivery of the spinners.[8]   Accordingly, RC is entitled to summary judgment on Plaintiff's claim that RC's refusal to deliver 34 of the 54 sets of spinners constituted a breach of contract.

> C.    Plaintiff's Breach Of Contract Claim Is Precluded
>        By The Statute Of Frauds.

RC is also entitled to summary judgment on Plaintiff's breach of contract claim that is predicated on the allegation that RC did not timely deliver the spinners and by refusing to return $31,096.80 because these claims are barred by the statute of frauds.

The only contract purportedly executed by both parties was the Agreement.  The parties never signed a distributor or supply agreement that governed the terms of RC's engineering, manufacture, sale and delivery of the spinners to Plaintiff.

Section 355.2-201 of the UCC provides, in pertinent part, that:

> (1) Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker.

Ky. Rev. Stat. § 355.2-201(1).  In the instant case, it is undisputed that Plaintiff's order of 54 sets of spinners was for more than $500.  Rivers Tr. at 217:11-18.  Further, it is undisputed that RC never signed the Supply Agreement Plaintiff sent to RC, Mathis Tr. at 50:22-24; Rivers Tr. at 180:21-181:3, which was an agreement that would have governed

---

[8]    Due to Plaintiff's order of 54 sets of spinners, RC was required to purchase new materials and parts inventory necessary to manufacture all 54 sets which cost it more than the $80,000 to $85,000 Plaintiff actually paid.  See Ball Tr. at 62:6-15.

the terms of the parties' obligations for the purchase, manufacture, sale and delivery of the spinners.

During his deposition, Mr. Mathis also confirmed that there was no contract setting a specific delivery date for the delivery of the wheels RC was manufacturing for Plaintiff, Mathis Tr. at 62:3-8, and no written contract governing the terms of distribution of the spinners. Mathis Tr. at 60:4-6. Indeed, Mr. Mathis testified during his deposition that "there were obviously no guidelines governing this relationship [between RC and Plaintiff.]" Mathis Tr. at 128:19-22.

Because there was no writing governing the terms of RC's and Plaintiff's business relationship, Plaintiff's breach of contract claim is barred by the statute of frauds. See Ky. Rev. Stat. § 355.2-201 (1).

II.    PLAINTIFF HAS PROVIDED NO PROOF THAT RC INTERFERED WITH ITS CONTRACTUAL RELATIONS.

In the Complaint, Plaintiff also alleges that RC is liable to it under the tort of intentional interference with contractual relations. See Complaint at ¶¶ 74-83. In this Count, Plaintiff actually groups two separate theories under one claim: intentional interference with performance of a current contract and interference with another's prospective contractual relations. RC is entitled to summary judgment on this Count because 1) Plaintiff has provided no proof that RC caused or induced third parties not to perform contracts or enter into contractual relations with Plaintiff, and 2) RC has a complete defense to a claim of intentional interference with contractual relations because it stopped manufacturing and delivering wheels as a result of Plaintiff's failure to pay in full for its orders.

Kentucky courts follow the Restatement (Second) of Torts, and hold that the *prima facie* elements of a claim of intentional interference with an existing contract are: 1) intentional and improper interference with 2) the performance of a contract, 3) between another and a third person, 4) by inducing or otherwise causing the third person not to perform the contract. *See* Harrodsburg Indus. Warehousing, Inc., LLC v. Migs, LLC, 182 S.W.3d 529, 533 (Ky. Ct. App. 2005) (citing The Restatement (Second of Torts § 766 (1979)). The doctrine of intentional interference with a prospective contractual relations requires proof of: 1) intentional and improper interference 2) with another's prospective contractual relation. Id. (citing The Restatement (Second) of Torts § 766B (1979)). However, "[i]t is a defense if the alleged interferer has acted in good faith to protect a legitimate interest of his own." *See* Bourbon County Joint Planning Commission v. Simpson, 799 S.W.2d 42, 45 (Ky. Ct. App. 1990) (citations omitted). Applying these principles to the facts of this case, RC is entitled to summary judgment on Count Three of the Complaint.

First, Plaintiff has failed to provide any reliable proof or testimony supporting its allegation that RC improperly interfered with its contractual relations, whether current or prospective, by telling individuals not to purchase spinners from Plaintiff. *See* Complaint at ¶ 77. When asked about these allegations, Mr. Mathis testified that:

> [T]here was a rumor going around in the industry that people were contacting RC Components, and RC Components was telling them that they were going to be producing the spinners so don't buy from Rimmax Wheels. *This was just a rumor we were hearing. I mean we never confront [sic] Rick Ball about that.*

Mathis Tr. at 123:9-14 (emphasis added). When counsel for RC asked Mr. Mathis who was telling him these rumors, Mr. Mathis responded that he did not remember. *See*

Mathis Tr. at 127:3-4.   Apart from these unsupported (and unsupportable) hearsay statements, Plaintiff has provided no substantiation for its claim that RC was telling Plaintiff's customers not to purchase spinners from it.

RC is also entitled to summary judgment on this Count of the Complaint because RC has a complete defense under applicable jurisprudence: it stopped manufacturing the spinners for Plaintiff to protect a legitimate interest of its own.  See Bourbon, 799 S.W.2d at 45.  As discussed above, it is a condition to performance that the Plaintiff paid for the spinners; Plaintiff's failure to do so excused RC's performance.  See Ky. Rev. Stat. § 355.2-511 (1); Bourbon, 799 S.W.2d at 45.

Plaintiff's failure to pay in full for the spinners it ordered also establishes that RC did not act with malice or commit any other wrongful conduct.  See Harrodsburg, 182 S.W.3d at 534.  RC simply stopped manufacturing the spinners because Plaintiff failed to pay in full for its orders, orders which caused RC to purchase raw materials and parts inventory necessary to manufacture 54 sets of wheels.   Ball Tr. at 62:12-15. Accordingly, the Court should grant RC summary judgment on Count Three of the Complaint.

III.    RC IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CLAIM FOR LOST PROFITS DAMAGES.

The Court should also grant RC summary judgment on Plaintiff's claim for lost profits damages because Plaintiff cannot prove such damages with any degree of reasonable certainty.[9]

---

[9]     Plaintiff did not include an express demand for lost profits damages in the Complaint but has raised this demand during discovery.  See Rivers Tr. at 275:17-23.

Kentucky courts follow the Restatement (Second) of Contracts, which provides that lost profits "[d]amages are not recoverable for loss beyond an amount that the evidence permits to be established with reasonable certainty." Pauline's Chicken Villa, Inc. v. KFC Corp., 701 S.W.2d 399, 401 (Ky. 1986); James Med. Equip. v. Allen, Nos. 2005-CA-000128-MR, 2006 WL 2788435, at *9 (Ky. App. Sept. 29, 2006). "[T]he loss of anticipated profits may be recovered when they can be legally ascertained, and when there is no lack of certainty on account of being too remote, conjectural, and speculative." See Advanta USA, Inc. v. Farmers Fertilizer Co., Inc., No. 2005-CA-000662-MR, 2006 WL 1561489, *3 (Ky. App. June 9, 2006) (inner quotation omitted). "[L]oss of profits must be established by at least a reasonable probability and not on sheer speculation and guesswork." See Compressed Gas Corp., Inc. v. U.S. Steel Corp., 857 F.2d 346, 353 (6th Cir. 1988) (citation omitted). Further, "if the business is a new one . . . proof will be more difficult." Pauline's Chicken, 701 S.W.2d at 401.[10] In light of evidence and testimony, it is clear that Plaintiff's claim of lost profits is wholly speculative and cannot be proven with reasonable certainty.

As set forth in the Expert Report of Tara A. Stephenson (the "Stephenson Report"), Plaintiff was a development stage business with minimal start-up capital, which

_____

[10]    Delaware law is similar. See, e.g., Ronald v. Gannett Co., Inc., 480 A.2d 662, 668 (Del. Super. 1984)(stating that "Courts have required that loss of future profits be established by substantial evidence and not be left to speculation. This requirement has given rise to a concept that as a general rule, evidence of expected profits from a new business is too speculative, uncertain and remote to be considered where there is no history of prior profits")(citations omitted); In re Heizer Corp., Civ. A. No. 7949, 1990 WL 70994, at *3 (Del. Ch. March 26, 1990)(holding that the plaintiff "was a 'start-up' company whose ability to generate profits, in any amount, was entirely speculative. Under these circumstances, it is unlikely that the trust could establish damages in the form of lost profits with sufficient certainty to obtain a recovery")(citation omitted).

increased the probability of its business failure.  A copy of the Stephenson Report is attached hereto as Exhibit H.  Plaintiff had no pre-existing customer base and generated fewer than two dozen customers from the attendance at motorcycle trade shows, magazine advertisements, and product placements in two unidentified and potentially unreleased music videos.  Stephenson Report at ¶¶ 1-5.  Sales to these customers never generated a profit for Plaintiff; indeed, Plaintiff has never been profitable from its formation through the present date,  Mathis Tr. at 166:15-167:3, and even failed to maintain sufficient liquidity to pay for the spinners it ordered from RC.  Plaintiff also appears to have operating for a short time, from late 2002 to August or September of 2003, Ball Tr. at 58:9-60:4, nor filed any tax returns.[11]  Further, neither Messrs. Rivers nor Mathis has any track-record of being able to successfully run a business – they have founded and managed other companies, but none of them were ever profitable.  Mathis Tr. at 7:9-23; Rivers Tr. at 10:14-11:4, 11:16-12:13.

RC has requested the amount of Plaintiff's lost profits claim, however, Plaintiff has never quantified its alleged damages.  See Interrogatory Response No. 36; Mathis Tr. at 162:5-9.  Indeed, Mr. Rivers provided testimony about the wholly speculative nature of the claim for lost profits:

> Q:    . . . [W]hat are you basing your lost profits damages claim on?  How do you calculate that?
>
> A:    I don't know how you calculate that.
>
> Q:    So you don't have any idea what Rimmax's lost profits would be?

---

[11]    RC has repeatedly requested the production of Plaintiff's tax returns but none have been produced.

A:      I don't know.

Rivers Tr. at 279:22-280:4. If even Plaintiff cannot calculate these damages – the party with the greatest interest in establishing their reliability – it is evident that these damages are wholly speculative and cannot be established with a reasonable certainty. See Compressed Gas Corp., 857 F.2d at 353; Pauline's Chicken, 701 S.W.2d at 401. Accordingly, the Court should grant RC summary judgment on Plaintiff's claim for lost profits damages.

IV.    RIMMAX IS NOT THE REAL PARTY IN INTEREST.

The Court should also grant RC summary judgment on all of Plaintiff's claims regarding its claimed intellectual property related to the spinners because Rimmax is not the real party in interest for such claims. Rule 17 (a) of the Federal Rules of Civil Procedure (the "Federal Rules") provides that "[e]very action shall be prosecuted in the name of the real party in interest." Fed. R. Civ. P. 17 (a). "Under [Rule] 17(a), '[t]o qualify as a real party in interest, the plaintiff must possess a right to relief under the substantive law creating the right that he is suing upon.'" See Synthes (U.S.A.) v. Globus Medical, Inc., No. Civ.A. 04-CV-1235, 2005 WL 2233441, *10 (E.D.Pa. Sept. 14, 2005).

In the instant case, Rimmax is not the real party in interest for any claim involving the legal right to the technology embodied in the spinners. As testified by Mr. Rivers during his deposition, the spinner technology is personally owned by Mr. Mathis and himself. Rivers Tr. at 77:23-78:8. It was never assigned to Rimmax. Id. Accordingly, Plaintiff is not the real party in interest to bring any claim based thereon and the Court should grant RC summary judgment on Counts One and Two of the Complaint. See Fed. R. Civ. P. 17 (a).

Further, once the Court dismisses the Complaint pursuant to Rule 17 (a) of the Federal Rules, the Court should preclude Mr. Mathis from attempting to replead the Complaint under his name because he does not have standing to bring an action based on the spinner technology. Mr. Mathis filed for Chapter 7 bankruptcy on October 12, 2005, and did not list any intellectual property related to the spinners on his schedules. (See Schedule B of Summary of Schedules (D.I. 14) in In re Marc C. Mathis, Bankr. C.A. No. 05-13885 (Bankr. D. Del. 2005))(a copy of the Summary of Schedules is attached hereto as Exhibit I.) Mr. Mathis was granted a discharge on March 24, 2006. (D.I. 24 in Bankr. C.A. No. 05-13885.) Because Mr. Mathis failed to list this intellectual property on his bankruptcy schedules, he lacks standing to prosecute a claim based on that property. See Brooks v. Beatty, 25 F.3d 1037 (1st Cir. 1994) (holding that a plaintiff lacked standing to prosecute an action because it did not schedule the property as an asset in its bankruptcy schedules); Watson v. H.J. Heinz Co., Nos. 03-1433, 03-1434, 2004 WL 1254600, at *2 (Fed. Cir. June 8, 2004) (affirming the district court's ruling that the plaintiff lacked standing to bring his claims as he failed to schedule the intellectual property on which his claim was based in his bankruptcy schedules).

For these reasons, the Court should grant RC summary judgment and dismiss the Complaint pursuant to Rule 17 (a) of the Federal Rules.

CONCLUSION

For the reasons set forth above, the Court should grant RC summary judgment on all Counts of the Complaint.

WHEREFORE, RC requests that the Court enter an order substantially in the form attached hereto as Exhibit J granting it summary judgment on all Counts of the

Complaint, dismissing the Complaint with prejudice, and granting RC such other and further relief as the Court deems appropriate.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*Will H. Sudell*

William H. Sudell, Jr. (#463)
Curtis S. Miller (#4583)
1201 N. Market Street
P. O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
    Attorneys for Defendant
    RC Components, Inc.

December 1, 2006
546819