# EXHIBIT D

CIVIL ACTION NO. 06-029-SLR          UNITED STATES DISTRICT COURT
                                     FOR THE DISTRICT OF DELAWARE


RIMMAX WHEELS, LLC,
a Delaware limited liability company               PLAINTIFF


VS.            (VIDEO DEPOSITION FOR PLAINTIFF)


RC COMPONENTS, INC.,
a Kentucky corporation                             DEFENDANT

                    :



                         ***    ***    ***

DEPONENT:               RICK BALL

DATE:                   OCTOBER 2, 2006

                         ***    ***    ***



APRIL KAUFMAN PEARSON,

REPORTER

_____
_____

                    PEARSON COURT REPORTING
                         P. O. BOX 5
                    BOWLING GREEN, KY  42102-0005
                       FAX (270)746-0848
                         (270)781-7730
                              1

I N D E X

EXAMINATION

BY MS. SULTON:                    4 - 119

2

The video deposition of RICK BALL, taken
pursuant to Notice, in the law offices of Wyatt, Tarrant and
Combs, 918 State Street, Bowling Green, Warren County,
Kentucky, on Monday, October 2, 2006, at 2:05 p.m. (Central
Time), upon oral examination and to be used in accordance with
the Kentucky Rules of Civil Procedure.

A P P E A R A N C E S

For the Plaintiff:          Ms. Anne T. Sulton
(Via Telephone)             Sulton Law Offices
                            Attorneys at Law
                            P. O. Box 2763
                            Olympia, WA  98507

For the Defendant:          Mr. Curtis Miller
(Via Telephone)             Attorney at Law
                            1201 North Market Street
                            P. O. Box 1347
                            Wilmington, DE  19899-1347

Also Present:               Mr. Mark Mathis
                            Ms. Betty Stone, Videographer

*** *** ***

3

2          MR. MILLER:  This is Curtis Miller.  At
3    this time, Mr. Ball would like to make a request to review and
4    sign the transcript after it's been transcribed.
5          MS. SULTON:  This is Ms. Sulton.  No
6    objection.
7          RICK BALL, called on behalf of the
8    Plaintiff, being first duly sworn, was examined and deposed as
9    follows:
10                    EXAMINATION
11   BY MS. SULTON:
12         Q.     Will you state your name and
13   spell your first and last name for the record, please?
14         A.     Full name is Fredric Richard
15   Ball, F-R-E-D-R-I-C, Richard, R-I-C-H-A-R-D, Ball, B-A-L-L.
16         Q.     And how are you employed, sir?
17         A.     President of RC Components.
18         Q.     What is RC Components?
19         A.     We are a wheel manufacturer for
20   the after-market motorcycle industry.
21         Q.     What does that mean?
22         A.     We manufacture motorcycle wheels
23   for after-market companies, American IronHorse and different
24   companies, and we have a dealer and retail base world-wide.
25         Q.     How long has RC Components been
                                    4

1    in business?
2          A.     Since April of 1989.
3          Q.     Who are the incorporators?
4          A.     Richard Ball, myself, and my
5    wife, Barbara Ball.
6          Q.     Any other incorporators?
7          A.     No.
8          Q.     Who has served as a member of
9    the board of directors of RC Components?
10         A.     Richard Ball, myself, and my
11   wife, Barbara Ball.
12         Q.     And what is your title as a
13   member of the board?
14         A.     I believe that would be
15   president, also.
16         Q.     And do you hold any other
17   titles?
18         A.     No.
19         Q.     And what is your wife's title as
20   a member of the board?
21         A.     I do not know her specific title
22   on her business card.  Internal operations, I'd say.
23         Q.     Have any other persons served as
24   members of the board of directors?
25         A.     No.
                                    5

1  Q.  Who are the officers of RC
2  Components?
3  A.  The same.
4  Q.  Who serves as the vice
5  president?
   A.  No one.  It's just us two.
7  Q.  Who serves as the treasurer?
8  A.  I'm not sure.
9  Q.  And who serves as the secretary?
10  A.  Not sure how it's written.
11  Q.  Have your corporate statements
12  been timely filed with the state in which the business is
13  incorporated?
14  A.  Yes.
15  Q.  And you're incorporated in
16  Kentucky?
17  A.  Yes.
18  Q.  And you're incorporated as a --
19  as a -- as a corporation or some other business form?
20  A.  Corporation.
21  Q.  And in the documents that you
22  filed with the State of Kentucky, have you identified any other
23  persons as officers or board of director members?
24  A.  I do not believe so.
25  Q.  Can you tell me what the

6

1  organizational chart of RC Component looks like?
2  MR. MILLER:  Objection.  Vague.
3  Q.  Can you tell me what the
4  structure of the company is in terms of how duties are outlined
5  and -- and the lines of responsibility of the various people
6  associated with the company?
7  A.  Are we talking 2002 or today?
8  Q.  Today.
9  A.  Today would be myself as
10  president.  Coming down would be to my wife, internal
11  operations, and then down to vice president of operations, and
12  then coming over to director of sales and marketing, human
13  resources, and finance -- financials, excuse me.
14  Q.  Any -- anything else?
15  A.  Oh, from there it would break
16  down to each machine shop manager, chrome manager, polishing
17  manager, shipping manager.  I believe that's it.  We would have
18  a research and development person, but they're not -- no one in
19  that position right at this second.
20  Q.  Any others?
21  A.  Well, I -- I guess from there,
22  you would break down to lead people of each department.  And we
23  would have a lead person in sales and -- well, we'd also have a
24  purchasing manager, also, that would be in charge of inventory.
25  Q.  Now, you mentioned that -- if I

7

1  understood your testimony correctly, that you have a person
2  that serves or a position identified as director of
3  sales/marketing and human resources.  Is that all one position?
4  A.  No, two different -- two
5  different positions.
6  Q.  Okay.  So there's a director of
7  sales and marketing, and then another director of human
8  resources?
9  A.  No, just a -- a manager of human
10  resources.
11  Q.  Okay.  So director of sales and
12  marketing and manager of human resources; is that correct?
13  A.  Correct.
14  Q.  Who currently serves as the vice
15  president of operations?
16  A.  Eric Morton.
17  Q.  And how long has Mr. Morton been
18  with the company?
19  A.  About two-and-a-half, three
20  months.
21  Q.  Who was your vice president of
22  operations before Mr. Morton?
23  A.  I did not have.
24  Q.  Who currently serves as your
25  manager of purchasing?

8

1  A.  Gene Grinstead.
2  Q.  And how long has Mr. Grinstead
3  served in that capacity?
4  A.  I believe five-plus years.
5  Q.  Who serves as your director of
6  sales and marketing currently?
7  A.  Jason Spillers.
8  Q.  How long has Mr. Spillers been
9  in that capacity?
10  A.  In that capacity, about one
11  year.
12  Q.  And who served in that capacity
13  before then?
14  A.  Did not have.
15  Q.  Who serves as your director of
16  human resources -- of human resources?
17  A.  No -- no director.  Stan
18  Creekmore.
19  Q.  And how long has Mr. Creekmore
20  been the manager of human resources?
21  A.  Two months.
22  Q.  And who served in that capacity
23  before Mr. Creekmore?
24  A.  Kelly Taylor.
25  Q.  And how long did Kelly Taylor

9

1  serve in that capacity?
2          A.    I believe just -- just over two
3  years.
4          Q.    Who serves as your manager or
5  director of financials?
6          A.    Gail Harney.
7          Q.    And how long has Harney served
8  in that capacity?
9          A.    Five-plus years.
10         Q.    Who serves as manager of your
11 machine shop department?
12         A.    Currently, Rick Brenell.
13         Q.    And how long has Mr. Brenell
14 served in that capacity?
15         A.    Probably two months.
16         Q.    Who served in that capacity
17 before Mr. Brenell?
18         A.    Edna Harnice.
19         Q.    And how long did Harnice serve
20 in that capacity?
21         A.    Three to six months.
22         Q.    And who served in that capacity
23 before Harnice?
24         A.    Chuck Skarsaune.
25         Q.    How long did Mr. Skarsaune -- is

10

1  that the correct way to pronounce it?
2          A.    Skarsaune.  It's tough.
3          Q.    Okay.  So how long did Mr.
4  Skarsaune serve in that capacity?
5          A.    I believe almost three years.
6          Q.    Who served before Mr. Skarsaune?
7          A.    I don't remember his name right
8  this second.
9          Q.    Who serves as the manager of
10 your chrome department?
11         A.    Michael Daugherty.
12         Q.    And how long has Mr. Daugherty
13 served in that capacity?
14         A.    Two years-plus.
15         Q.    And before him who?
16         A.    Michael Hoke, Mike Hoke.
17         Q.    Can you spell the last name for
18 me?
19         A.    H-O-K-E.
20         Q.    And how long did Mr. Hoke serve
21 in that capacity?
22         A.    A year-plus.  I'm not sure
23 exact.
24         Q.    Who before Mr. Hoke?
25         A.    Dennis Babbs.  Mike Hoke would

11

1  have probably been longer than one year.  Maybe even two-plus
2  years.
3          Q.    And before him was Dennis Babbs?
4          A.    Babbs.
5          Q.    And how long did Mr. Babbs serve
6  in that capacity?
7          A.    Six months.
8          Q.    And before Mr. Babbs?
9          A.    Did not have a chrome shop.
10         Q.    Who serves as your manager of
11 polishing?
12         A.    Darrell Keene.
13         Q.    King, K-I-N-G?
14         A.    No, Keene, K-E-E-N-E, I believe.
15         Q.    And how long has Mr. Keene
16 served in that capacity?
17         A.    Three-plus years.
18         Q.    Who is the manager of shipping?
19         A.    Edna Harnice.
20         Q.    She has two -- she previously is
21 the same Edna Harnice who was your machine shop manager?
22         A.    Yes.  We moved her from machine
23 shop and promoted her to shipping assembly.
24         Q.    Is the department called
25 shipping and assembly or just shipping?

12

1          A.    Shipping, slash, receiving,
2  slash, building -- or assembly.
3          Q.    And how long has she served in
4  that capacity?
5          A.    It may be two months now.
6          Q.    And before that, who served in
7  the capacity of manager of shipping, receiving and assembly?
8          A.    Did not have.
9          Q.    Does anyone currently serve in
10 the position of manager of research and development?
11         A.    No.
12         Q.    Who previously served in that
13 capacity?
14         A.    Bobby Cataldo.
15         Q.    And when did he leave?
16         A.    Two weeks ago, I believe.
17         Q.    How long did Mr. Cataldo serve
18 as your manager of research and development?
19         A.    Five-plus years.
20         Q.    You said you have lead people of
21 each department?
22         A.    Yes.
23         Q.    Who serves as a lead person in
24 the sales and marketing department?
25         A.    We have Blake Milton.

13

1    Q.    And how long has Mr. Milton
2  served as the lead for your sales and marketing?
3          A.    I don't exactly know when we
4  started.  Less than six months, I believe.
5          Q.    And who was serving in that
6  capacity before Mr. Milton?
7          A.    No one.
8          Q.    Who serves as the lead person in
9  your human resources department?
10         A.    Human resource is just one
11 person.
12         Q.    Who serves as your lead person
13 in financial?
14         A.    Do not have a lead person in
15 financial.
16         Q.    Who is your lead person in the
17 machine shop?
18         A.    I'm not sure who it actually is.
19         Q.    Who is the lead person in your
20 chrome shop?
21         A.    Not sure right at the present
22 time.
23         Q.    Who is the lead person in your
24 polishing department?
25         A.    Not sure of last name.  Quin
                                14

1  Davenport, I believe.
2          Q.    And how long has Davenport
3  served as a lead person for the polishing department?
4          A.    It would be a couple of years.
5  Excuse me, his name is Quinton, not Quin, I'm sorry.
6          Q.    And before Quinton, who served
7  as the lead person in the polishing department?
8          A.    I'm not sure if we had that
9  position before him.
10         Q.    Who serves as the lead person in
11 the shipping, receiving, and assembly department?
12         A.    We have -- I can't think of
13 their names right now.
14         Q.    Do you have more than one?
15         A.    Yes.  It's a two-part -- two
16 people.
17         Q.    And do you know how long they've
18 served in their capacity as lead in your shipping,
19 receiving and assembly department?
20         A.    Roughly one-year neighborhood.
21         Q.    And before them, do you know who
22 served in that capacity?
23         A.    A Richey and I'm not sure of his
24 last name.
25         Q.    Do you know how long Richey
                                15

1  served in that capacity?
2          A.    I believe one to two years.
3          Q.    And before Richey, do you know
4  who served in that capacity?
5          A.    Do not remember.
6          Q.    You would have records that will
7  identify the names of those persons, but you don't remember?
8          A.    We should be able to get the
9  names, just don't know if their titles would be there.
10         Q.    Would you be able to tell what
11 their titles are if you look at a name?
12         A.    Possible.
13         Q.    How many people does RC
14 currently employ?
15         A.    I believe we're right at eighty.
16         Q.    And how many people did RC
17 employ in 2005?
18         A.    Somewhere between a -- one
19 hundred and a hundred and fifteen.
20         Q.    And what about in 2004?
21         A.    Probably about the same.
22         Q.    A hundred to a hundred and
23 fifteen?
24         A.    Yes.
25         Q.    And what about in 2003?
                                16

1          A.    Probably in the seventy to as
2  high as one hundred.
3          Q.    And what about in 2002?
4          A.    In the fifty to seventy.
5          Q.    And what about in 2001?
6          A.    Probably in the forty to fifty.
7          Q.    You testified that last year you
8  had about a hundred to a hundred and fifteen people working for
9  you --
10         A.    Yes.
11         Q.    -- or working at RC?
12         A.    Yes.
13         Q.    Why did RC drop from a hundred
14 or a hundred and fifteen to eighty persons in the last year?
15         A.    Sales are down is one of the
16 reasons.
17         Q.    Do you know why the sales are
18 down?
19         A.    Our after-market industry is --
20 in my opinion, the after-market industry is -- is flooded and
21 it's making its own shift.
22         Q.    Is RC Components a publically
23 traded company?
24         A.    No.
25         Q.    Are you listed as an employee of
                                17

1  RC?
2          A.    Yes.
3          Q.    And your job title, again, is?
4          A.    President.
5          Q.    And as president, what are your
6  job duties?
7          A.    To oversee the company, all the
8  final financial issues of spending and expenditures, along with
9  various other things.
10         Q.    Tell me what those various other
11 things are.
12         A.    It all depends on the moment
13 since I do not have a structure.  And since I was a
14 self-started company, it's pretty much a one-on-one issue if it
15 comes up.
16         Q.    Who has the authority to sign
17 binding contracts for the company?
18         A.    Myself.
19         Q.    Does your wife ever have the
20 authority to sign binding contracts?
21         A.    She technically has the
22 authority.  She never has, other than maybe health insurance.
23         Q.    Who has the authority to sign
24 checks on behalf of RC?
25         A.    Myself, Barbara, maybe Gail
                                18

1  Harney.
2          Q.    Barbara whom?
3          A.    Barbara Ball, my wife.  I'm
4  sorry.
5          Q.    Oh, I'm sorry.  Excuse me.  And
6  then Gail Harney, who is your manager of financial; correct?
7          A.    Correct.
8          Q.    Have you ever given anybody else
9  authority to sign checks for RC?
10         A.    Yes.
11         Q.    And to whom else have you given
12 authority to sign checks?
13         A.    I do not know specifically right
14 this second.  Managers, when I was smaller, they were able to
15 do -- to do it, also, for if I was out of town.
16         Q.    Did you ever give Jeff Cooper
17 authority to sign checks?
18         A.    I do not believe so.
19         Q.    Did you ever give anyone other
20 than yourself or your wife the authority to sign contracts?
21         A.    Absolutely not.
22         Q.    What is your compensation for
23 your services as president to the company?
24         A.    I'm sorry, I did not -- did not
25 understand.
                                19

1          Q.    What is your compensation for
2  the services you provide to the company?
3          A.    My pay?
4          Q.    Yes, sir.
5          A.    Oh, five hundred thousand a
6  year.
7          Q.    And what are your benefits?
8          A.    Regular company benefits; health
9  insurance, retirement program, paid -- paid holidays, paid
10 vacation.
11         Q.    How much paid vacation?
12         A.    I don't take it.
13         Q.    How much do you earmark for
14 yourself if you wanted to take it?
15         A.    I guess I would get three weeks.
16         Q.    And how much is your wife
17 compensated?
18         A.    Two hundred thousand.
19         Q.    Plus benefits?
20         A.    Excuse me?
21         Q.    Two hundred thousand per year
22 plus benefits?
23         A.    Yes.
24         Q.    So is it fair to say that
25 between you and your wife, you compensate yourself at about a
                                20

1  million dollars a year?
2          A.    I believe that's seven hundred
3  thousand.
4          Q.    I said with benefits.
5          A.    Oh, with -- I wouldn't know what
6  the benefit percentage is, if it's fifteen percent or so, but
7  it wouldn't be that much for mine.  It may be fifteen to twenty
8  percent on a ten-dollar-an-hour employee, but not us.  It
9  may --
10         Q.    Okay.
11         A.    -- it may be one percent.
12         Q.    What were the gross revenues of
13 the company in 2005?
14         A.    I do not know the actual number
15 in front of me -- or have it in front of me.
16         Q.    Do you have an estimate?
17         A.    I -- fourteen to fifteen
18 million, somewhere in there.
19         Q.    What are your gross revenues so
20 far this year in 2006?
21         A.    I'm not too sure.  I believe
22 they're almost to ten million.
23         Q.    And what about 2004, what do you
24 think your gross revenues were?
25         A.    I believe they were in the
                                21

fourteen to fifteen million, also.

Q.    And what about in 2003?

A.    Between thirteen and fourteen million.

Q.    And what about in 2002?

A.    I -- I don't even -- I'm not sure.

Q.    Can you give me your best estimate?

A.    I'm pretty sure it was under ten million.

Q.    What was the company's net profit in the year 2005?

A.    I'm -- I'm not sure.

Q.    Can you give me your best estimate?

A.    I -- I don't want to speculate.

Q.    Did you bring with you today the papers that I requested in your notice of deposition?

A.    No.

Q.    Why not?

THE WITNESS:  Curtis?

MR. MILLER:  Anne, this is Curtis Miller, for the record.  The -- the documents you requested were not subpoenaed and were not requested in your discovery request.

22

MS. SULTON:  They were requested in the notice of deposition.

MR. MILLER:  And the notice of deposition is not a proper way to request documents.

MS. SULTON:  Can you cite me some authority for that, Mr. Miller?

MR. MILLER:  I'm not aware of any authority that says that's a permissible way to obtain documents.

MS. SULTON:  Can you cite me some authority for why it is not a permissible way to request documents of a company president?

MR. MILLER:  One, this wasn't a 30(b)(6) deposition.  Two, you didn't serve a subpoena.  So the Federal Rules say it's not permissible.

MS. SULTON:  Can you cite me the rule that says it's not permissible.

MR. MILLER:  Can you cite me the rule that says it is?

MS. SULTON:  I don't know of any rule that says it's not permissible.  I was asking you if you're saying that he didn't bring it because it's not permissible for me to ask for it this way, then I'm asking you to cite me the rule, because I don't know of any rule that says that.

MR. MILLER:  I can tell you that Rule 30

23

for the Federal Rules of Civil Procedure --

MS. SULTON:  Uh-huh.

MR. MILLER:  -- which discuss depositions --

MS. SULTON:  Yes.

MR. MILLER:  -- does not say that that is a permissible way.

MS. SULTON:  Where does it say that in Rule 30?

MR. MILLER:  It doesn't say you can do it that way.

MS. SULTON:  It doesn't say I can't, correct?

MR. MILLER:  And it doesn't say you can.

MS. SULTON:  Okay.  But I'm -- but I'm saying it -- the rule doesn't say that I can't ask for it this way, correct?

MR. MILLER:  Well, I'm not being deposed, so I don't know what you're trying to get at with me, but I can tell you the rule does not say that's a permissible way of obtaining documents.  The Federal Rules are explicit in the way you can obtain documents --

MS. SULTON:  Did you advise --

MR. MILLER:  -- and that's not one of them.

24

MS. SULTON:  Okay.  Well, let me continue with the deponent.  Thank you.

Q.    Mr. Ball, were you advised not to bring those documents with you to the deposition today?

MR. MILLER:  Objection.  It's attorney/client privilege and work product privilege.

MS. SULTON:  Are you instructing him not to answer?

MR. MILLER:  Rick, do not -- yes.  Rick, do not answer that question.  That's a question about your attorney/client privilege and work product privilege.

MS. SULTON:  I'm not asking a question about attorney/client privilege.

Q.    I'm simply asking, Mr. Ball, did anybody tell you not to bring the documents I requested you bring to the deposition?  Did anybody tell you that?

MR. MILLER:  Same objection.  Rick, don't answer that question.

Q.    Do you have any idea what your net profits were in the year of 2004?  And when I say you, I'm talking about RC Components.

A.    I do not.

Q.    What about 2003?

A.    I remember that one, around two point five million.

25

```
1       Q.      What about 2002?
2       A.      I do not remember that one.
3       Q.      And can you give me your best
4  estimate?
        A.      No.
        Q.      What about 2001?
7       A.      Do not know at all.
8       Q.      Who is Jim Cooper?
9       A.      An ex-employee sales manager.
10      Q.      And when did he start working
11 for you?
12      A.      I do not have the dates.
13      Q.      How long did he work for you?
14      A.      A year-plus, I believe.
15      Q.      What did he do before he came to
16 work for you?
17      A.      He had an insurance company.
18      Q.      Do you know what kind of
19 insurance he sold?
20      A.      The company was called Shelter
21 Insurance.  He was a franchisee of the Bowling Green store, I
22 guess you would say.
23      Q.      And when did he leave your
24 employ?
25      A.      I do not remember exact dates.
                        26
```

```
1       Q.      When he was employed for you,
2  what did he do for you as your manager of -- or director of
3  sales and marketing?
4       A.      Well, he didn't do anything for
5  marketing.  His job title was manager -- sales manager.  He
6  answered phone calls, took phone -- took orders over the phone,
7  did technical support, problem-solved customers that had
8  issues, ran -- a little bit of running reports on the sales for
9  the month and where we were, how we were doing, ideas of going
10 forward, how to increase sales, come up with a game plan for
11 those kinds of things.
12      Q.      When you said he provided
13 technical support, can you define or describe that for me?
14      A.      If we sent you a wheel and it
15 didn't fit your bike properly or if something was bad on it,
16 you would call in.  You know, if you were wanting to return it
17 or wonder if some -- maybe you thought something was -- a part
18 was missing to finish assembly, he would go -- try and go
19 step-by-step to see if the customer was installing the product
20 wrong, if you may have had the wrong part or things like that
   in nature.
        Q.      Did he have a technical
23 background so that he could provide that kind of support to the
24 customer?
25      A.      Not a technical background, no.
                        27
```

```
1       Q.      So if there was a technical
2  question that came up, would he refer that call to someone else
3  in the company?
4       A.      If it starts -- if it started
5  getting real technical, as fitment and measurements, it would
6  have gone to our research and development area.  At that time,
7  it would have been Bobby Cataldo and/or myself.
8       Q.      How much was he paid for
9  compensation?
10      A.      Jim Cooper?
11      Q.      Yes, sir, Mr. Cooper.
12      A.      Probably low thirty thousand
13 range.
14      Q.      Why did he leave your
15 employment?
16      A.      He found a very good job in
17 Indianapolis.
18      Q.      I received an address saying
19 that he still lives in Bowling Green?
20      A.      He is --
21      Q.      Does he live in Bowling Green or
22 does he live in Indianapolis?
23      A.      He was -- he never officially
24 sold his house or moved.  He worked in Indianapolis under one
25 year.  I don't know the exact time, but then ended up coming
                        28
```

```
1  back to Bowling Green officially.  His wife and kids never
2  left.
3       Q.      So he still lives in Bowling
4  Green?
5       A.      Yes.
6       Q.      And what does he do now?
7       A.      I am not too sure.
8       Q.      When was the last time you spoke
9  with him?
10      A.      Three months or -- or -- two to
11 four months.
12      Q.      When he left the company, did
13 you leave on good terms -- did he leave on good terms?
14      A.      Yes.
15      Q.      Did you ever have any
16 conversations with Mr. Cooper about the plaintiff in this case,
17 Rimmax Wheels?
18      A.      Since his unemployment -- or
19 since his non-employment with RC?
20      Q.      At any time.
21      A.      Well, of course, when he worked
22 at RC, yes.
23      Q.      And what kind of conversations
24 did you have with him when he worked for RC?
25      A.      Taking the orders, those kinds
                        29
```

1  of issues. Then when he left, I believe I talked to him one
2  time about it, that he may be getting depositioned.
3          Q.      Let me go back to the
4  conversations you had with him when he was still employed by
   RC.
6          A.      Okay.
7          Q.      What kind of conversation did
8  you have with him about taking the orders?
9          A.      Well, as sales manager, any --
10 or I shouldn't say any, accounts that may have product that is
11 not in our catalog, in our price sheet, he would be -- be more
12 in charge of as far as taking orders, making sure the part
13 numbering system is correct, of things like that.
14         Q.      Did you ever have any
15 conversations with him about Rimmax wanting to order items from
16 RC?
17         A.      Yes. He was -- he was the one
18 doing the part numbers into the system. He probably is the
19 person that made the part numbers for our computer system.
20         Q.      And how would he have known how
21 to make part numbers for the computer system?
22         A.      Talking with myself and probably
23 Chuck Skarsaune and Gene Grinstead of all the parts to make --
24 build the material for the part numbers and making of the part
25 numbers, or at least entering the part numbers into the system

                                30

1  and pricing.
2          Q.      And how would he have known --
3  that is, Mr. Cooper, how would he have known what parts were
4  needed so that he would know how to assign numbers to those
5  parts in your computer system?
6          A.      Through myself.
7          Q.      And how would you have known?
8          A.      Through development and figuring
9  out what we need and building the parts from there.
10         Q.      Let me ask you, if I could,
11 about Charles Skarsaune.
12         A.      Okay.
13         Q.      What years did he work for your
14 company?
15         A.      I'm -- I'm not sure exact hire
16 or when he left, the exact dates.
17         Q.      And when he worked for you, what
18 were his job titles?
19         A.      Machine shop manager. I'm not
20 sure if part of research and development, too, I believe.
21         Q.      And what were his job duties?
22         A.      To run the machine shop. He
23 oversaw the machine shop and headed two employees to program
24 product, draw -- draw parts and program and continuous
25 improvement for the machine shop.

                                31

1          Q.      What was his compensation?
2          A.      Somewhere around seventy
3  thousand, I believe.
4          Q.      When did he stop working for RC?
5          MR. MILLER: That's been asked and
6  answered.
7          Q.      If you remember.
8          A.      I do not. It was -- I believe
9  it was this year.
10         Q.      And why did he leave?
11         A.      Took another job.
12         Q.      Working for whom?
13         A.      A company called Novitec.
14         Q.      Is it based there in Bowling
15 Green?
16         A.      No, it is not.
17         Q.      Where is it based?
18         A.      Franklin, Kentucky, twenty miles
19 away.
20         Q.      I was given a Bowling Green
21 address for him. Does he still live in Bowling Green?
22         A.      I believe so, yes.
23         Q.      And do you know what he does for
24 Novitec?
25         A.      I'm not sure exact title.

                                32

1          Q.      Do you know what kind of company
2  Novitec is in terms of the product or services it provides?
3          A.      They're a machine shop.
4          Q.      And do you know whether or not
5  his rate of compensation is higher or lower than what RC was
6  paying him?
7          A.      I have no idea.
8          Q.      Did he leave on good terms?
9          A.      Yes.
10         Q.      When did RC Components make its
11 first set of spinner wheels?
12         A.      Not -- not sure exact date.
13         Q.      Do you remember the month?
14         A.      No.
15         Q.      Do you remember the year?
16         A.      It was at the end of one or
17 beginning of another.
18         Q.      Do you remember what year?
19         A.      I'm not sure. It was right at
20 the border line of the two years.
21         Q.      Well, which two years are those,
22 sir?
23         A.      Just went by out of my head. I
24 apologize.
25         Q.      I'm sorry, so let me repeat the

                                33

1  question.
2          A.    Or can we come back to it?  I'm
3  not hiding it from you, I just absolute went blank.
4          Q.    Would it be fair to say that you
5  made the first set of spinners in or around 2002 or the first
   part of 2003?
7          A.    Thank you.  Yes.
8          Q.    All right.  So sometime toward
9  the end of 2002 or at the beginning of 2003, RC made the first
10 set of spinners; correct?
11         A.    Correct.  It would have been
12 very late 2002 or beginning of two thousand -- early, early
13 2003.
14         Q.    What prompted RC to make
15 spinners?
16         A.    Rimmax Wheels.
17         Q.    And what is Rimmax Wheels?
18         A.    They were two -- two individuals
19 that wanted to make spinning wheels.
20         Q.    And prior to you -- prior to RC
21 having contact with Rimmax Wheels, had RC been in the process
22 of making or developing spinners?
23         A.    No.  I did not want to make
24 spinners.
25         Q.    Were you aware of spinners?
                          34

1          A.    Yes.
2          Q.    And how did you become aware of
3  spinners?
4          A.    Through a company called Amen
5  Chassis in Tennessee.
6          Q.    Spell that.
7          A.    Excuse me?
8          Q.    I'm sorry, spell that for me,
9  please.
10         A.    Amen, A-M-E-N --
11         Q.    Uh-huh.
12         A.    -- Chassis, C-H-A-S-S-I-S.
13         Q.    And they're located where?
14         A.    I'm not sure of the town.
15 Eastern Tennessee, I believe.
16         Q.    And how did you become aware of
17 Amen Chassis doing spinner wheels?
18         A.    They're a chassis builder in the
19 motorcycle industry.  And in October, 2001 at Daytona Beach,
20 the motorcycle industry has a bike rally called Biketoberfest
21 and his motorcycle with spinning wheels was on display at their
22 booth on Beach Street in October of 2001.
23         Q.    And the spinner wheels that you
24 saw Amen Chassis bring to the bike meeting in Daytona Beach,
25 was it the same spinning wheels that Rimmax Wheels asked you to
                          35

1  make?
2          A.    Yes.
3          Q.    And how do you know it was the
4  same wheel?
5          A.    The -- the way a spinning wheel
6  has to be made is really only one way it can be made and that
7  is the spinning portion of the wheel has to be spinning
8  separately or able to spin separately from the wheel itself.
9  And that is why.
10         Q.    Now, Amen Motorcycles, they're
11 also called, correct?
12         A.    I believe so, yes.
13         Q.    And they are known for making
14 really unique wheels that looks like they also make a spokeless
15 motorcycle wheel; correct?
16         A.    Correct.
17         Q.    And do you know if they
18 currently are making the spinner wheel?
19         A.    I do not know if they're
20 currently making them or not.
21         Q.    Is it fair to say that Amen
22 Motorcycles is one of your competitors?
23         A.    I don't really consider them a
24 competitor, no.
25         Q.    Do they buy after-market product
                          36

1  wheels from RC?
2          A.    I believe they have.
3          Q.    Have they bought any lately?
4          A.    I would not know.
5          Q.    Who would know what kind of
6  wheels Amen Motorcycles might have purchased from RC?
7          A.    Our software would be able to
8  look that up.
9          Q.    And when you say our software,
10 what does that mean?
11         A.    Our mass ninety software, we can
12 look Amen Chassis up and see if they've bought any product from
13 us this year or last year.
14         Q.    And -- and can you do that with
15 any of the people or companies that have purchased from you?
16         A.    Yes.
17         Q.    And can you do that for any kind
18 of product they may have purchased?
19         A.    You would have to go through
20 each invoice at that point in time.
21         Q.    But all that is computerized?
22         A.    Yes.
23         Q.    So if we wanted to know how many
24 spinner wheels have been sold and to whom, you could do that
25 through your software; correct?
                          37

1          A.     Correct.
2          Q.     So RC made spinners at the
3  request of Rimmax?
4          A.     Yes.
5          Q.     And how did that come about?
6          A.     They would have had to have
7  called RC Components and was transferred to me and the talking
8  began.
9          Q.     And do you -- now, before Rimmax
10  had contacted you, had you ever heard about Rimmax before?
11         A.     No.
12         Q.     So at some point, you talked
13  with the people at Rimmax; correct?
14         A.     Correct.
15         Q.     And what was the content of your
16  conversation with the people at Rimmax about these spinner
17  wheels that they wanted to make?
18         A.     That they had a patented product
19  that they wanted me to make for them.
20        MR. MATHIS:  Mark Mathis.
21        MS. SULTON:  All right.  We're in the
22  middle of a deposition, Mark, so if you'll stand by quietly
23  while I ask the questions.
24        MR. MATHIS:  Not a problem.
25        MS. SULTON:  I'm sorry, please read back
                     38

1  the last question if you would -- to the court reporter.
2        (Whereupon the reporter read the previous
3           questions: Okay.  And what was the
4           content of your conversation with the
5           people at Rimmax about these spinner
6           wheels that they wanted to make?)
7        MS. SULTON:  Okay.  Thank you.
8          Q.     Sir, if you would answer that
9  question, please.
10         A.     They had a patented -- they told
11  me they had a patented product and was wondering if I would be
12  interested in producing it for them.
13         Q.     And what did you tell them?
14         A.     I would be.
15         Q.     And what happened after that
16  conversation?
17         A.     We -- they let me know what the
18  product was.  And I told them at that point in time, spinning
19  wheels, how do you have a patent on it and -- because of the
20  fact I already knew about Amen Chassis or Amen Motorcycles as
21  already producing motorcycle wheels for spinners and it was
22  very popular for, of course, motorcycle -- or wheels for
23  cars -- spinning wheels for cars.
24         Q.     And then what was said?
25         A.     We just continued.  I would
                     39

1  still be interested in making them, but I just constantly
2  questioned their patented product.
3         Q.     You were doing this by telephone
4  or writing letters?
5         A.     At this time, it was --
6         Q.     How were you communicating?
7         A.     At this time, it was by
8  telephone.
9         Q.     And was there more than one
10  telephone conversation?
11         A.     I'm sure there was.
12         Q.     Okay.  After you questioned
13  their having a patented product, then what did you say?
14         A.     Well, I -- they informed me of
15  what made theirs difference -- different than the other product
16  and I just didn't understand, but I was still interested in
17  making their product.
18         Q.     And then what happened?
19         A.     They -- I guess a couple more
20  phone calls, do not know how many, and then they wanted to come
21  out -- I asked them to come out and they came out, however that
22  ended up, to come out and see our facility and we could sit
23  down and discuss and they would be able to bring their idea to
24  us and see if we could produce it.
25         Q.     And did they come down after you
                     40

1  invited them to come down?
2         A.     They did.
3         Q.     And tell me about that meeting
4  when they came down to visit the RC facility.
5         A.     We sat and talked.  They didn't
6  bring down any pictures or drawings or blueprints of what they
7  were talking about.  And at that point in time, it was just
8  that they had spinning rims they wanted somebody to make.
9         Q.     And do you recall how long that
10  initial meeting lasted?
11         A.     I'm sure it was in the --
12  walking through the plant, a tour if you will call it, and
13  talking and discussing different ideas, different ways to do
14  it, probably two to four hours.
15         Q.     Did they meet with any persons
16  when they visited RC other than you?
17         A.     I know Chuck Skarsaune was there
18  and I'm not sure if Jim Cooper was in the room at that time or
19  not.
20         Q.     Anyone else?
21         A.     There may have been.  I would
22  not -- I do not remember.
23         Q.     Was there any agreement reached
24  during that visit about whether or not RC would make the
25  spinning wheels for Rimmax?
                     41

1      A.      I don't know if you would call
2  it an agreement, but both parties left on a positive feeling of
3  going forward.
4              Q.      Is it fair to say that there was
5  an understanding that Rimmax would be using RC to help Rimmax
6  make the spinners?
7      A.      I don't know if I would say
8  understanding, but very likely that it would be happening.
9              Q.      Did you, after that meeting,
10 contact the people at Amen Chassis or Amen Motorcycles to
11 inquire of them about the spinning wheel that they had or to
12 notify or to alert them that Rimmax was asking that a similar
13 product be made by RC?
14     A.      No.
15             Q.      Why not?
16     A.      Not my responsibility.  I'm not
17 the one with the patent pending or patent, as they said it.
18             Q.      Do you know whether or not Amen
19 Chassis had a patent on a spinning motorcycle wheel?
20     A.      I do not believe they did, but I
21 do know they made it back in 2001.
22             Q.      Now, as you talked with the
23 people from Rimmax, their idea of the spinning wheel, did it
24 sound like what you had seen Amen Chassis with?
25     A.      Yes.

                          42

1              Q.      After the meeting -- after the
2  Rimmax people visited RC Components, were there any other
3  communications between RC and Rimmax?
4      A.      After they left our facility?
5              Q.      Yes, sir.
6      A.      Yes.
7              Q.      Who initiated the very next
8  communication?
9      A.      I -- I wouldn't remember that.
10             Q.      Can you tell me what you do
11 remember about your subsequent communications; that is, the
12 communications after the Rimmax people visited the RC facility?
13     A.      I can't tell you, of course,
14 word for word or dates or how many times, but obviously, we
15 talked again since then a few times and continued moving
16 forward to where we talked about building inventory, producing
17 and manufacturing the product and assembling the product at our
18 facility rather than shipping the parts separately back to
19 Rimmax.  We talked about how the whole process would work, part
20 numbering --
21             Q.      Did you --
22     A.      I'm sorry?
23             Q.      I'm sorry.  Did you finish your
24 answer?  I apologize.
25     A.      Well -- and the building of the

                          43

1  part numbers, what product they were going to sell.  I helped
2  them in what would sell, what wouldn't sell, of certain things
3  of just my knowledge of being in the industry.
4              Q.      Any other communications that
5  you can recall?
6      A.      Not specifically.  There may
7  have been other stuff, I just don't remember.
8              Q.      Is it fair to say, Mr. Ball,
9  that at some point there was an understanding that RC would
10 build and assemble the spinner wheel for Rimmax?
11     A.      Yes.
12             Q.      And what was your understanding
13 of what the two companies responsibilities would be?
14     A.      I would -- I would build the
15 inventory, build the product.  They were to go out and find
16 customers to buy their product and I would ship to them and
17 they would ship to warehouse their product at their place of
18 business, and then ship their product to the customers.
19             Q.      And who was supposed to pay for
20 all of this stuff?
21     A.      Well, I would imagine Rimmax.
22 If they're going to be selling it, they should be paying for
23 it.
24             Q.      So it was your understanding
25 that Rimmax would pay you for these services; is that correct?

                          44

1      A.      Absolutely.  Yes.
2              Q.      Did you ever accept any money
3  from Rimmax?
4      A.      Yes.
5              Q.      How much money did you accept
6  from Rimmax?
7      A.      I do not know the exact dollar
8  amount.
9              Q.      When you accepted the money from
10 Rimmax, were you accepting the money because you were building
11 the spinner wheel and shipping it for them?
12     A.      I was building inventory, the
13 different parts, ordering the different parts to make the
14 spinning wheels, and then would and did start shipping the
15 completed assembly to Rimmax.
16             Q.      Did you ship to Rimmax
17 customers?
18     A.      Yes.  They had us drop ship to
19 some customers, also.
20             Q.      Define for me drop ship.
21     A.      Drop ship would be Rimmax would
22 call us and tell them to ship it straight to the customer so
23 they didn't -- so Rimmax wouldn't have to pay for U.P.S.
24 charges to their facility, and then turn around and relabel it
25 and ship it to their customer.

                          45

1    Q.    Did Rimmax tell you what kind of
2  packaging they wanted the spinner wheels drop shipped in?
3    A.    No.
4    Q.    They never told you that they
wanted it shipped in packaging with the Rimmax logo?
6    A.    No.
7    Q.    How would you know to whom to
8  drop ship the completely assembled spinner?
9    A.    They would have to send me the
10  name and address of who it's shipping to.
11    Q.    And then you would take that
12  information and put it into what, an RC Components box, and
13  then ship it?
14    A.    Correct.  And invoice Rimmax and
15  a packing slip to their customer in --
16    Q.    So inside the box or outside the
17  box, attached thereto, would be an invoice that stated --
18    A.    Not an invoice.
19    Q.    -- that the product was being
20  sent to them by Rimmax?
21    A.    No.  It would show that it came
22  from us.  And it wasn't an invoice, it was just a packing slip.
23  And I don't know if we faxed them the actual -- Rimmax, we
24  faxed them the invoice or mailed the invoice or both.
25    Q.    So at no time did you ship any

46

1  of the product to Rimmax's customers with a packaging or an
2  invoice that showed that it was a Rimmax product; is that
3  correct?
4    A.    I'm a little bit confused on --
5  the question again, please?
6    Q.    Let me try again.  Is it -- is
7  it true that at no time did RC Components, when shipping the
8  assembled spinner wheel to Rimmax customers, indicate either by
9  the packaging or the shipping label that the product was coming
10  from Rimmax?
11    A.    The customer knew that it was
12  coming from RC Components, but it was sold through Rimmax.  I
13  believe that's what you're asking, correct?
14    Q.    Well, I'm -- I'm asking you
15  whether or not the customer would know from whom the product
16  was coming when it received it, either by the packaging or by
17  the shipping label?
18    A.    Well, the shipping label would
19  have had our address -- it would say RC Components with our
20  address, but --
21    Q.    Is it fair to say that the
22  customer who received the assembled -- and that, now, is the
23  Rimmax customer who received the assembled spinner would assume
24  that the product was a RC product?
25    A.    Yes.

47

1    Q.    Did you have an agreement with
2  Rimmax that its customers would be told that what they were
3  getting was an RC product?
4    A.    Well, repeat again.  I'm sorry.
5    MS. SULTON:  I'm going to ask that you
6  read back the question, please -- the court reporter, please.
7  Thank you.
8    (Whereupon the court reporter read the
9        previous question:  Did you have an
10       agreement with Rimmax that its customers
11       would be told that what they were getting
12       was an RC product?)
13    A.    Did we have an agreement with
14  Rimmax?  No, not an agreement.
15    Q.    Did you have an understanding?
16    A.    Well, if the product came from
17  my factory, it would have to show that it came from RC
18  Components.  Then if I turned around and shipped it to Rimmax,
19  then they could have taken it out of a box, put it in their own
20  box, and then turned around and shipped it to the customer from
21  their own address.  They may have done that on the product that
22  we shipped to them directly.  I don't know.
23    Q.    Was it your understanding that
24  what Rimmax was trying to do was to build up RC Components'
25  business or to build up Rimmax's business?

48

1    MR. MILLER:  Objection.  Compound
2  question.
3    MS. SULTON:  I'll rephrase.
4    Q.    Was it your understanding, sir,
5  that Rimmax was trying to build up RC Components' business?
6    A.    No, they were not.
7    Q.    What was your understanding?
8    A.    That they used my name to help
9  grow their business.
10    Q.    And how did they do that?
11    A.    Because we were in business
12  for -- since 1989, thirteen years in business, and they were a
13  brand new company.  So they teamed up with RC Components to
14  show the validity and the strength of the product.
15    Q.    And were they trying to build up
16  RC's business or were they trying to build up Rimmax's
17  business?
18    MR. MILLER:  Objection.  Compound
19  question.
20    Q.    Were they trying to build up
21  RC's business?  Was that your understanding?
22    A.    No.
23    Q.    Was it your understanding that
24  Rimmax was trying to build up its business?
25    A.    I would imagine that's their

49

1  plan.
2           Q.     Was it your understanding that
3  they were trying to build up their brand name, the brand name
4  of Rimmax?
5           A.     Yes.  And they felt they could
6  do that by co-branding with RC Components.
7           Q.     Do you have any documents that
8  show that Rimmax was trying to co-brand with RC Components?
9           A.     They had RC Components on their
10 website until we told them to take it off.
11          Q.     Hold on one second.
12                 When did you tell them to take
13 it off your website?
14          A.     Off their website?
15          Q.     Yes, sir.
16          A.     I am not exactly sure when.
17          Q.     But you're saying that it was on
18 their website?
19          A.     Yes, it was on their website.
20          MR. MILLER:  Anne, I don't know if you can
21 hear that, but there's a lot of, like, clicking or something
22 going on in the background.
23          MS. SULTON:  Yeah, but as he's talking to
24 me, I am checking things on the Internet and that's me typing
25 on the computer.
                          50

1          MR. MILLER:  Oh, okay.
2          MS. SULTON:  Yeah.  So when he says
3  something like Amen Chassis, I'm right in their website.  As he
4  says that -- when he says that RC Components co-branded with
5  Rimmax, I'm on the Internet to try to check and see if I can --
6  see if I can confirm that.  That's what I'm doing, if you want
7  to know.  Anything else?  So hold on one second, because I'm in
8  the Internet right now.  Give me one second here.
9          Q.     Okay.  Now, Mr. Ball --
10         A.     Yes.
11         Q.     -- do you know how much money
12 Rimmax sent to you?
13         A.     I do not --
14         MR. MILLER:  Asked and answered.  Rick,
15 you can answer.
16         A.     Yeah.  I -- I do not know exact
17 amount.
18         Q.     Is it fair to say they sent to
19 RC over a hundred thousand dollars?
20         A.     I'm not quite sure of that.
21         Q.     The money that they sent to you,
22 why were they sending you that money?
23         A.     For inventory, programming of
24 product, raw material, and wheels that we were shipping.
25         Q.     What's programming?
                          51

1          A.     If they wanted something special
2  on the -- of the wheel to do it a certain way, we would charge
3  them extra for that, normally a one-time fee, plus, we would
4  end up running product -- what we call end caps or hubs, refer
5  to, they would have to run twenty or twenty-five at a time and
6  they would have to pay for that, also.
7          Q.     And you said inventory.  What --
8  how are you defining inventory?  Why were they being charged
9  for inventory?
10         A.     Well, this -- a lot of this was
11 exclusive to Rimmax.  They were a brand new company.  So if I
12 ordered product, whether wheels, raw material, bearings, design
13 tooling, I would want to be paid for it and want to be paid up
14 front.
15         Q.     And they paid for the designs?
16         A.     A little bit.
17       . Q.     Who paid for the tooling?
18         A.     A little bit of Rimmax, a little
19 bit of RC.
20         Q.     Do you have any documents that
21 support what RC would have paid for tooling?
22         A.     Actual tooling, I didn't -- I
23 did not charge them for.  That was the setups on the machine,
24 whether I had to buy material to do setup fixture for, I did
25 not charge them for, as a matter of fact.
                          52

1          Q.     Did you charge them at all for
2  design?
3          A.     I think I charged them one or
4  two items for design and stopped after that.
5          Q.     What does that mean when you say
6  one or two items for design?
7          A.     I believe the first couple of
8  end caps we were charging them for of the different style
9  bikes.  And after that, we just stopped and were concentrating
10 on the wheels themselves.  As I felt more --
11         Q.     Did you --
12         A.     Excuse me?
13         Q.     I'm sorry, did you finish?
14         A.     Yes.
15         Q.     Did you charge them for
16 assembly?
17         A.     That was all inclusive on -- in
18 the price.
19         Q.     Did you charge them for raw
20 materials?
21         A.     We never got down to an official
22 Rimmax inventory.
23         Q.     Did you ever charge them for
24 shipping wheels?
25         A.     Yes.
                          53

1    Q.    Do you know how many RC
2  employees worked on the design of the spinner?
3    A.    No.  It would be hard to say.
4    Q.    Do you know how many RC
5  employees worked on the production at any stage of the spinner?
6    A.    That's a constant variable.
7    Q.    What does that mean?
8    A.    It could -- it could vary from
9  moment to moment in what production output was and various
10 things.
11   Q.    Do you know how many RC
12 employees worked on the marketing of spinners?
13   A.    Oh, I -- marketing person
14 running ads -- or in -- for them, no, matter of fact.  I
15 wasn't -- we were strictly through Rimmax.  I'm sorry.
16   Q.    I'm not certain I understood
17 your answer.
18   A.    I -- I didn't do any advertising
19 or marketing.  That was -- that was us dealing with Rimmax.
20   Q.    Okay.  So you didn't do any
21 marketing of the spinners.  It was Rimmax doing the marketing?
22   A.    Yes.
23   Q.    And there was no design work
24 done on spinners until after your meeting with Rimmax; correct?
25   A.    Yes.

54

1    Q.    There was no design work done on
2  spinners until after Rimmax sent you money; correct?
3    A.    No.  I probably started doing
4  design before that.
5    Q.    On the spinners?
6    A.    Yes.
7    Q.    And why would you have done
8  design work on the spinners if you hadn't received any money
9  from Rimmax?
10   A.    Confident level with them.  The
11 rush that they were needing product for a show at the Javits
12 Trade Center in New York, which I believe is the third weekend
13 of January.  So I was helping them out getting going on it
14 while I had the time at my facility.
15   Q.    Had they sent you any money
16 before they -- before that first prototype spinner was
17 completed?
18   A.    I would imagine so, yes.
19   Q.    And the money that they would
20 have sent you would have been to pay, in part, for design?
21   A.    For inventory and for the wheel
22 itself, of course, and a little bit of design.
23   Q.    Okay.  Was it your understanding
24 that Rimmax was paying you to provide a service and/or goods
25 for it?

55

1    A.    Yes.
2    Q.    Was it your understanding that
3  Rimmax had told -- well, let me ask the question this way.
4  Rimmax had represented to you in your communications with the
5  Rimmax people that it had some type of patents on the product;
6  correct?
7    A.    They told me that, yes.
8    Q.    And was there any point at which
9  they told you that you could, i.e., RC Components, could make
10 spinners without Rimmax being involved in the process?
11   A.    No.
12   Q.    So was it your understanding
13 that Rimmax was simply giving you this -- or giving to RC
14 Components this idea and not expecting any compensation for the
15 idea?
16   A.    I was only producing product for
17 them so they could make money on their product.
18   Q.    So at no point did Rimmax tell
19 you that you could -- or RC could make spinners and sell it as
20 an RC product; correct?
21   A.    They told me they did not want
22 me to do that.
23   Q.    And you did it anyway; right?
24   A.    Not till later.
25   Q.    What changed that made you make

56

1  the spinners even though Rimmax told you they didn't want you
2  to do that?
3    A.    Because Rimmax was, to my
4  knowledge, out of business.  They would not return phone calls
5  anymore.
6    Q.    And so you thought that you then
7  could just take the spinner idea and make money off of it for
8  RC; correct?
9    A.    The spinner idea?  That was not
10 my intentions.  They owed a lot of money in inventory.
11   Q.    And how much did they owe you in
12 inventory?
13   A.    Not sure exact, but I believe it
14 was in -- somewhere in the seventy-plus thousand dollar range.
15   Q.    So it's your testimony -- and I
16 want to make certain that we understand we're under oath,
17 sworn, and you are being videotaped --
18   A.    Yes.
19   Q.    -- it is your testimony that the
20 reason that you stopped making product for Rimmax is because
21 you believe Rimmax was out of business?
22   A.    They would not return any more
23 phone calls.  They did not send any more money.  We called
24 them.  They wouldn't return calls.  We were getting calls from
25 other people, yes.  I thought they were out of business.

57

1          Q.     And they owed you seventy
2    thousand dollars for inventory?
3          A.     If the numbers you have -- yes.
4          Q.     You gave me the number seventy
5    thousand, sir. I'm asking you how -- how much money if it
6    wasn't seventy thousand.
7          A.     You have -- you should have a
8    document of that.
9          Q.     All right. So it's your
10   testimony that the reason that RC started to make and sell
11   spinners and represent it as an RC product is what?
12             MR. MILLER: Asked and answered.
13          Q.     Can you answer my question, sir?
14             MR. MILLER: Rick, you can answer.
15          A.     Because they were out of
16   business.
17          Q.     So at no time did you receive
18   any communication or correspondence in any way from Rimmax
19   saying that they were out of business, you just assumed they
20   were out of business?
21          A.     For two to three months, they
22   would not return phone calls, no more money was coming in. I
23   presumed that to be they are out of business and we were
24   getting constant calls from their upset customers, yes.
25          Q.     Did you ever get any

                               58

1    correspondence from an attorney by the name of Patrick Mixon?
2          A.     Yes.
3          Q.     And when did you start getting
4    correspondence or communication from Attorney Mixon?
5          A.     I do not have dates.
6          Q.     Was there anything in the
7    correspondence or communication that you received from Attorney
8    Mixon that led you to believe that Rimmax was out of business?
9          A.     That was before all that
10   happened.
11          Q.     I'm sorry, let me try to go back
12   and create a time line. Was it your understanding that Rimmax
13   was out of business before or after you began receiving
14   communications from Attorney Mixon?
15          A.     It would have been afterwards.
16          Q.     How much after?
17          A.     Two to four months.
18          Q.     So two to four months after your
19   last communication with Attorney Mixon was when you made the
20   assumption that Rimmax was out of business?
21          A.     Through non-returning of phone
22   calls and constant customers calling, yes.
23          Q.     Did you ever check the Internet
24   to see if Rimmax was still advertising the product on the
25   Internet or if its Internet site was still up and active?

                               59

1          A.     Their Internet site was up. I
2    don't know how active it was, but we called the phone numbers
3    that we had and, again, they did not respond to our messages of
4    let's talk.
5          Q.     Do you have phone records that
6    confirm your sworn testimony, sir?
7          A.     Not three years later, no.
8          Q.     You don't maintain your phone
9    records as part of your income tax records?
10          A.     No. The phone bill, maybe. Not
11   the records, no.
12          Q.     Well, the phone bills that you
13   have for the company or either your cell telephone, do they
14   record the long distance telephone numbers that are called from
15   the company or from your cell phone?
16          A.     I don't believe so, as far as on
17   the bill itself. No.
18          Q.     What is the name of the
19   telephone company that you use?
20          A.     What is it here? South Central
21   Bell.
22          Q.     Have you changed phone services
23   from South Central Bell since 2002?
24          A.     I'm not sure if we have or not.
25          Q.     And so it's your testimony that

                               60

1    South Central Bell did not give you a detailed list of numbers
2    called from the business?
3          A.     If they --
4             MR. MILLER: Objection. Anne, I think
5    you're misquoting a witness. I believe Mr. Ball testified that
6    he didn't know.
7             MS. SULTON: That's not what I heard him
8    say. Let me re-ask the question.
9          Q.     Sir, is it your testimony that
10   the telephone company your business uses does not provide you,
11   along with the bill, a listing of the long distance telephone
12   calls made from the company office?
13          A.     They -- I'm sure they do. And
14   I'm stating that I don't believe we keep all the number part of
15   the phone bill and we just keep the bill part itself that would
16   not have that. So I do not believe we could go back and
17   recreate that.
18          Q.     Did you receive letters from
19   Attorney Mixon demanding return of over thirty thousand dollars
20   of money that Rimmax claimed was owed it by RC; correct?
21          A.     Correct.
22          Q.     Did you ever respond to any of
23   those letters?
24          A.     Yes.
25          Q.     And what was the reason you gave

                               61

1  for failing to return the thirty thousand-plus that was being
2  demanded by Rimmax?
3          MR. MILLER:  Objection.  That's an
4  argumentative question.  It also assumes --
5          MS. SULTON:  Let me rephrase it.
6          Q.      Why did RC refuse to send to
7  Rimmax the thirty thousand dollars-plus demanded in the letters
8  sent by Attorney Patrick Mixon?
9          A.      The reason we would -- would
10 have refused is because of the inventory issue at stake, which
11 was well above the thirty thousand dollars.
12         Q.      Let me make certain I
13 understand.  So RC had purchased seventy thousand dollars worth
14 of inventory that Rimmax had not paid for?
15         A.      Correct.
16         Q.      What are the components of the
17 inventory?
18         A.      All of the parts that it would
19 take to make wheels, front wheel blanks, rear wheel blanks, the
20 spinner blanks, plus the product that has been produced in a
21 non-complete form, but not raw inventory, the bearings, both
22 the spinner bearings and the bearings for the wheels, the end
23 caps, polishing, machining, chroming, all that would become
24 inventory of dollars it cost RC Components to produce the
25 spinning wheels.

                              62

1          Q.      Does the -- does the polishing
2  and the chroming -- is that a part of inventory?
3          A.      If we had polished and chromed
4  it, yes.
5          Q.      Okay.  So you had inventory that
6  was not polished or yet chromed; correct?
7          A.      Correct.  There would be raw
8  inventory, machining, polishing, chroming, and then the start
9  of assembly.
10         Q.      Okay.  But I'm talking just
11 about inventory now.
12         A.      Yes.
13         Q.      So when we talk about inventory,
14 are we talking about the spinner bearings?
15         A.      All of it.
16         Q.      Okay.  So the spinner bearing
17 would be part of inventory?
18         A.      Correct.  The wheel would be
19 part of -- raw wheel or a complete assembled wheel that hasn't
20 been shipped yet.
21         Q.      Okay.  Let me stay just with the
22 spinner bearing for a minute, if I could.
23         A.      Okay.
24         Q.      The spinner bearing would be
25 part of the inventory; correct?

                              63

1          A.      Correct.
2          Q.      Where did you get the spinner
3  bearing from?
4          A.      I would -- I do not know that.
5          Q.      You don't know the name of the
6  company from which you ordered the spinner bearing?
7          A.      No.  I personally do not, no.
8          Q.      Who would know?
9          A.      Probably Gene Grinstead or he'd
10 have to try and find it, look it up.
11         Q.      Okay.  And Gene Grinstead is the
12 person who is your manager of purchasing?
13         A.      Correct.
14         Q.      In charge of inventory; correct?
15         A.      Correct.
16         Q.      And Gene still works for you?
17         A.      Yes.
18         Q.      As your purchasing manager in
19 charge of inventory; correct?
20         A.      Correct.
21         Q.      And so he likely would know the
22 companies from whom the spinner bearing is purchased; right?
23         A.      Correct.
24         Q.      Could -- can the spinner be made
25 without this spinner bearing?

                              64

1          A.      No.
2          Q.      Do you have any idea what it
3  cost for a single spinner bearing?
4          A.      At the beginning -- I don't want
5  to say the price, but it was very expensive.  And as we were
6  purchasing them at start, they come down in pricing.
7          Q.      Well, when you say very
8  expensive, are we talking about a thousand dollars a bearing or
9  are we talking about seventy-five cents a bearing?
10         A.      I believe it was close to the
11 two hundred dollar neighborhood.
12         Q.      Per bearing?
13         A.      Per bearing.  A hundred and
14 eighty to two hundred dollars, I believe.
15         Q.      And how many bearings did it
16 take to make a single spinning wheel?
17         A.      One per spinner.
18         Q.      Okay.  So if I had a set of
19 spinners on my motorcycle, I would have a -- a spinner bearing
20 wheel -- I mean, a spinning -- a spinner bearing in each wheel,
21 so there would be two; correct?
22         A.      Unless you had dual spinning
23 wheels, then you would have four.
24         Q.      Okay.  So -- and because
25 initially they cost about a hundred and eighty dollars a piece,

                              65

1   for the inventory just for the spinner bearing, if I had dual
2   spinners on a -- on a set of wheels, I would have eight --
3   almost eight hundred dollars worth of spinner bearings alone;
4   correct?
        A.     Yes. Expensive.
        Q.     Okay. Yes, that is expensive.
7                 Now, other than the spinner
8   bearings, what were the other major expensive component parts
9   that you had to have in inventory specifically for this
10  spinning wheel?
11        A.     Every part of it. The
12  seventeen-by-five-and-a-half rims, the rim blanks, the
13  seventeen-by-three-point-five rim blanks, the spinner -- the
14  spinner itself, raw material and/or machined, polished and/or
15  chromed.
16        Q.     Okay. So let me stop you with
17  the rim blanks. You said that there was a -- so I now have a
18  part of what makes this wheel unique is I have these spinner
19  bearings that could run me eight hundred dollars for a set;
20  correct?
21        A.     On a dual spinner, yes.
22        Q.     Then I have these
23  seventeen-by-five rim blanks; correct?
24        A.     Correct.
25        Q.     Are -- is there any other wheel
               66

1   that is made by RC that uses the spinner bearing?
2        A.     No.
3        Q.     Is there any other rim made by
4   RC that uses a seventeen-by-five rim blank?
5        A.     Very low volume.
6        Q.     So there are?
7        A.     The rim blank itself, yes, but
8   very low volume.
9        Q.     Okay. About how many wheels or
10  what percentage of wheels made by RC Components uses the
11  seventeen-by-five rim -- rim blank other than the spinner
12  wheel?
13        A.     Sales wise was probably two to
14  five percent.
15        Q.     Okay. All right. Then the next
16  component that is a part of this unique wheel is the spinner
17  itself?
18        A.     Correct.
19        Q.     Okay. And how -- well, let me
20  go back to the rim blank for a minute. How much does it cost
21  for a rim blank that's a seventeen-by-five?
22        A.     I'm not sure what the cost was
23  back then.
24        Q.     Well, what it is now?
25        A.     I believe close to two hundred
               67

1   dollars.
2        Q.     Per rim blank?
3        A.     Yes. A hundred --
4        Q.     So if I had a motorcycle, I
5   would have two of these, one on the front and one on the back;
6   right?
7        A.     Yes.
8        Q.     So now, I have four hundred
9   dollars, then, just for the rim blanks; correct?
10        A.     Roughly three to four hundred
11  dollars, yes.
12        Q.     Okay. So three to four hundred.
13  So if I add that in with the spinner bearing for inventory now,
14  I'm up to somewhere between eleven and twelve hundred dollars
15  just for those two pieces of inventory; correct?
16        A.     On a -- again, a dual spinner
17  wheel, yes.
18        Q.     Okay. Then we have the spinner
19  itself. How much do those cost?
20        A.     I believe they were being
21  charged just under a hundred dollars or somewhere right at a
22  hundred dollars.
23        Q.     Is that what it cost you for the
24  spinner itself?
25        A.     We were job shopping everything
               68

1   for them. It may have cost me twenty dollars less than what I
2   was charging them.
3        Q.     Okay. So your out-of-pocket
4   cost on the spinner itself might be eighty bucks?
5        A.     Yes, if we were charging them
6   one hundred.
7        Q.     Okay. And then the rim blank,
8   was that a job shop cost at two hundred or was that your actual
9   cost for the rim blanks?
10        A.     Probably about a ten percent up
11  charge.
12        Q.     Okay. So maybe a hundred and
13  eighty, your cost, for a seventeen-by-five rim blank?
14        A.     Yes. And all these numbers are
15  guesstimates and not actual.
16        Q.     Okay. But -- but -- but it's
17  the best estimate you can think of at the moment; correct?
18        A.     Yes.
19        Q.     Okay. So let me go back to the
20  spinner bearings. The price that we are talking about at
21  about a hundred and eighty dollars a piece for a spinner
22  bearing, is that the job shop cost or is that your actual cost?
23        A.     Raw material like that would
24  be -- I would have added about a ten percent increase, ten to
25  fifteen --
               69

1    Q.    So maybe somewhere in the
2  hundred -- neighborhood of a hundred and fifty dollars for a
3  bearing?
4    A.    A hundred and fifty to a hundred
and eighty.
6    Q.    Okay.  Okay.  So then the next
7  thing we have is the spinner itself.  Now, is the spinner
8  itself used by any other wheel made by RC?
9    A.    We've already talked about the
10  spinner itself.  That was the hundred dollar item.
11    Q.    No.  No.  No.  My question was
12  the spinner itself, was that item -- that particular raw item
13  of inventory, is that used for any other wheel that RC sells?
14    A.    No.
15    Q.    Okay.  The rim blanks are used
16  by others; correct?
17    A.    A low volume, yes.
18    Q.    And the spinner bearing is used
19  just for the spinner; correct?
20    A.    Correct.
21    Q.    Okay.  Any other items of
22  inventory that are used only for the spinning wheel?
23    A.    The end caps, the inner crush
24  sleeves -- and the inner crush sleeves.
25    Q.    All right.  Let me write this
                                  70

1  down.  So we have end caps.  What was the next thing?
2    A.    Inner crush sleeves.
3    Q.    Okay.  What else?
4    A.    The retaining clip of holding
5  the bearing and its crush sleeve.
6    Q.    Anything else?
7    A.    I -- I believe that's it.
8    Q.    Okay.  Let me talk about the end
9  caps.  What was your actual cost for an end cap?
10    A.    I do not know.
11    Q.    The end cap is not used for any
12  other wheel made by RC?
13    A.    No.
14    Q.    No, it isn't or no, it is?
15    A.    No, it is not.
16    Q.    Okay.
17    A.    Sorry.
18    Q.    The inner crush sleeve, that --
19  what is -- what is your cost for inner crush sleeve?
20    A.    Probably three dollars to four,
five dollars, somewhere in there.
22    Q.    And that's not used for any
23  wheel other than the spinning wheel?
24    A.    Correct.
25    Q.    The retaining clip for the
                                  71

1  bearing, how much do those cost?
2    A.    I believe those were twelve to
3  fifteen dollars.
4    Q.    And they're not used for any
5  wheel that RC makes other than the spinners?
6    A.    Correct.
7    Q.    And the -- and the retaining
8  clips crush sleeve, how much does that cost?
9    A.    About twelve -- probably ten to
10  fifteen dollars, also.
11    Q.    And that's not used for anything
12  other than the spinning wheel; correct?
13    A.    Correct.
14    Q.    Okay.  Are there any other items
15  of inventory other than these five -- seven that you've
16  mentioned, and that is the spinner bearing, the
17  seventeen-by-five rim blank, the spinner itself, end caps,
18  inner crush sleeve, retainer clip for bearing and its crush
19  sleeve, are there any other items of inventory that are used
20  only to make the spinning wheel by RC?
21    A.    I believe that is all.
22    Q.    These items of inventory, how
23  did you know what pieces were needed in order to make this
24  spinning wheel that Rimmax brought to you?
25    A.    How did we know those pieces are
                                  72

1  needed?
2    Q.    Yes, sir.
3    A.    That was the design we came up
4  with -- that RC Components came up with.
5    Q.    Did Rimmax participate at all in
6  the design of the spinning wheel?
7    A.    No.
8    Q.    Rimmax paid you to design the
9  wheel; correct?
10    A.    That was our first initial
11  talking, yes.
12    Q.    Well, my question is, Rimmax
13  sent to RC money to pay RC to design the wheel; correct?
14    A.    One portion of it, yes.
15    Q.    What portion is that?
16    A.    The first set of end caps, I
17  believe, and the design of the first spinner.
18    Q.    Okay.  So R -- so RC was paid by
19  Rimmax to design the first spinner?
20    A.    Well, it was going to be more
21  than that.  We just never charged them any more than that.
22    MS. SULTON:  And can you read back the
23  question -- to the court reporter, please?
24    (Whereupon the court reporter read the
25    previous question:  Okay.  So RC was paid
                                  73

by Rimmax to design the first spinner?)

A.   They were originally going to be charged for all spinners, all end caps that we designed for them -- or started making for them, I should say, but they never did -- we never charged them for it.

Q.   Okay.  But they sent you money on the theory that you were going to design this product for them; correct?

A.   They started to.  A little bit of money, yes.

Q.   And why didn't they send you all the money?

A.   I do not know.

Q.   Did you ask them to send it to you?

A.   I -- I started feeling a little better with them of how they were very upbeat in sales people of being able to sell the product.  So I didn't push the issue of that and I just wanted them to sell product so both of us could make money.

Q.   Well, isn't it true, sir, that RC is the one who made the money and that Rimmax didn't make any money?

A.   Well, I would tell you Rimmax should have made quite a bit of money.

74

Q.   Why didn't Rimmax make quite a bit of money?

A.   You would have to ask them, I guess.

Q.   Well, sir, if I understand the figures that you gave to your lawyer and he gave them to me, that RC made over one point one million dollars selling spinners in the last few years; right?

A.   But we're talking RC Components versus Rimmax.  Now, you're -- you've been asking me about Rimmax.

Q.   I'm -- the question, sir, is RC Components reports that it made over one point one million dollars selling spinning motorcycle wheels in the last few years; correct?

A.   I don't believe your first question was that and that's what I was answering to.  The latest question you're asking me, I guess that is true if that's what is on the documents.

Q.   Well, sir, didn't you produce the document?

A.   Yes, but you were --

Q.   Isn't that your signature on RC Components' documents saying that the figures in your lawyer's letter are correct?

75

A.   You were asking me -- before that question, you were asking me about Rimmax and that's what I was answering you for.  I may have been mistaken.  I'm sorry if I was, but that's what I was answering to, not me making money.

Q.   Well, the problem is mine.  I have the responsibility of asking the question clearly.  So let me reframe the question.

A.   But we're talking about a different question right now is what my whole point is.

Q.   Okay.  So I'm saying ignore --

A.   The previous.

Q.   -- the previous -- ignore the previous couple of questions and let me start with another question, okay?

A.   Okay.

Q.   And that question is isn't it true that RC Components has made over a million dollars in selling the spinner wheels in the last couple of years?

MR. MILLER:  Objection.  Are you referring to gross revenue or are you referring to a different number?

MS. SULTON:  The question is the question, and then let me follow up, Curtis, if you will.

MR. MILLER:  Rick, you can answer if you understand the question.

76

A.   Yeah.  Well, just to confirm, gross revenue, yes, would -- I believe on the paper that we gave and would be over one million dollars in gross sales in the last three years, I believe.

Q.   And the spinners that you sold in the last three years or so is the same product that Rimmax paid you to design; correct?

A.   No.

Q.   How is it different?

A.   We used our designs, did not use Rimmax's designs.

Q.   Okay.  When you say design, define that or describe that for me, please.

A.   The design -- how do I -- the design is the three-spoke wheel or the five-spoke wheel.  I call that the design.  We use --

Q.   Okay.  But Rimmax didn't pay you to design the number of spokes, it paid you to design the wheel that has the component parts of a spinner bearing, a seventeen-by-five rim blank, the spinner itself, the end caps, the inner crush sleeve, the retainer clip, and its crush sleeve; correct?

A.   I don't think we ever got that far to charge them for that kind of money to design all that stuff.  I believe all I charged them for was the making of the

77

**Page 78**

1  end caps, the first batch of end caps that I said earlier. And
2  then we kind of stopped charging them the designing charges.
3          MS. SULTON:  We have been going for almost
4  two hours.  I have some additional questions that I want to
5  ask, but I thought we might take a fifteen-minute break for the
6  court reporter.  Can we do that, gentlemen?
7          MR. MILLER:  We can do it for me, too.
8          MS. SULTON:  Okay.  Super.  So let's do
9  this.  We will continue to use this -- this line that we have
10  available, this conference line, and we'll just all call back
11  in in about fifteen minutes.
12          MR. MILLER:  Okay.
13          MS. SULTON:  Okay.  Thank you so much.
14  And we'll wait for the videographer to go off.
15          (Off the record)
16          Q.     Mr. Ball --
17          A.     Yes.
18          Q.     -- are you aware of the sales
19  price that Rimmax had attached to the sale of the spinners?
20          A.     I'm aware of it.  I do not know
21  the exact number offhand.
22          Q.     And were you aware of the --
23  RC's cost or charge to Rimmax for each spinner it was making?
24          A.     Yes.
25          Q.     Were you aware of the difference

**Page 79**

1  between the price for which Rimmax was selling the spinners and
2  the cost for RC to manufacture that product?
3          A.     Yes.
4          Q.     Is it fair to say that you knew
5  the gross profit margin on which Rimmax was operating?
6          A.     I could figure that out, yes.
7          Q.     Is it fair to say that Rimmax's
8  gross profit margin per spinner set was about twenty-one
9  hundred dollars?
10          A.     I do not know what they were
11  actually selling them for, I just know what they advertised
12  them or had them on a piece of paper for.
13          Q.     And do you know what that price
14  is?
15          A.     I do not know off the top of my
16  head.
17          Q.     If I said forty-five hundred
18  dollars, would you disagree with that?
19          A.     No.  I just don't know if that's
20  what they sold them for.
21          Q.     Do you know how much you were
22  charging Rimmax per sale for the manufacture of each spinner
23  set?
24          A.     I do not know it off the top of
25  my head.

**Page 80**

1          Q.     If I said it was about
2  twenty-four hundred, would you disagree with me?
3          A.     Sounds about correct.
4          Q.     If we assume that the price --
5  the advertised price by Rimmax for the sale of spinners was
6  forty-five hundred dollars and the amount that you were
7  charging it was about twenty-four hundred dollars, would you
8  agree with me that Rimmax's gross profit of which you were
9  aware was about twenty-one hundred dollars per set?
10          A.     If they sold it for that price,
11  correct.
12          Q.     How many sets of spinner wheels
13  has RC sold that were not associated with the work it was doing
14  directly for Rimmax?
15          A.     I believe it was seven hundred
16  and five to our records.
17          Q.     Seven hundred and five sets of
18  spinners?
19          A.     No, seven hundred and five
20  wheels.
21          Q.     Seven hundred and five wheels?
22          A.     I believe that is correct.
23          Q.     Would -- would some of RC's
24  customers buy just one wheel versus a set of two wheels?
25          A.     Yes.

**Page 81**

1          Q.     And approximately how much did
2  each wheel sell for that RC was selling?
3          A.     Price varied.
4          Q.     Can you give me the low range?
5          A.     Probably in the -- I don't want
6  to guess.  I'd be guessing.
7          Q.     What's the high range?
8          A.     I believe we sold for forty-two
9  or in that range on the high end for a set.
10          Q.     Forty-two hundred for a set?
11          A.     I believe two thousand to
12  twenty-two hundred per wheel.
13          Q.     About two thousand per wheel?
14          A.     Somewhere in there.
15          Q.     Okay.  So if we say that --
16          A.     On the high end.
17          Q.     On the high end?
18          A.     Yes.
19          Q.     So if we say that you sold two
20  hundred wheels -- I'm sorry, if we say you sold seven hundred
21  and five wheels and we multiply that by about two thousand per
22  wheel, then -- then the amount that RC realizes gross sales was
23  about one point four million?
24          A.     No.
25          MR. MILLER:  Objection.  That assumes that

1　RC sold it for -- for this high price.
2　　　　　MS. SULTON:  That is correct.  So let me
3　restate the question.  Thank you for the clarification, Curtis.
4　　　　　Q.　But if we assume, Mr. Ball, that
5　RC sold seven hundred and five wheels and if we assume that the
6　average cost per wheel was about two thousand dollars per
7　wheel, would you agree with me that the gross sales then would
8　have been about one point four million?
9　　　　　A.　We would not have sold that many
10　at that high a price.  We do not sell like that.
11　　　　　Q.　What was your cost to produce
12　per wheel?
13　　　　　A.　I do not have that information.
14　　　　　Q.　Do you have those records
15　anywhere?
16　　　　　A.　No.
17　　　　　Q.　Why is that?
18　　　　　A.　That is just -- we build the
19　product and we sell it and we figure out our profit from there.
20　　　　　Q.　So how do you figure out your
21　profit from the -- from the building?
22　　　　　A.　Minus overhead and all the other
23　minuses.  And you have a net at the end of it.
24　　　　　Q.　So you calculate in your
25　overhead as a part of your net profit?

82

1　　　　　A.　Yeah.  All that would be taken
2　into consideration to get net profit.
3　　　　　Q.　Okay.  So you don't -- so you
4　don't keep records where you can tell how much it cost you to
5　produce the wheel based on the raw materials that are used to
6　produce it or the inventory used to produce it?
7　　　　　A.　No.  We just have a base -- base
8　cost that's not a real number.
9　　　　　Q.　And so the -- I just used the
10　term raw materials.  Is it fair to say that part of raw
11　materials would be the spinner bearing?
12　　　　　A.　You could say it that way.  We
13　would say raw material would be the raw aluminum before
14　machining.  The bearing would be considered in raw inventory,
15　but it's one in the same.
16　　　　　Q.　Does RC do business just in
17　Kentucky?
18　　　　　A.　No.  We do it worldwide.
19　　　　　Q.　And does RC Sell products in
20　Delaware?
21　　　　　A.　I'm sure we do.  We have a few
22　dealers.
23　　　　　Q.　Does RC market its products in
24　Delaware?
25　　　　　A.　We don't actually market our

83

1　product in any particular state, it's through magazines,
2　through the Internet, and not targeted at any one state.
3　　　　　Q.　So -- but it's fair to say that
4　you realize that magazines in which you're marketing your
5　products would reach into the State of Delaware or would be
6　sold --
7　　　　　A.　Yes.
8　　　　　Q.　-- and distributed in the State
9　of Delaware?
10　　　　　A.　Yes.
11　　　　　Q.　Did RC ever ship anything to
12　Rimmax at its Delaware address?
13　　　　　A.　Yes, I believe so.
14　　　　　Q.　Did RC ever call, i.e.,
15　telephone Rimmax at its office in Delaware?
16　　　　　A.　I would believe so.  I believe
17　most of the time was a cell phone that's, probably, address was
18　in Delaware.
19　　　　　Q.　Okay.  It had a three-o-two area
20　code?
21　　　　　A.　Okay.  I'm not going to dispute
22　that.
23　　　　　Q.　Would you disagree with the
24　contention that Rimmax paid to RC a total of over one hundred
25　thousand dollars?

84

1　　　　　A.　If that's what the documents
2　show.
3　　　　　Q.　Have you seen the copies of the
4　canceled checks that Rimmax alleges that it sent to RC?
5　　　　　A.　I believe so.
6　　　　　Q.　And have you had an opportunity
7　to add those up?
8　　　　　A.　I just -- have not add -- added
9　those up, no.
10　　　　　Q.　And it was your understanding
11　that Rimmax was sending this money in part for the design and
12　in part for what?
13　　　　　A.　In a lot of inventory and
14　shipping of product.
15　　　　　Q.　How many sets of wheels did
16　Rimmax ask RC to make and ship for it?
17　　　　　A.　I'm not -- do not know the exact
18　number.
19　　　　　Q.　And where would we find that
20　information?
21　　　　　A.　It should be on some of the
22　documentation that you have.
23　　　　　Q.　Jim Cooper signed a document
24　that's been referred to as a confidentiality agreement.  Are
25　you aware of that?

85

```
 1              Now, I am, yes.
 2       Q.      And when did you first become
 3  aware that Jim Cooper signed a confidentiality agreement?
 4       A.      When this litigation started.
 5       Q.      And prior to that point, you
 6  were completely unaware of that?
 7       A.      I believe so.
 8       Q.      Was there ever a point at which
 9  you asked Rimmax if it could sell spinners to Harley?
10       A.      To Harley?  No.
11       Q.      Was there ever a point at which
12  you asked Rimmax if you could sell spinners to any other entity
13  or person?
14       A.      Other product, yes.
15       Q.      And what was their response?
16       A.      Not at this point in time.
17       Q.      Was there any point in time when
18  they told you it was okay to sell to Harley or any other entity
19  or person?
20       A.      It never came up again.
21       Q.      Why?
22       A.      It never -- the relationship
23  didn't last that long and it just never came up again.
24       Q.      Is the address for RC Components
25  three seventy-three Mitch McConnell Way, Bowling Green,
                              86
```

```
 1  Kentucky, four two one-o-one?
 2       A.      Correct.
 3       Q.      And you are its registered agent
 4  and founder?
 5       A.      Yes.
 6       Q.      And it manufactures wheels,
 7  pulley rotors, calibers and frames for the motorcycle industry?
 8       A.      Yes.
 9       Q.      And it employs currently about
10  eighty people?
11       A.      Correct.
12       Q.      And your manufacturing facility
13  is about fifty-five thousand square feet?
14       A.      Correct.
15       Q.      Do you operate twenty-four hours
16  per day?
17       A.      No.
18       Q.      How -- how many days -- how many
19  hours per day do you operate?
20       A.      Two shifts in certain areas.  So
21  in some areas, sixteen hours a day.
22       Q.      And how large is its inventory?
23       A.      Of RC Components?
24       Q.      Yes, sir.
25       A.      Right now, it's about -- just a
                              87
```

```
 1  little over two point two million.
 2       Q.      And among the services RC offers
 3  is new product design, machining, prototypes and production
 4  design?
 5       A.      We can do that, but that's not
 6  what we do normally.
 7       Q.      For whom or for what else --
 8  what other companies or persons have you done new product
 9  design other than Rimmax?
10       A.      For Harley-Davidson Corporation
11  and for Big Dog Motorcycle, American IronHorse Motorcycle,
12  Saxon Motorcycle, Thunder Mountain Motorcycle, and quite a few
13  others that we do exclusives.
14       Q.      And what kind of agreements do
15  you have with them when you do new product design?
16       A.      It is their wheel design that
17  would be exclusive if that's what we went to or no contract at
18  all.
19       Q.      And when dealing with Rimmax,
20  was it your understanding that you were doing an exclusive
21  arrangement with them for this new product design?
22       A.      We were going to make them --
23  spinning wheels for them, yes.
24       Q.      And what about machining
25  prototypes?  For whom or what companies, entities, persons, do
                              88
```

```
 1  you do machining prototype?
 2       A.      Prototype would be first article
 3  before we start producing product for them.
 4       Q.      And so you would do that for the
 5  various companies you mentioned, like --
 6       A.      If we need -- if -- if we need
 7  to, yes.
 8       Q.      Was that what you were doing in
 9  part for Rimmax, machining -- a machining prototype?
10       A.      No.  We were building a first
11  article to send to them for their okay so we could start
12  producing it in a quantity fashion.
13       Q.      And would that have been the
14  production design component?
15       A.      Correct.
16       Q.      And you were paid by Rimmax to
17  do a prototype and production design?
18       A.      Part of the prototype design, we
19  just -- that's where I've said before, we just got off to where
20  we didn't keep charging them for more and more design time or
21  building of inventory, strictly for inventory.
22       Q.      Do you deny that Mark Rivers --
23  I'm sorry, that Mike Rivers and Mark Mathis invented the
24  spinners as the prototype that you designed at their request?
25       A.      Absolutely I deny it.
                              89
```

1    Q.    And tell me why.

2    A.    Because they didn't -- they

3  didn't invent it.  As I stated earlier, Amen Chassis had a

4  spinning wheel, and then they brought us no documentation, no

5  written on napkin, no blueprint, no nothing of how to make the

6  spinning wheel.

7    Q.    Are you denying that Rimmax did

8  not send to you any sketches or other written papers that had a

9  visual depiction of the spinning wheel?

10   A.    Not to my knowledge.  There has

11 been one thing introduced that I still do not believe that I

12 saw in the beginning, but that was just a wheel design, not the

13 interworkings at all of a spinner.

14   Q.    To what extent was Chuck

15 Skarsaune -- is that how you pronounce it?

16   A.    Skarsaune.  Just say Chuck.

17   Q.    Yes, Skarsaune.  Thank you.

18         To what extent was he involved

19 in the product design?

20   A.    He was probably eighty, ninety

21 percent involved.

22   Q.    What do you mean by that?

23   A.    Well, I was involved, also, but

24 as actually programming it, putting it onto a blueprint,

25 dimensionizing the product, he did that.

90

1    Q.    And what about the prototype?

2  To what extent was Chuck involved in that?

3    A.    To the same eighty, ninety

4  percent.

5    Q.    And what about the production

6  designs, to what extent was he involved in that?

7    A.    Well, once the first article has

8  been approved, then Chuck is fairly much out of that and -- but

9  he's responsible for the production part of it coming through

10 the machine shop.

11   Q.    And do you know how many

12 completed sets of spinners RC made for Rimmax?

13   A.    I do not know that number off --

14 off the top.

15   Q.    When did you first become aware

16 that Rimmax was complaining about it not getting all of the

17 sets of spinners for which it allegedly had paid?

18   A.    I do not remember exact time

19 frame.

20   Q.    Was it before you got letters

21 from Patrick Mixon?

22   A.    Shortly there before, yes.

23   Q.    Did you ever refer Rimmax to Jim

24 Cooper, your -- the RC sales manager at that time?

25   A.    I probably -- I do not know if I

91

1  referred to him or not a hundred percent.

2    Q.    Do you know how Jim Cooper would

3  have been involved in dealing with Rimmax?

4    A.    Well, as I stated earlier, if

5  it's a -- more of a specialty of a product that we're doing for

6  somebody else or a high volume as a Big Dog Motorcycle or

7  anything like that, Jim Cooper would be the contact person to

8  enter sales orders and follow the production flow to make sure

9  delivery -- or not to make sure, but to let clients know how

10 delivery is doing.

11   Q.    Do you deny that Rimmax faxed a

12 written agreement to RC that had confidentiality provisions in

13 it?

14   A.    I don't deny that now, no.

15   Q.    Do you deny that on August 20th,

16 2002, that Rimmax and RC entered into a written agreement where

17 RC promised not to disclose Rimmax's information to others?

18   A.    I -- I deny that I knew about it

19 and I deny that Jim Cooper would have been -- should have been

20 the one or would have been the one to sign such document.

21   Q.    Do you deny that on August 20th,

22 2002, Rimmax and RC entered into a written agreement wherein RC

23 promised not to use Rimmax's information in a way that would

24 unfairly take advantage of knowledge about Rimmax's spinners?

25   A.    As I said earlier, I did not

92

1  know about this document -- alleged document until we started

2  litigation.

3    Q.    Do you deny that Rimmax was

4  disclosing information about spinners to RC for the sole

5  purpose of RC manufacturing spinners for Rimmax?

6    A.    They disclosed no information to

7  RC whatsoever about spinning wheels.

8    Q.    And why do you say that?

9    A.    Because they did not.

10   Q.    They didn't send you any

11 drawings or anything?

12   A.    I've already answered that,

13 again, earlier.

14   Q.    If -- if -- well, let me ask the

15 question this way.  Are you denying that Rimmax had

16 conversations with Chuck Skarsaune about the spinning wheels

17 and the design of it?

18   A.    Correct.  They did not in any

19 way to my knowledge give any information on how to build,

20 assemble, design a spinning wheel whatsoever.

21   Q.    Do you deny that Jim Cooper

22 signed the agreement -- the confidentiality agreement on behalf

23 of RC noting he was authorized to sign it on behalf of RC?

24   A.    I do not know where it said that

25 he is authorized.  And again, I maintain that I did not know

93

1  about that document until litigation started. And no, he did
2  not have the authority from the very beginning of our -- my
3  deposition, that he did not have the authority to sign such
4  document. And such document would have gone straight to an
5  attorney with that kind of wording in it.
6          Q.      Are you denying that Rimmax
7  contacted you and advised you that Mr. Cooper signed the
8  agreement?
9          A.      Absolutely.
10         Q.      Are you denying that Rimmax
11 contacted you and informed you that a patent application on the
12 Rimmax spinning wheel was pending?
13         A.      It was not a patent pending
14 product. Later found out through Patrick Mixon that it was not
15 even patented, it wasn't patent pending, it was a patent
16 provisional.
17         Q.      My question, sir, is -- let me
18 try to sharpen the question. Are you denying that Rimmax
19 contacted you and told you that they had a patent application
20 pending?
21         A.      They told me that they had a
22 patent or patent pending, yes, but they, in fact -- when they
23 told me that, they did not have such document.
24         Q.      Was it your understanding, based
25 on your conversations with Rimmax, that it had a patent pending

                                   94

1  at the time that you were asked to help them design the
2  prototype?
3          MR. MILLER:  Objection. This question has
4  been asked and answered.
5          MS. SULTON:  No, this is a different
6  question, Curtis.
7          MR. MILLER:  Rick, you can answer.
8          A.      Oh, man, how many times. They
9  told me they had a patent or a patent pending. I told them I
10 don't see how they could have such a patent or patent pending,
11 because this has already been produced on a motorcycle, again,
12 dating back to Amen Chassis. Then also, later on in
13 conversation with Patrick Mixon, Patrick Mixon informed me
14 and -- of a patent provisional and it was not a patent -- it
15 was not even a patent pending.
16         Q.      Did you ever discuss with Rimmax
17 its marketing plan for the spinner wheel?
18         A.      May have mentioned a word or two
19 as they told me about their marketing plan. I -- I would say
20 no, but possible.
21         Q.      Do you deny that on or about
22 October 2nd of 2002 that RC faxed to Rimmax a quote or pricing
23 sheet for design, tooling and prototype manufacturing?
24         A.      I believe that's a correct
25 statement.

                                   95

1          Q.      Were you the person that faxed
2  to either Mike Rivers or Mark Mathis --
3          A.      Yes.
4          Q.      -- on or about October 2nd,
5  2002 --
6          A.      I believe so.
7          Q.      -- the quote or pricing sheet
8  for design and tooling --
9          MR. MILLER:  Rick, let her ask --
10         Q.      -- and prototype manufacturing?
11         A.      I'm sorry. Could you repeat,
12 Anne, I'm sorry?
13         Q.      Yes. Of course. The question
14 is were you the person that faxed to Rimmax, either Mike Rivers
15 or Mark Mathis, the quote or pricing sheet for design, tooling
16 and prototype manufacturing?
17         A.      Yes. I would -- I probably was.
18         Q.      Were you the person who placed
19 on the pricing sheet the various tasks that RC would perform
20 for Rimmax if Rimmax paid to RC seven thousand two hundred
21 twenty-seven dollars and fifty cents as a deposit to pay for
22 all the design work and to begin production of Rimmax's
23 spinners?
24         A.      I would imagine if you're
25 reading that off of a document of mine, yes.

                                   96

1          Q.      Well, I want you to assume I'm
2  not reading it off any document of yours. The question is --
3          A.      Then I would have --
4          Q.      -- are --
5          A.      Then I would have to say I don't
6  know.
7          Q.      Are you aware of a pricing sheet
8  listing various tasks RC would perform for Rimmax if Rimmax
9  paid to RC seven thousand two hundred twenty-seven dollars and
10 fifty cents as a deposit to pay for all the design work and to
11 begin production of Rimmax's spinners?
12         A.      If you would leave out the exact
13 dollar amount, I will agree to that, but I do not know the
14 exact dollar amount.
15         Q.      Okay. Do you agree that the
16 pricing sheet tells Rimmax that RC will charge Rimmax eighty
17 dollars per hour for RC's design work?
18         A.      I believe so. Yes.
19         Q.      Do you agree that on or about
20 October 2nd, 2002, Rimmax sent to RC a check in the amount of
21 seven thousand two hundred twenty-seven dollars and fifty
22 cents?
23         A.      Again, with you putting the
24 number on the check, I can't confirm.
25         Q.      But you would agree that

                                   97

1  somewhere in October of 2002, Rimmax sent to RC a check for the
2  amount requested in the pricing sheet that had been sent to it
3  earlier in October, 2002?
4              A.      I don't know if it was for the
5  exact amount that I requested, but I do believe we received a
6  check.
7              Q.      Would you agree that RC, as it
8  was involved in the process of designing, tooling and prototype
9  manufacturing, telephoned Rimmax at its Delaware office to talk
10  about the technical aspects of Rimmax's spinners?
11             A.      I don't know why I would have
12  called them for the technical aspects and tell them about the
13  technical aspects, no.
14             Q.      Well, I'm sorry, the question
15  was poorly framed.  Let me try again.
16                     Are you aware that anybody who
17  was an employee of RC, who was involved in the design, tooling
18  or prototype manufacturing phase, was telephoning Rimmax people
19  to talk about the technical aspects of Rimmax's spinners?
20             A.      That's possible.
21             Q.      You don't deny that that
22  happened?
23             A.      I -- I'm saying it is possible
24  that it happened.
25             Q.      Is it true that RC delivered to
                              98

1              A.      We brought it up one time.  I
2  would have told you it was at our meeting when he was at our
3  facility.
4              Q.      Do you agree that RC -- or
5  either yourself or someone else at RC told Rimmax that RC would
6  make fifty-four sets of spinners for plaintiff and deliver sets
7  to plaintiff sometime in April of 2003 if plaintiff gave to RC
8  eighty thousand dollars?
9              A.      I -- I can't -- no recollection
10  of that.
11             Q.      Do you deny that Rimmax sent to
12  RC eighty thousand dollars sometime prior to April, 2003, to
13  pay for fifty-four sets of spinners?
14             A.      I -- I do not know if that's
15  true or not.
16             Q.      Do you keep any records that
17  show the amount received from people doing business with you?
18  .           A.      Yes.
19             Q.      Have you checked your records to
20  see whether or not the allegations in the complaint are true as
21  they relate to the amount of money that Rimmax claims it sent
22  to RC?
23             A.      I do not have any such documents
24  in front of me, so there -- I cannot truthfully answer yes or
25  no.
                              100

1  Rimmax a prototype spinner sometime in or about January of
2  2003?
3              A.      I would agree with that in that
4  time frame.
5              Q.      And that that prototype was
6  taken to the International Motorcycle Show in New York City?
7              A.      Yes.
8              Q.      And subsequent to the prototype
9  being taken to the International Motorcycle Show in New York,
10  that Rimmax began receiving orders for the spinners?
11             A.      I believe so.
12             Q.      And would you agree that Rimmax
13  then called you or someone else at RC Components and began
14  placing orders for the spinner?
15             A.      I would imagine that's how it
16  would have happened.
17             Q.      And shortly thereafter, there
18  was a discussion between you and someone at Rimmax to talk
19  about making spinners for Harley-Davidson?
20             A.      I don't know when that would
21  have been.
22             Q.      But there was such a
23  conversation?
24             A.      I answered that earlier.
25             Q.      And your answer was yes?
                              99

1              Q.      No.  My question was have you
2  checked your records to see if it's true?
3              A.      I've gone through some of the
4  stuff, but again, I can't tell you exact numbers.  I can't
5  state yes or no to that question.
6              Q.      But do you agree that Rimmax
7  sent to RC a copy of Rimmax's detailed order list and customer
8  shipping addresses?
9              A.      I'm not sure exactly what all
10  they have sent.  I know we did do drop ships, which would have
11  entailed the customer's shipping address, yes.
12             Q.      Do you deny that RC failed to
13  timely ship all of the spinners according to the shipment
14  schedule agreed to by Rimmax and RC?
15             MR. MILLER:  Objection.  That question
16  assumes that there was a schedule agreed to.  Rick, you can
17  answer if you can.
18             A.      Yeah.  I -- I don't know of any
19  such schedule until later on.
20             Q.      I'm sorry, what do you mean by
21  that?
22             A.      There is one document that
23  showed shipping product, I believe it was in the month of May.
24  And they were going to send a certain amount of dollars each
25  week and I would have shipped product accordingly.  That's the
                              101

1  only really ship document that I am aware of.

2          Q.      So are you saying that there was

3  no agreement about the time frame in which the spinners ordered

4  would be manufactured and shipped?

5          A.      Not an actual shipping calendar,

6  I guess you would say, no.

7          Q.      Was there a time that Rimmax

8  contacted you or someone else at RC and advised RC that

9  Rimmax's customers were upset about not receiving their

10  spinners in a timely manner?

11         A.      Yes.

12         Q.      And were you or anybody else at

13  RC told by Rimmax that time was of the essence in delivering

14  the spinners for which plaintiff -- or which Rimmax had paid

15  RC?

16         MR. MILLER:  Objection.  Vague.  What do

17  you mean by time is of the essence?

18         MS. SULTON:  Let me rephrase the question.

19         Q.      Would you agree with me that

20  Rimmax told you that it was important that the customers of

21  Rimmax immediately receive their spinners because they were

22  complaining about not getting them?

23         A.      If that's what they're claiming,

24  I guess so.  I don't know what their customers were saying to

25  them.

102

1          Q.      Well, my question is did someone

2  at Rimmax ever tell you that they needed to get the spinners

3  out right away because their customers were complaining that

4  they hadn't received them?

5          A.      Yes.

6          Q.      And what did you do in response

7  to hearing that information?

8          A.      We tried to get a schedule

9  together and get money together to start producing product.

10         Q.      And whose money were you trying

11  to get together?

12         A.      Well, mainly Rimmax so I could

13  put my money together of all the inventory I had purchased.

14         Q.      Had you purchased inventory

15  prior to April, 2003 to make the spinners?

16         A.      Yes.

17         Q.      Do you have documents showing

18  that?

19         A.      It would -- I don't know if we

20  could produce documents for that or not anymore.

21         Q.      Is it true that RC eventually

22  made and shipped about twenty sets of spinners for Rimmax?

23         A.      I don't know exactly how many

24  wheels we shipped to them.

25         Q.      Or for them -- to their

103

1  customers directly?

2          A.      Either -- either or, I do not

3  know.

4          Q.      Now, it's your understanding

5  that because RC hadn't sent fifty-four sets of spinners to

6  Rimmax that it was then that Rimmax asked Attorney Patrick

7  Mixon to send you a letter demanding return of the thirty-one

8  thousand dollars; correct?

9          A.      I believe it's something like

10  that, yes.

11         Q.      And the number of spinners they

12  were complaining about that had not been delivered or the

13  number of sets of spinners about which they were complaining

14  had not been delivered was thirty-four; correct?

15         A.      I do not know the amount.

16         Q.      Did RC ever communicate with any

17  of the persons that Rimmax had identified were its customers?

18         A.      Repeat the question, please.

19         Q.      Did RC ever communicate directly

20  with those customers that Rimmax had identified as its

21  customers?

22         A.      I would imagine there was times

23  that those customers may have called us directly to verify the

24  truth of Rimmax.

25         Q.      And what would they have said --

104

1          A.      Asking --

2          Q.      -- or what did they say, as best

3  you recall?

4          A.      Well, I wouldn't have been on

5  the phone, so I wouldn't actually know exactly what, but they

6  would be calling to see why the wheels were late or where is my

7  wheels or things like that.

8          Q.      Did RC sell spinners to persons

9  or entities or companies that Rimmax had identified as its

10  customers?

11         A.      Not that I know of.

12         Q.      When did RC begin advertising

13  that it sells spinners?

14         A.      Probably very late -- here we go

15  blank again on the years.  To late 2003 or 2002.  The documents

16  would show.

17         Q.      Did RC begin advertising and

18  selling spinners under RC's name prior to the point at which

19  Rimmax engaged it?

20         A.      Again, we did not sell any

21  spinners until what we felt that Rimmax was out of business for

22  a couple three months.

23         Q.      Would you agree with me that RC

24  has benefitted economically from the sale of spinners?

25         A.      We have made money from it, yes.

105

1          Q.     Okay.  Give me just a minute or
2   two here, please.
3                 Do you know who your vendors are
4   currently as it relates to purchasing the bearings --
5          A.     No, I do not.
6          Q.     -- the spinner bearings we
7   talked about earlier?
8          A.     No, I do not.
9          Q.     Do you know the motorcycle brand
10  which the particular spinning bearing is used on?
11         A.     There would be a few different
12  types.
13         Q.     Can you give me an example?
14         A.     Probably Honda, Harley, Suzuki,
15  Yamaha, Kawasaki.
16         Q.     Do you know how many bearings
17  you currently have on hand?
18         A.     I do not know.
19         Q.     Does RC have general business
20  and/or product liability insurance?
21         A.     Yes, it does.
22         Q.     And what is the name of that
23  insurance company?
24         A.     I do not know the name of it
25  off -- from here.

                        106

1          Q.     How many dealers/distributors,
2   does -- dealers or distributors does RC Components currently
3   have listed in the dealer network?
4          A.     I believe it's five thousand
5   plus or six thousand plus, worldwide.
6          Q.     Do you know how many spinner
7   wheels you currently have on hand at the RC factory or
8   facility?
9          A.     No, I do not.
10         Q.     Can you tell me how RC
11  advertised that it makes and sells spinners other than on its
12  website?
13         A.     Through different industry
14  magazines.
15         Q.     Can you give me an example?
16         A.     I would imagine Hot Bike,
17  American IronHorse, V-Twin, RoadBike.  I don't know all the
18  names.
19         Q.     Do you advertise on television
20  or radio?
21         A.     We've done one little thirty
22  second deal for semi-local shows.
23         Q.     Has RC obtained a patent of any
24  type or trademark of any type with the federal government?
25         A.     No.

                        107

1          Q.     Who is Jodie Jendon?
2          A.     A dealer of ours, customers.
3          Q.     Did you sell spinners to Jodie
4   Jendon?
5          A.     Probably later on when we
6   started selling them.  Possibly.
7          Q.     When you say later on, do you
8   mean after your --
9          A.     Rimmax was out of business.
10         Q.     After you claim you thought they
11  were out of business; is that correct?
12         A.     Correct.
13         Q.     And were you aware at that time
14  that you contacted Jodie Jendon that Jodie Jendon was one of
15  the customers of Rimmax?
16         MR. MILLER:  Objection.  That assumes that
17  RC contacted Jodie Jendon.
18         MS. SULTON:  Well, let me rephrase the
19  question.
20         Q.     RC has done -- has sold spinners
21  to Jodie Jendon; correct?
22         A.     We've sold lots of product to
23  them, yes.
24         Q.     Among that are spinners;
25  correct?

                        108

1          A.     Correct.
2          Q.     And are you aware that Jodie
3   Jendon had ordered spinners initially from Rimmax?
4          A.     I'm not a hundred percent sure
5   of that.  I believe that is correct.
6          Q.     Have you -- do you know a person
7   by the name of Ron with RT Motorsports of Tennessee?
8          A.     Yes.
9          Q.     And have -- has RC sold spinners
10  to Ron or RT Motorsports of Tennessee?
11         A.     Yes.
12         Q.     And are you aware that Ron
13  and/or RT Motorsports of Tennessee was a customer of Rimmax
14  which had ordered spinners from Rimmax?
15         A.     Not at the time.
16         Q.     Not at which time?
17         A.     The time that we sold him
18  spinners.  He came to us.
19         Q.     And when did he first come to
20  you?
21         A.     I do not know.
22         Q.     Has RC Components received
23  permission from Honda to produce a wheel that is similar to the
24  wheel that Honda produces itself?
25         A.     We don't sell wheels to Honda.

                        109

1    Q.    My question was -- well, let me
2  rephrase it. Does RC Components make a wheel similar to the
3  wheel that Honda makes?
4    A.    Too vague of a question, I
5  guess.
6    Q.    Well, has -- has RC Components
7  duplicated and sold a wheel that's similar to a wheel that
8  Honda puts on its bikes?
9    A.    That is -- that's just too vague
10 of a question. I don't quite understand what you're asking.
11    MR. MILLER: Anne, maybe you can define
12 for him what you mean as the same as. I mean, that could be --
13 that could cover anything.
14    MS. SULTON: Sure. So let me try again.
15    Q.    Is it fair to say, Mr. Ball,
16 that various motorcycle companies or various companies that
17 make motorcycles also design wheels that specifically work well
18 with their particular motorcycle?
19    A.    Okay. Yes.
20    Q.    And isn't it true that Honda
21 designed a wheel that works particularly well with the Honda
22 motorcycle that it makes?
23    A.    Okay. Yes.
24    Q.    And isn't it true, sir, that RC
25 Components is making a wheel that is based upon the design of
                    110

1  the Honda wheel that is specifically made for its Honda
2  motorcycle?
3    MR. MILLER: Anne, which -- objection.
4  It's vague. Which wheel are you talking about? I don't think
5  Mr. Ball knows what wheel you're talking about.
6    Q.    Any -- any wheel. Is there any
7  wheel that RC makes that is based upon the design of Honda or
8  its wheels for its motorcycle?
9    MR. MILLER: Rick, you can answer if
10 you -- if you know the answer.
11    A.    Well, I -- it's just confusing.
12 She's being very vague when she uses the word design. We
13 design a better-looking wheel than what is on the factory
14 Honda. So customers that would buy a factory Honda would turn
15 around and buy an RC Components wheel to put on their bike to
16 make their bike look better.
17    Q.    And so -- so if we use that as
18 our example --
19    A.    Okay.
20    Q.    -- that particular wheel to
21 which you referred is a wheel that is based on a Honda patent;
22 correct?
23    A.    They have no such patent.
24    MR. VITALE: Can I ask a question for a
25 second? Can we go off the record just for a second?
                    111

1    (Off the record)
2    Q.    Mr. Ball, have you ever been
3  convicted of a felony?
4    A.    No.
5    Q.    Have you ever been involved in a
6  civil lawsuit other than this lawsuit?
7    A.    Yes.
8    Q.    And can you tell me what other
9  civil lawsuits have been filed against you or RC?
10    THE WITNESS: Curtis, do I need --
11    MR. MILLER: I'm sorry, Anne. Can you
12 repeat that question again?
13    MS. SULTON: Yes. The question is what
14 other civil lawsuits other than this particular lawsuit has
15 been filed against Rick Ball or RC Components.
16    MR. MILLER: Rick, you can answer that
17 question.  .
18    A.    Okay. A racial discrimination.
19    Q.    The name of the plaintiff?
20    A.    Dennis Babbs.
21    Q.    When did he file that?
22    A.    I believe -- I believe in 2002,
23 maybe 2003. I'm not sure.
24    Q.    How was that resolved?
25    A.    Out-of-court settlement.
                    112

1    Q.    And what was the amount?
2    A.    I cannot say.
3    Q.    Yes, you can, we're in a
4  deposition.
5    THE WITNESS: Curtis?
6    MR. MILLER: Well, if that -- if that
7  agreement is subject to a confidentiality provision, he can't
8  say.
9    MS. SULTON: No. No, that's not correct.
10 I just had that question come up in a case I just finished in
11 Denver where one of my clients was subject of a prior
12 confidentiality agreement and the Court ordered him to so state
13 and wagged the finger at us and said that we'll get hit with
14 sanctions if that question is not answered. So if you want to
15 direct him not to answer, I'll -- I'll file --
16    MR. MILLER: Well, what case was that,
17 Anne?
18    MS. SULTON: Are you instructing him not
19 to answer?
20    MR. MILLER: I'm asking you what precedent
21 you're citing for support of that.
22    MS. SULTON: I'm simply telling you what a
23 judge told me in a case -- in a case I have pending in Federal
24 Court in Denver.
25    MR. MILLER: Okay. Can we take a break
                    113

1  for just a second?

2        MS. SULTON:  Well, let me go on to the

3  next question.  We can come back to that.

4        MR. MILLER:  Okay.

5        Q.    What other lawsuits have been

6  filed against either you personally, Mr. Ball, or against RC

7  Components?

8        A.    I don't know if another one was

9  ever filed or threatened of filing.  I --

10       Q.    Who would have been the

11 plaintiff in that case?

12       A.    RC Components.

13       Q.    RC Components was the plaintiff

14 or the defendant?

15       A.    Which one -- which one am I?

16 Defendant.  Correct?

17       Q.    Okay.  And who filed that or who

18 threatened to file that complaint against RC?

19       A.    Cannot think of his name right

20 this second.

21       Q.    Where was it -- where would it

22 have been filed?  Would it have been in Kentucky or California?

23       A.    Kentucky.

24       Q.    Have you ever been sued in

25 California?

                    114

1        A.    Okay.  I don't know what she's

2  asking.

3        Q.    Okay.  Well, let me ask the

4  question this way.  Have you ever heard of a company named

5  Metric Cruisers?

6        A.    I -- it sounds familiar but I do

7  not know.  Are we there?

8        Q.    Yes.

9        A.    Oh.

10       Q.    Did you ever make a hub for

11 Rimmax called -- that would fit on a Suzuki?  Did RC ever make

12 a hub for Rimmax that would fit on a Suzuki?

13       A.    Yes, particular style type?

14       Q.    No, I'm just asking about the

15 general brand name of Suzuki.

16       A.    Oh, yes.

17       Q.    And what other brands of

18 motorcycle would that spinner fit on other than the Suzuki?

19       A.    Probably that would be the only

20 one.

21       Q.    All right.  So all of the

22 spinners that RC made for Rimmax would fit only on a Suzuki?

23       A.    No.  That particular end cap

24 that would fit a Suzuki would probably only fit that style of

25 bike of a Suzuki.

                    116

1        A.    No.  I do not believe so.

2        Q.    Any other lawsuits?

3        A.    I believe that is it.

4        Q.    Other than the spinner wheel,

5  did RC and Rimmax have any dealings at all?

6        A.    I do not believe so.

7        Q.    Do you deny that at some point

8  there was a supply agreement sent to you by Rimmax?

9        A.    Sent to me?  No, I do not deny

10 that.

11       Q.    Do you deny that you edited or

12 made markings on the document and sent it back to Rimmax?

13       A.    We sent it back and told them we

14 were not interested in this kind of document.

15       Q.    What is Metric Cruisers?

16       A.    Excuse me?

17       Q.    What is an entity called Metric

18 Cruisers?

19       A.    What do you mean entity?

20       Q.    Can you tell me what Metric

21 Cruisers is, if you know?

22       A.    I'm not -- is this a company

23 or -- I'm not quite sure what you're asking.

24       MR. MILLER:  Rick, if you don't know the

25 answer, you can just say I don't know.

                    115

1        Q.    Okay.  But there were other

2  spinners made at Rimmax's request that would fit bikes other

3  than a Suzuki bike; is that correct?

4        A.    I believe so, yes.

5        Q.    Did RC make spinners for other

6  types of Suzuki's other than the type of Suzuki for which

7  Rimmax had requested a spinner be made?

8        A.    I believe that's a yes.

9        Q.    Do you deny that RC sent out a

10 memo to its dealers and customers stating that it would not

11 make products or spinners for Rimmax?

12       A.    We better not have.

13       Q.    Are you denying that a memo was

14 sent out saying that RC was not making spinners for Rimmax?

15       A.    That we sent out a memo to all

16 of our dealers and retail people that -- I guess I'm a little

17 confused on the question.

18       Q.    So let me try to reframe it.

19 The question is, to your knowledge, did RC send out a memo or

20 other communication to some of its dealers and customers

21 stating that RC would not be making spinners for Rimmax?

22       A.    We may have sent something to a

23 customer that was calling in afterwards and letting them know

24 that we weren't making it, so people weren't sending us product

25 that we did not make.

                    117

1    Q.    I'm almost done.  Hang on one
2  second, please.
3          Did -- did RC ever receive any
4  marketing material for the spinners from Rimmax?
5          A.    Not to my knowledge, no.
6          Q.    One moment, please.
7          Is RC denying that it didn't
8  produce all of the wheels for which Rimmax paid?
9          A.    Am I denying what?
10         Q.    Is RC denying that it produced
11 all of the spinner wheels for which Rimmax paid?
12         A.    I just -- I would not know if we
13 produced all of the wheels that Rimmax sold, correct.
14         Q.    No.  No.  No.  I'm sorry.  Let
15 me reframe the question, because I want to make certain that
16 you understand this.
17         Rimmax is saying that it paid RC
18 for fifty-four sets of spinners.  That's what Rimmax is saying.
19         A.    Okay.
20         Q.    And Rimmax is saying that it got
21 about twenty sets of spinners.  So Rimmax is claiming that RC
22 did not either send to Rimmax or send to Rimmax's customers all
23 of the spinners for which Rimmax paid.  So my question is, is
24 RC denying Rimmax's allegation that it paid for spinners it
25 never received?

                          118

1          A.    Correct.
2          Q.    Does RC produce spinners for
3  anybody else, any other company?
4          A.    No.
5          Q.    Is RC still advertising that it
6  sells spinners?
7          A.    Probably on the website.  I do
8  not think we do advertising in magazines anymore.  I'm not
9  sure.
10         MS. SULTON:  Okay.  I think I'm almost
11 done.  Let me just do a real quick check here.  We can go off
12 the record for a second while I do this check and see if there
13 are any other questions out there.  So let me ask you to hang
14 on for just a second, if I could.
15         (Off the record)
16         MS. SULTON:  Okay.  I don't have any
17 additional questions at this time, Mr. Ball.  And I thank you
18 for your time and courtesy.  Curtis, thank you kindly.  Did you
19 have any follow-up questions you wanted to ask?
20         MR. MILLER:  No.
21         MS. SULTON:  Okay.  Thank you kindly.  We
22 are done and, again, the record should reflect that Mr. Ball
23 reserves the right to read and correct.  And everyone have a
24 great day.
25         (Whereupon the video deposition

                          119

1  concluded.)
2
3                ···  ···  ···
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

                          120

1                C E R T I F I C A T E
2
3              I, Rick Ball, having read the foregoing
4  deposition, do hereby certify said testimony is a true and
5  accurate transcript with the following changes, (if any):
6  PAGE NO.     LINE NO.      CHANGE
7  _____     _____      _____
8  _____     _____      _____
9  _____     _____      _____
10 _____     _____      _____
11 _____     _____      _____
12 _____     _____      _____
13 _____     _____      _____
14 _____     _____      _____
15 _____     _____      _____
16
17                           _____
18 STATE OF KENTUCKY )        Rick Ball
19 COUNTY OF WARREN  )
20                           Sworn to and subscribed before me this
21 ____ day of _____, 2006.
22                           _____
                            Notary Public, State at Large
23 My Commission Expires:  _____
24
25

                          121

```
 1   STATE OF KENTUCKY        )
                              )
 2                            )  SS
                              )
 3   COUNTY OF WARREN         )

 4

                   I, April Kaufman Pearson, a

     Notary Public within and for the State at Large, do hereby

 7   certify that the foregoing video deposition of RICK BALL, was

 8   taken before me at the time and place and for the purpose in

 9   the caption stated; that the witness was first duly sworn to

10   tell the truth, the whole truth and nothing but the truth; that

11   the deposition was reduced to shorthand writing by me in the

12   presence of the witness; that the foregoing is a full, true and

13   correct transcript of said deposition so given to the best of

14   my ability; that there was a request that the witness read and

15   sign the deposition; that the appearances were as stated in the

16   caption.

17                   I further certify that I am

18   neither of counsel nor of kin to either of the parties to this

19   action, and am in no wise interested in the outcome of said

20   action.

21                   WITNESS MY SIGNATURE this 5th

22   day of October, 2006.  My commission expires October 28, 2006.

23

24                   _____

25                   NOTARY PUBLIC
                     State at Large, Kentucky

                        122
```