UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

---

RIMMAX WHEELS, LLC,
a Delaware limited liability company,

    Plaintiff,

v.                                      Civil Action No. 06-029-SLR

RC COMPONENTS, INC.,
a Kentucky corporation,

    Defendant.

---

**PLAINTIFF'S BRIEF IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

Dated this 26th day of January 2007

                                                Plaintiff's Attorneys

                                                WILLIAMS & CROSSE

                                                Kester I.H. Crosse [Bar I.D. 638]
                                                1214 King Street
                                                Suite 300
                                                Wilmington, DE  19801
                                                Telephone: (302) 652-3141
                                                E-Mail: kesterih@aol.com

## TABLE OF CONTENTS

Page

| | | |
|---|---|---|
| I. | Table of Citations | 3 |
| II. | Statement of the Nature and Stage of Proceeding | 5 |
| III. | Summary of Argument | 6 |
| IV. | Statement of Facts | 6 |
| V. | Argument | 12 |
| VI. | Conclusion | 18 |
| VII. | Certificate of Service | 19 |
| VIII. | Appendix / Attachments | |
| | B-1) Affidavit of Marc Mathis | |
| | B-2) Exhibits attached to Affidavit of Marc Mathis | |
| | B-3) Affidavit of Mike Rivers | |

# I. TABLE OF CITATIONS

|  | Page |
|---|---|
| **Cases:** | |
| *Andres v. Williams*, 405 A.2d 121, 122-23 (Del. Supr., 1979) | 17 |
| *Bowl-Mor Company Inc. v. Brunswick Corp.*, 297 A.2d 61, 64 (Del. Ch., 1972) | 17 |
| *Connolly v. Labowitz*, 519 A.2d 138, 143 (Del. Super., 1986) | 17 |
| *De Bonaventura v. Nationwide Mut. Ins.*, 419 A.2d 942, 947 (Del. Ch., 1980), *aff'd*, Del. Supr., 428 A.2d 1151, 1153 (1981) | 17 |
| *Equitable Trust Co. v. Gallagher*, 99 A.2d 490, 492-93 (Del. Supr., 1953) | 14 |
| *Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 472 (Del. Supr., 1992) | 16 |
| *George & Lynch Co. v. State*, 197 A.2d 734, 736 (Del. Supr., 1964) | 13 |
| *Gilbert v. El Paso Co.*, 575 A.2d 1131, 1142 (Del. Supr., 1990) | 13 |
| *Glenn v. Tidewater Associated Oil Co.*, 101 A.2d 339, 344 (Del. Ch., 1954) | 14 |
| *Harmon v. Masoneilan Intern, Inc.*, 442 A.2d 487, 499 (Del. Supr., 1982) | 16 |
| *Industrial America, Inc. v. Fulton Indus., Inc.*, 285 A.2d 412, 415-16 (Del. Supr., 1971) | 13 |
| *Irwin & Leighton, Inc., v. W.M. Anderson Co.*, 532 A.2d 983, 992-93 (Del. Ch., 1987) | 17 |

*Leeds v. First Allied Connecticut Corp.*, 521 A.2d 1095,

    1101-02 (Del. Ch., 1986)      13

*Metropolitan Convoy Corp. v. Chrysler Corp.*, 173 A.2d 617,

    626 (Del. Super., 1961)      17

*Murphy v. Godwin*, 303 A.2d 668 (Del. Super., 1973)      17

*Norse Petroleum A/S v. LVO International, Inc.*, 389 A.2d 771,

    773 (Del. Super., 1978)      13

*Regal Home Distributors v. Gordon*, 66 A.2d 754,

    754-55 (Del. Super., 1949)      17

*Ryan v. Weiner*, 610 A.2d 1377, 1380-82 (Del. Ch., 1992)      14

*Salisbury v. Credit Service*, 199 A. 674, 681-82 (Del. Super., 1938)      13

*Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069,

    1074 (Del. Supr., 1983)      16

*Stoltz v. Delaware Real Estate Comm'n*, 473 A.2d 1258,

    1263-64 (Del. Super., 1984)      17

*Twin Coach Co. v. Chance Vought Aircraft, Inc.*, 163 A.2d 278,

    283-84 (Del Super., 1960)      16

## II. Statement of the Nature and Stage of Proceeding

**Nature:**

This action arises from an agreement between plaintiff RiMMAx Wheels, LLC [hereinafter "Rimmax"] and defendant RC Components, Inc. [hereinafter "RC"], wherein RC promised to manufacture for Rimmax unique free spinning rims for motorcycle wheels called "spinners" that Rimmax designed. RC also promised Rimmax RC would not use the confidential information and proprietary technology Rimmax disclosed to RC for any purpose other than manufacturing spinners for Rimmax and delivering same to Rimmax customers.

Rimmax kept its part of the agreement, paying over $100,000 to RC. However, RC did not honor the agreement. RC failed to deliver to Rimmax all spinners for which Rimmax paid, and RC used Rimmax's confidential information and proprietary technology to make and sell over $1 million worth of spinners under RC's brand name to Rimmax's customers and others.

Per a written agreement between Rimmax and RC, this action is brought pursuant to Delaware state laws to redress breach of contract, fraud, and intentional interference with contractual relations. Rimmax seeks compensatory damages, punitive damages, attorneys fees, costs, and any other relief deemed just by this Honorable Court.

Contrary to the arguments made by defendant in its motion for summary judgment, in this case, Rimmax is not claiming patent infringement.

**Stage:**

RC filed a motion for summary judgment. Discovery is complete. The case currently is set for a jury trial in March 2007.

### III. Summary of Argument

RC is not entitled to summary judgment because there are genuine issues of material fact in dispute, requiring a jury's determination. As this brief explains, and the evidence attached hereto shows: 1) RC violated the contract when RC failed to deliver spinners for which Rimmax paid in advance; 2) RC engaged in fraud when RC intentionally misled Rimmax so that RC could financially benefit; and 3) RC intentionally interfered with Rimmax's contractual relations with Rimmax's customers.

### IV. Statement of Facts

1. Rimmax is a Delaware limited liability company formed in 2002. It designs unique free spinning rims for motorcycle wheels called "spinners". The two men forming this company are Michael Rivers, Jr. (an engineer) and Marc Mathis (holding a master's degree in business administration). This company operates, and Mathis resides, within the jurisdiction of the U.S. District Court for the District of Delaware. [Mathis Affidavit, paragraph 1; Rivers Affidavit, paragraph 1.]

2. RC is a Kentucky corporation formed in 1994, and located at 373 Mitch McConnell Way, Bowling Green, Kentucky 42101. Its registered agent and founder is Richard "Rick" Ball. RC manufacturers wheels, pulley rotors, calipers, and frames for the motorcycle industry. RC advertises it employs 100 people, has a 55,000 square foot manufacturing facility operating 24 hours per day to provide efficient production, has a million dollars in inventory, and offers new product design, machining prototypes and production design. [Mathis Affidavit, paragraph 2.]

3. In or about 2002, Rivers and Mathis designed their spinners and took steps to obtain patents. Rivers and Mathis also established the company they call Rimmax. [Mathis Affidavit, paragraph 3; Rivers Affidavit, paragraph 3.]

4. In 2002, Rimmax contacted RC via e-mail and told RC Rimmax was looking for a manufacturer of Rimmax spinners. [Mathis Affidavit, paragraph 4.]

5. Rimmax was referred to Jim Cooper, RC's sales manager. [Mathis Affidavit, paragraph 5.]

6. Rimmax told Cooper before Rimmax could discuss Rimmax's spinner with RC or any of RC's representatives RC must sign a written agreement promising Rimmax RC would not use the confidential information and proprietary technology Rimmax disclosed to RC for any purpose other than manufacturing spinners for Rimmax. [Mathis Affidavit, paragraph 6.]

7. Rimmax faxed the written confidentiality agreement to RC. [Mathis Affidavit, paragraph 7.]

8. On August 20, 2002, Rimmax and RC entered into a written confidentiality agreement wherein RC promised not to disclose Rimmax's information to others or to use Rimmax's information in a way that would "unfairly take advantage of knowledge" about Rimmax's spinners, which Rimmax was disclosing to RC for the sole purpose of RC manufacturing spinners for Rimmax. [Mathis Affidavit, paragraph 8.]

9. Cooper signed the agreement on behalf of RC, noting he was authorized to sign it on behalf of RC because he was RC's sales manager. [Mathis Affidavit, paragraph 9.]

10. Rimmax then contacted Rick Ball, advised Ball Cooper signed the agreement, and informed Ball Rimmax had a patent application pending for the spinners. [Mathis Affidavit, paragraph 10.]

11. Ball invited Rimmax to visit RC's operations in Kentucky and to discuss the work Rimmax wanted RC to perform for Rimmax. [Mathis Affidavit, paragraph 11.]

12. Rimmax, in the persons of Rivers and Mathis, traveled to RC's facility in Kentucky. When they arrived, they were met by Ball and a RC engineer named Chuck. [Mathis Affidavit, paragraph 12; Rivers Affidavit, paragraph 5.]

13. During this meeting, Ball and Chuck received some of Rimmax's confidential information and proprietary technology. [Mathis Affidavit, paragraph 13.]

14. During this meeting Ball encouraged Rivers and Mathis to discuss Rimmax's marketing plans and discouraged Rivers and Mathis by telling them they likely would only be able to sell one set of spinners per week. [Mathis Affidavit, paragraph 14.]

15. After Rivers and Mathis returned to Delaware, on or about October 2, 2002, RC faxed to Rimmax a quote or "pricing" sheet for design, tooling and prototype manufacturing. [Mathis Affidavit, paragraph 15.]

16. This "pricing" sheet lists various tasks RC would perform for Rimmax if Rimmax paid money to RC, including a $7,227.50 deposit to begin their work together. [Mathis Affidavit, paragraph 16.]

17. Rimmax accepted RC's offer. [Mathis Affidavit, paragraph 17.]

18. On or about October 3, 2002, Rimmax sent the $7,227.50 to RC. [Mathis Affidavit, paragraph 18.]

8

19. As Rimmax and RC engaged in the design, tooling and prototype manufacturing phase, RC frequently telephoned Rimmax at its Delaware office, speaking with Rivers about the technical aspects of Rimmax's spinners. This phase of the manufacturing process required Rimmax to disclose to RC all of Rimmax's confidential information and proprietary technology about the technical aspects of Rimmax's spinners. [Mathis Affidavit, paragraph 19; Rivers Affidavit, paragraph 4.]

20. RC delivered to Rimmax the prototype spinner about a month after the date promised. [Mathis Affidavit, paragraph 20.]

21. On or about January 7, 2003, Rimmax took the prototype spinner to an international motorcycle show in New York. There was great excitement and "a lot of buzz" at the show about Rimmax's new product. [Mathis Affidavit, paragraph 21.]

22. Shortly after the show, Rimmax began receiving orders for its spinners. [Mathis Affidavit, paragraph 22.]

23. Rimmax called RC, spoke with Ball, advised Ball orders were placed for the spinners, and asked Ball to begin manufacturing Rimmax's spinners. [Mathis Affidavit, paragraph 23.]

24. Ball told Rimmax RC received inquiries about Rimmax's spinners from some of RC's customers, and asked Rimmax if RC could make spinners for RC's customers, including Harley Davidson. [Mathis Affidavit, paragraph 24.]

25. Rimmax declined RC's invitation to enter into this business arrangement, and informed RC Rimmax already was marketing Rimmax's spinners, including via advertisements in Cycle Dreams Magazine. [Mathis Affidavit, paragraph 25.]

26. RC told Rimmax RC would make 54 sets of spinners for Rimmax, and deliver the sets to Rimmax by late April 2003, if Rimmax gave to RC over $90,000 more. [Mathis Affidavit, paragraph 26.]

27. Rimmax accepted RC's offer and paid RC a total of over $100,000. [Mathis Affidavit, paragraph 27.]

28. RC asked Rimmax to send to RC Rimmax's detailed order list and customer shipping addresses so that RC could ship the spinners to Rimmax's customers. [Mathis Affidavit, paragraph 28.]

29. Rimmax sent this information to RC, instructing RC to ship the spinners in boxes with Rimmax's name and logo. [Mathis Affidavit, paragraph 29.]

30. April 2003 passed without RC keeping its promise to make and ship Rimmax's spinners. [Mathis Affidavit, paragraph 30.]

31. Rimmax contacted RC and advised RC Rimmax's customers were furious about not receiving their spinners. Rimmax told RC time was of the essence in delivering the spinners for which Rimmax had paid RC. [Mathis Affidavit, paragraph 31.]

32. Ball responded by saying the spinners had not been made, and promising to make and ship the spinners within a few weeks. [Mathis Affidavit, paragraph 32.]

33. RC eventually made and shipped 20 sets of Rimmax's spinners to Rimmax's customers. [Mathis Affidavit, paragraph 33.]

34. However, RC ignored Rimmax's specific direction about the packaging. RC shipped Rimmax's spinners in RC logo boxes, making it appear to the recipients the spinners were a RC product rather than Rimmax's product. [Mathis Affidavit, paragraph 34.]

35. Because RC failed to honor its promise to make 54 sets of spinners by late April 2003 and was shipping Rimmax's spinners in RC boxes, on July 2, 2003, Rimmax sent RC a letter canceling the contract, requesting return of $31,096.80, and demanding return of all confidential information and proprietary technology Rimmax gave to RC for the sole purpose of RC manufacturing spinners for Rimmax. [Mathis Affidavit, paragraph 35.]

36. RC refuses and has failed to deliver 34 of the 54 sets of Rimmax's spinners for which Rimmax paid in full. [Mathis Affidavit, paragraph 36.]

37. RC refuses and has failed to refund to Rimmax the $31,096.80 demanded. [Mathis Affidavit, paragraph 37.]

38. RC refuses and has failed to return to Rimmax the confidential information and proprietary technology Rimmax gave to RC for the sole purpose of RC manufacturing spinners for Rimmax. [Mathis Affidavit, paragraph 38.]

39. Rimmax then discovered RC has been communicating with Rimmax's customers, telling them to buy spinners from RC rather than Rimmax, and selling Rimmax's spinners to Rimmax's customers and other third parties without Rimmax's knowledge or consent. [Mathis Affidavit, paragraph 39.]

40. Prior to Rimmax's contract with RC, RC did not make or sell spinners. [Mathis Affidavit, paragraph 40; Rivers Affidavit, paragraph 7.]

41. RC charged Rimmax to make the tooling necessary to manufacture the spinners. [Mathis Affidavit, paragraph 41; Rivers Affidavit, paragraph 7.]

42. Rimmax also discovered RC is advertising it sells spinners. [Mathis Affidavit, paragraph 42.]

43. The spinners RC advertises it sells, and that it does sell, is the same spinner designed by Rimmax and on which Rimmax has patents. [Mathis Affidavit, paragraph 43; Rivers Affidavit, paragraph 8.]

44. Rimmax did not give to RC the right or permission to contact Rimmax's customers or others for the purpose of selling to them spinners under RC's logo or brand name. [Mathis Affidavit, paragraph 44; Rivers Affidavit, paragraph 4.]

45. Rimmax did not give to RC the right or permission to sell spinners Rimmax designed. [Mathis Affidavit, paragraph 45.]

46. Rimmax did not give to RC the right or permission to use Rimmax's confidential information and proprietary technology to RC's economic benefit and Rimmax's detriment. [Mathis Affidavit, paragraph 46.]

47. RC has sold over $1 million in spinners designed by Rimmax, using Rimmax's confidential information and proprietary technology. [Mathis Affidavit, paragraph 47; Rivers Affidavit, paragraph 9.]

48. Rimmax has lost money and its reputation has been irreparably damaged. [Mathis Affidavit, paragraph 48; Rivers Affidavit, paragraph 9.]

### V. Argument

#### A. Introduction:

At pages 2 and 3 of their confidentiality agreement, Rimmax and RC expressly state: "This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without reference to the principles of conflict of laws." [Mathis Affidavit, Exhibit attached thereto, pages 2 and 3.]

### B. Breach of Contract:

The law is well settled. Under Delaware law, a contract is a legally binding agreement between two or more parties. Each party to the contract must perform according to the agreement's terms. A party's failure to perform a contractual duty constitutes breach of contract. If a party breaches the contract and that breach causes injury or loss to another party, then the injured party may claim damages. For a legally binding contract to exist, there must be: 1) an offer of a contract by one party; 2) an acceptance of that offer by the other party; 3) consideration for the offer and acceptance; and 4) sufficiently specific terms that determine the obligations of each party. *Leeds v. First Allied Connecticut Corp.*, 521 A.2d 1095, 1101-02 (Del. Ch., 1986); *Norse Petroleum A/S v. LVO International, Inc.*, 389 A.2d 771, 773 (Del. Super., 1978).

A legally binding contract requires the parties manifest or show mutual assent to the contract's terms. Mutual assent must be shown by words or acts of the parties in a way representing a mutually understood intent. *George & Lynch Co. v. State*, 197 A.2d 734, 736 (Del. Supr., 1964).

An offer is a display of willingness to enter into a contract on specified terms. To constitute an offer, this display must be made in a way leading a reasonable person to understand an acceptance, having been sought, will result in a binding contract. *Gilbert v. El Paso Co.*, 575 A.2d 1131, 1142 (Del. Supr., 1990); *Salisbury v. Credit Service*, 199 A. 674, 681-82 (Del. Super., 1938).

An acceptance of an offer is an agreement, either by express act or by conduct, to the precise terms of the offer so that a binding contract is formed. *Industrial America, Inc. v. Fulton Indus., Inc.*, 285 A.2d 412, 415-16 (Del. Supr., 1971).

Consideration is something of value received by someone which induces them to make a promise to the person giving the thing of value. To be enforceable, a contract must be supported by consideration. Consideration may include money, an act, a promise not to act, or a return promise, and it may be found anywhere in the transaction, whether or not it is clearly stated or spelled out in writing as "consideration." *Ryan v. Weiner*, 610 A.2d 1377, 1380-82 (Del. Ch., 1992); *Equitable Trust Co. v. Gallagher*, 99 A.2d 490, 492-93 (Del. Supr., 1953); *Glenn v. Tidewater Associated Oil Co.*, 101 A.2d 339, 344 (Del. Ch., 1954).

There was a legally binding contract between Rimmax and RC. There was an offer, acceptance, consideration for the offer and acceptance, and sufficiently specific terms that determine the obligations of each party.

Rimmax fully performed all its obligations under the agreement, by paying to RC the amounts requested to do the work Rimmax requested. RC breached the agreement when it failed to timely deliver to Rimmax 54 sets of spinners for which Rimmax had paid. RC also breached the agreement when it failed to refund to Rimmax $31,096.80 for spinners RC failed to deliver to Rimmax.

Per the August 20, 2002 written agreement between Rimmax and RC, RC is prohibited from using Rimmax's confidential information and proprietary technology in any manner that would "unfairly take advantage of knowledge" about Rimmax's spinners. RC breached the agreement when it unfairly took advantage of Rimmax's knowledge and began selling spinners under the RC logo or brand name. RC breached the agreement when it used Rimmax's confidential information and proprietary technology for purposes other than manufacturing spinners for Rimmax. RC also

14

breached the agreement when it failed to return to Rimmax its confidential information and proprietary technology.

RC's failure to perform its contractual duties constitutes a breach of contract. RC's breach of contract caused injuries and losses to Rimmax, and Rimmax claims damages in an amount according to proof.

In summary, Rimmax's Complaint alleges RC breached the contract to manufacture spinners for Rimmax and deliver to Rimmax's customers these spinners. Rimmax and RC agreed that in exchange for Rimmax paying to RC over $100,000 RC would manufacture for Rimmax and deliver to Rimmax's customers a total of 54 sets of spinners. Rimmax paid the amount of money RC requested when RC made the offer. However, RC delivered less than half of the agreed upon sets of spinners. Therefore, RC breached the contract.

RC also breached the contract when it: a) failed and refused to refund or return to Rimmax over $31,000 due Rimmax for un-delivered sets of spinners for which Rimmax had pre-paid; b) stole Rimmax's spinner idea and began marketing and selling spinners under RC's name; and c) contacting Rimmax's customers and selling spinners directly to them.

RC denies it breached the contract. Consequently, there is a genuine issue of material fact in dispute, requiring jury resolution and denial of RC's motion for summary judgment on Rimmax's contract claim.

**C. Fraud:**

Fraud consists of the following five elements: 1) the false representation of a fact that is important to another; 2) the knowledge or belief that this representation was false,

15

or was made with reckless indifference to the truth; 3) the intent to induce the plaintiff to act on the false representation, or to decline to act; 4) the fact that plaintiff acted, or declined to act, in justifiable reliance on the false representation; and 5) damage to plaintiff as a result of this reliance. A false representation may be asserted by words or by conduct. A fact is important if it would cause a reasonable person to decide to act in a particular way, or if the maker of the misrepresentation knew another person would regard it as important. *Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 472 (Del. Supr., 1992); *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. Supr., 1983); *Harmon v. Masoneilan Intern, Inc.*, 442 A.2d 487, 499 (Del. Supr., 1982); *Twin Coach Co. v. Chance Vought Aircraft, Inc.*, 163 A.2d 278, 283-84 (Del Super., 1960).

RC made numerous false representations of fact that were important to Rimmax. For example, RC falsely represented it would not use Rimmax's confidential information and proprietary technology for any purpose other than to manufacture spinners for Rimmax. RC actually used Rimmax's information for RC's economic benefit and to Rimmax's detriment. RC sold over $1million in spinners, while Rimmax lost money and its reputation. RC also falsely represented it needed Rimmax's detailed order list and customer shipping addresses so that RC could ship the spinners directly to Rimmax's customers. However, RC did not ship 54 sets of spinners to plaintiff's customers, as promised, and used this information to sell spinners directly to Rimmax's customers and others, resulting in an economic benefit of over $1 million for RC and an economic disaster for Rimmax.

RC knew or believed these representations it made to Rimmax were false. RC had the intent to induce Rimmax to act on the false representations. Rimmax acted in

16

justifiable reliance on RC's false representations. Rimmax has been damaged as a result of this reliance, and claims compensatory and punitive damages in an amount according to proof.

### D. Interference with Contractual Relationship:

A party intentionally and improperly inducing or otherwise intentionally preventing another from performing a contract with a third party or makes the performance of the contract more costly is responsible to the other party for the loss suffered as a result of the prevention or interference with the contract. One who purposely and improperly induces or otherwise purposely causes a third party not to enter into or continue a prospective contractual relation with another is responsible to that other party for the loss suffered as a result of the prevention or interference with the contractual relationship. *Irwin & Leighton, Inc., v. W.M. Anderson Co.*, 532 A.2d 983, 992-93 (Del. Ch., 1987); *Bowl-Mor Company Inc. v. Brunswick Corp.*, 297 A.2d 61, 64 (Del. Ch., 1972); *De Bonaventura v. Nationwide Mut. Ins.*, 419 A.2d 942, 947 (Del. Ch., 1980), *aff'd*, Del. Supr., 428 A.2d 1151, 1153 (1981). *Connolly v. Labowitz*, 519 A.2d 138, 143 (Del. Super., 1986); *Stoltz v. Delaware Real Estate Comm'n*, 473 A.2d 1258, 1263-64 (Del. Super., 1984); *Andres v. Williams*, 405 A.2d 121, 122-23 (Del. Supr., 1979); *Murphy v. Godwin*, 303 A.2d 668 (Del. Super., 1973); *Metropolitan Convoy Corp. v. Chrysler Corp.*, 173 A.2d 617, 626 (Del. Super., 1961); *Regal Home Distributors v. Gordon*, 66 A.2d 754, 754-55 (Del. Super., 1949).

Rimmax had agreements with third parties to deliver to them sets of spinners. RC was aware of these agreements. RC intentionally prevented Rimmax from performing Rimmax's contracts with Rimmax's customers when RC intentionally failed to deliver 34

of the 54 sets of spinners to Rimmax customers and for which Rimmax had pre-paid RC to so do. Therefore, RC is responsible to Rimmax for the loss suffered as a result of the prevention or interference with the contracts Rimmax had with its customers.

RC also purposely and improperly induced or otherwise purposely caused some of Rimmax's current customers and prospective customers (such as Harley Davidson) not to enter into or continue a current or prospective contractual relationship with Rimmax. RC intentionally and improperly induced or otherwise intentionally caused third parties not to perform their contracts with Rimmax when RC told these third parties not to purchase spinners from Rimmax and to purchase spinners from RC. These spinners are the spinners designed by Rimmax. Therefore, RC is responsible to Rimmax for the loss suffered as a result of the prevention or interference with the contractual relationships. RC also is responsible to Rimmax for the loss suffered as a result of the third parties' breach of their contracts with Rimmax.

RC's interference with Rimmax's contractual relations caused injuries and losses to Rimmax. Rimmax claims compensatory and punitive damages in an amount according to proof.

## VI. Conclusion

Based upon the foregoing reasons, and the record in this case, Rimmax respectfully requests this Honorable Court deny RC's motion for summary judgment.

Dated this 26th day of January 2007.

Kester I.H. Crosse, Esq. #638

Plaintiff's Attorneys

WILLIAMS & CROSSE
1214 King Street
Suite 300
Wilmington, DE 19801
Telephone: (302) 652-3141
E-Mail: kesterih@aol.com

### CERTIFICATE OF SERVICE (CM/ECF)

I hereby certify that on January 26, 2007 I ~~electronically filed~~ *HAND DELIVERED* the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Attorney Curtis S. Miller@ CMiller@MNAT.com

_____
Kester I.H. Crosse, Esq. #638