IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| RIMMAX WHEELS, LLC, a Delaware limited liability company | )<br>)<br>) |
| Plaintiff, | ) |
| vs. | ) C.A. No. 06-029 (SLR) |
| RC COMPONENTS, INC., a Kentucky corporation, | )<br>) |
| Defendant. | )<br>) |

## AFFIDAVIT OF MARC C. MATHIS

I, Marc C. Mathis, being duly sworn on oath depose and say:

1. I serve as co-president of RiMMax Wheels, LLC, [hereinafter "Rimmax"], a Delaware limited liability company formed in 2002 and Plaintiff in the above captioned case. Rimmax designs unique free spinning rims for motorcycle wheels called "spinners". The two men forming this company are Michael Rivers, Jr. (an engineer) and me (holding a master's degree in business administration). I currently reside in New Castle County, State of Delaware.

2. RC is a Kentucky corporation formed in 1994, and located at 373 Mitch McConnell Way, Bowling Green, Kentucky 42101. Its registered agent and founder is Richard "Rick" Ball. RC manufacturers wheels, pulley rotors, calipers, and frames for the motorcycle industry. RC advertises it employs 100 people, has a 55,000 square foot

1

manufacturing facility operating 24 hours per day to provide efficient production, has a million dollars in inventory, and offers new product design, machining prototypes and production design.

3. In or about 2002, Rivers and I designed spinners and took steps to obtain patents.

4. In 2002, Rimmax contacted RC via e-mail and told RC Rimmax was looking for a manufacturer of Rimmax spinners.

5. Rimmax was referred to Jim Cooper, RC's sales manager.

6. Rimmax told Cooper that before Rimmax could discuss Rimmax's spinner with RC or any of RC's representatives RC must sign a written agreement promising Rimmax RC would not use the confidential information and proprietary technology Rimmax disclosed to RC for any purpose other than manufacturing spinners for Rimmax.

7. Rimmax faxed the written agreement to RC.

8. On August 20, 2002, Rimmax and RC entered into a written agreement wherein RC promised not to disclose Rimmax's information to others or to use Rimmax's information in a way that would "unfairly take advantage of knowledge" about Rimmax's spinners, which Rimmax was disclosing to RC for the sole purpose of RC manufacturing spinners for Rimmax.

9. Cooper signed the agreement on behalf of RC, noting he was authorized to sign it on behalf of RC because he was RC's sales manager.

10. Rimmax then contacted Rick Ball, advised Ball that Cooper signed the agreement, and informed Ball that Rimmax had a patent application pending for the spinners.

2

11. Ball invited Rimmax to visit RC's operations in Kentucky and to discuss the work Rimmax wanted RC to perform for Rimmax.

12. Rivers and I traveled to RC's facility in Kentucky. When we arrived, we met with Ball and a RC engineer named Chuck.

13. During this meeting, Ball and Chuck received some of Rimmax's confidential information and proprietary technology.

14. During this meeting Ball "encouraged" Rivers and I to discuss Rimmax's marketing plans and "discouraged" Rivers and I by telling us we likely would only be able to sell one set of spinners per week.

15. After Rivers and I returned to Delaware, on or about October 2, 2002, RC faxed to Rimmax a quote or "pricing" sheet for design, tooling and prototype manufacturing. A copy of this document is attached hereto.

16. This "pricing" sheet lists various tasks RC would perform for Rimmax. Ball also told Rimmax it must pay RC $7,227.50, as a deposit to pay for the design stage portion of our work together.

17. Rimmax accepted RC's offer.

18. On or about October 3, 2002, Rimmax sent $7,227.50 to RC. A copy of this check is attached hereto.

19. As we engaged in the design, tooling and prototype manufacturing phase, RC frequently telephoned Rimmax at its Delaware office, speaking with Rivers about the technical aspects of Rimmax's spinners. This phase of the manufacturing process required Rimmax to disclose to RC all of Rimmax's confidential information and proprietary technology about the technical aspects of Rimmax's spinners.

3

20. RC delivered to Rimmax the prototype spinner about a month after the date promised.

21. On or about January 7, 2003, Rimmax took the prototype spinner to an international motorcycle show in New York. There was great excitement and "a lot of buzz" at the show about Rimmax's new product.

22. Shortly after the show, Rimmax began receiving orders for its spinners.

23. Rimmax called RC, spoke with Ball, advised Ball orders were placed for the spinners, and asked Ball to begin manufacturing Rimmax's spinners.

24. Ball told Rimmax it had received inquiries about Rimmax's spinners from some of RC's customers, and asked Rimmax if RC could make spinners for RC's customers, including Harley Davidson.

25. Rimmax declined RC's invitation to enter into this business arrangement, and informed RC Rimmax already was marketing Rimmax's spinners, including via advertisements in Cycle Dreams Magazine.

26. RC told Rimmax RC would make 54 sets of spinners for Rimmax, and deliver the sets to Rimmax by late April 2003, if Rimmax gave to RC over $90,000 more.

27. Rimmax accepted RC's offer and paid RC a total of over $100,000.

28. RC asked Rimmax to send to RC Rimmax's detailed order list and customer shipping addresses so RC could ship the spinners to Rimmax's customers.

29. Rimmax sent this information to RC, instructing RC to ship the spinners in a box with Rimmax's name and logo.

30. April 2003 passed without RC keeping its promise to make and ship Rimmax's spinners.

31. Rimmax contacted RC and advised RC Rimmax's customers were furious about not receiving their spinners. Rimmax told RC time was of the essence in delivering the spinners for which Rimmax had paid RC.

32. Ball responded by acknowledging the spinners had not been made, and promising to make and ship the spinners within a few weeks.

33. RC eventually made and shipped 20 sets of Rimmax's spinners to Rimmax's customers.

34. However, RC ignored Rimmax's specific direction about the packaging. RC shipped Rimmax's spinners in RC logo boxes, making it appear to the recipients the spinner was an RC product rather than Rimmax's product.

35. Because RC failed to honor its promise to make 54 sets of spinners by late April 2003 and was shipping Rimmax's spinners in RC boxes, on July 2, 2003, Rimmax sent RC a letter canceling the contract, requesting return of $31,096.80, and demanding return of all confidential information and proprietary technology Rimmax gave to RC for the sole purpose of RC manufacturing spinners for Rimmax.

36. RC refuses and has failed to deliver 34 of the 54 sets of Rimmax's spinners for which Rimmax paid in full.

37. RC refuses and has failed to return to Rimmax the $31,096.80 demanded.

38. RC refuses and has failed to return to Rimmax the confidential information and proprietary technology Rimmax gave to RC for the sole purpose of RC manufacturing spinners for Rimmax.

39. Rimmax then discovered RC has been communicating with Rimmax's customers, telling them to buy spinners from RC rather than Rimmax, and selling

Rimmax's spinners to Rimmax's customers and other third parties without Rimmax's knowledge or consent.

40. Prior to Rimmax's contract with RC, RC did not make or sell spinners.

41. RC charged Rimmax to make the tooling necessary to manufacture the spinners.

42. Rimmax also discovered RC is advertising it sells spinners. A copy of one of RC's ads is attached hereto.

43. The spinners RC advertises it sells, and that it does sell, is the same spinner designed by Rimmax and on which Rimmax has patents.

44. Rimmax did not give to RC the right or permission to contact Rimmax's customers or others for the purpose of selling to them spinners under RC's logo or brand name.

45. Rimmax did not give to RC the right or permission to sell spinners Rimmax designed.

46. Rimmax did not give to RC the right or permission to use Rimmax's confidential information and proprietary technology to RC's economic benefit.

47. RC has sold over $1 million in spinners designed by Rimmax, using Rimmax's confidential information and proprietary technology.

48. Rimmax has lost money and its reputation has been irreparably damaged.

49. In summary, in 2002 and 2003, RC offered to manufacture for Rimmax, and deliver to Rimmax and/or ship directly to Rimmax customers, 54 sets of spinners, for a total cost of approximately $100,000. This amount of money included the tooling and

other special set-up manufacturing costs because RC did not have the tooling necessary to make the spinners.

50. I specifically told Rick Ball, RC's president, all spinners shipped directly to Rimmax customers must be shipped in boxes bearing Rimmax's name and logo. Ball told me RC would ship all spinners in boxes bearing the Rimmax name and logo.

51. I specifically and repeatedly told Ball Rimmax had applied for patents on the spinners and all information pertaining to the Rimmax spinner design and Rimmax customer list must be held in strictest confidence. Ball promised me RC would hold this information in confidence and not use it for any purpose other than manufacturing the spinners for Rimmax and shipping the spinners to Rimmax and/or Rimmax customers.

52. Because the manufacturing and delivery processes required Rimmax to disclose to RC Rimmax's confidential business information about the spinners' design and Rimmax's customers, Rimmax required RC to sign a confidentiality agreement. A copy of this agreement is attached hereto.

53. After the confidentiality agreement was signed by RC, Rimmax communicated with RC about the spinner design, sent its customer list to RC, and sent RC several checks totaling over $100,000. Copies of these checks are attached hereto.

54. I believed RC when it told me the delay in shipping the spinners to Rimmax customers, for which Rimmax had paid in advance, was due to manufacturing difficulties. I was shocked when I learned that at the same time RC was telling me this RC was actually selling the Rimmax designed spinners to current and potential Rimmax customers, seriously injuring Rimmax's business reputation because Rimmax's customers' orders had not been filled.

_____
MARC C. MATHIS

Subscribed and sworn to before me this 26th day of January 2007.

_____ Notary Public. State of Delaware.   [SEAL]

My Commission expires: _____   **KESTER I. H. CROSSE**
Attorney at Law
State of Delaware
Notarial Officer Pursuant to
29 Del.C. § 4323(a)(3)
No Expiration Date

8