IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| RIMMAX WHEELS LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 06-029-SLR |
| | ) |
| RC COMPONENTS, INC., | ) |
| | ) |
| Defendant. | ) |

Kester I. H. Crosse, Esquire, of Williams & Crosse, Wilmington, Delaware.  Counsel for Plaintiff.

William H. Sudell, Jr., Esquire, and Curtis S. Miller, Esquire, of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware. Counsel for Defendant.

**MEMORANDUM OPINION**

Dated:  February $\mathcal{2}l$ , 2007
Wilmington, Delaware

ROBINSON, Chief Judge

## I.   INTRODUCTION

On January 13, 2006, RiMMax Wheels, LLC ("plaintiff") filed this diversity action against RC Components, Inc. ("defendant") alleging breach of contract, fraud, and intentional interference with contractual relations.  (D.I. 1)   In its complaint, plaintiff sought unspecified monetary damages, including costs and attorneys's fees, an order for defendant to return plaintiff's confidential information and proprietary technology, and an injunction to stop defendant from using this information "in any way."  (Id. at 11)   Plaintiff is a Delaware limited liability company operating in Delaware.  (Id. at 3; D.I. 4 at 2) Defendant is a Kentucky corporation with manufacturing operations in the city of Bowling Green, Kentucky.  (Id.)   The court has diversity jurisdiction over plaintiff's claims pursuant to 28 U.S.C. § 1332.   Currently before the court is defendant's motion for summary judgment.  (D.I. 37)   For the reasons set forth below, the court grants defendant's motion.

## II.   BACKGROUND

This action arises from an agreement between plaintiff and defendant, wherein defendant agreed to manufacture for plaintiff free-spinning rims for motorcycle wheels ("spinners")[1] that

---

[1]Spinners are ornamental wheel covers which spin independently of the wheel itself while the wheel is in motion. (D.I. 38 at 1)   Spinners may be attached onto existing custom wheels and sold as one unit.   For simplicity, the court will use the term "spinners" to reference the combination wheels

plaintiff purportedly invented.[2]  (D.I. 1 at 1)  Plaintiff,
through its founders and principals Michael Rivers, Jr.
("Rivers") and Marc Mathis ("Mathis"), approached defendant in
2002 to manufacture spinners for plaintiff.  (D.I. 38 at 1)
Plaintiff was referred to Jim Cooper ("Cooper"), defendant's
sales manager.[3]  Plaintiff demanded that a written
confidentiality agreement be executed before plaintiff could
discuss its spinner technology with defendant.  (D.I. 48 at 7)  A
document, entitled "Agreement Regarding Confidential Information
and Intellectual Property" (the "Agreement"), was faxed to
defendant and signed by Cooper on August 20, 2002.  (Id.)

     The Agreement provides that "[a]ny [i]ntellectual [p]roperty
embodying or derived from the [c]onfidential [i]nformation or
[p]roprietary [i]nformation, or created, conceived, or first made
in connection with the business discussions and/or business
negotiations between [plaintiff] and [defendant] shall likewise
be the sole and exclusive property of [plaintiff]," and shall not
be used by defendant for any purpose whatsoever.  (D.I. 38, ex. C

_____

manufactured by defendant in this case.

     [2]Defendant states that neither plaintiff nor its principals
has a utility patent on spinners (D.I. 38 at 2, n.3), and
plaintiff states that it has patents, possibly design patents, on
its spinners.  (D.I. 48 at 12)  Neither plaintiff's patents nor
the patentability of plaintiff's technology are at issue in this
case.

     [3]Cooper is no longer employed by defendant.  (D.I. 38 at 2,
n.4)

2

at "Terms and Conditions" ¶¶ 1, 2)  "Intellectual property"

includes any concepts, inventions or information, "whether or not

patentable" and "whether or not reduced to practice."  (Id. at

"Definitions" ¶ 2)  Further, "confidential information" and

"proprietary information" expressly includes

> [a]ll [i]ntellectual [p]roperty and/or information related
> to the spinning rim in any way, which:  (I) is provided to
> [defendant] by [plaintiff] . . . (ii) is created, developed,
> or otherwise generated by or on behalf of [plaintiff], (iii)
> concerns or relates to any aspect of Owner's business, or
> (iv) is, for any reason, identified by [plaintiff] as
> confidential or proprietary; except such information which
> [defendant] can show, **clearly and convincingly:**  (a) is
> publicly and openly known and in the public domain, (b)
> becomes publicly and openly known and in the public domain
> through no fault of [defendant], or (c) is in [defendant's]
> possession and documented prior to this Agreement, lawfully
> obtained by [defendant] from a source other than from
> [plaintiff], and not subject to any obligation of
> confidentiality or restrictions on use.

(Id. (emphasis added))  The Agreement provides that it may be

amended only in a writing, and that no other express or implied

understandings or agreements exist between the parties relating

to confidentiality.[4]  (Id., ex. C at "Terms and Conditions" ¶ 4)

Some time thereafter, Rivers and Mathis visited defendant's

plant in Kentucky to discuss defendant's manufacture of

plaintiff's spinners.  (Id. at 3)  Rivers and Mathis met with

Richard Ball ("Ball"), defendant's registered agent and founding

---

[4]The Agreement states that it shall "be governed by and
controlled in accordance with the laws of the State of Delaware
without reference to the principles of conflict of laws."  (D.I.
38, ex. C at "Terms and Conditions" ¶ 4)

principal, and Charles Skarsaune ("Skarsaune"), a mechanical
engineer.[5]  (Id.)  Plaintiff states, without further detail, that
"[d]uring this meeting, Ball and [Skarsaune] received some of
[plaintiff's] confidential information and proprietary
technology."  (D.I. 48 at 8)  Defendant contends that no such
information was received, as evidenced by plaintiff's admission
that "[defendant] was engaged by [plaintiff] to design and
engineer the spinners."  (D.I. 38 at 3 & ex. E, Response to
Interrogatory No. 25 at p.12)

Plaintiff states that on or about October 2, 2002, defendant
faxed to plaintiff a "Rim - Max Wheel Pricing" sheet (the
"pricing sheet") for the design, tooling, and prototype
manufacturing of plaintiff's spinners.  (D.I. 48 at 8)   The
pricing sheet indicated that a "[p]roduction [r]un [p]ricing" for
spinner wheels was $1638.  (D.I. 48)[6]  Mathis testified that this
pricing sheet listed some components necessary for a front
motorcycle wheel, some for a back motorcycle wheel, and some
which could be used for both wheels.  (D.I. 39, ex. A at 92-93)
Based on these price components, Mathis confirmed that a front
spinning wheel cost plaintiff $1193, and a back spinning wheel
cost $1223, for a combined $2416 per set.  (Id.)  Rivers also

_____

[5]Skarsaune is no longer employed by defendant.  (D.I. 38 at
3)

[6]The pricing sheet is attached to the affidavit of Mathis.
(D.I. 48)

4

testified that defendant charged plaintiff $2400 for each set of spinners. (D.I. 39, ex. B at 223) Defendant requested a $7227.50 deposit to begin its design work and production, and plaintiff sent defendant $7227.50 in acceptance of this offer on or about October 9, 2002.[7] (D.I. 1 at 5; D.I. 48 at 8)

On or about October 7, 2002, plaintiff requested that Ball sign a supply agreement which purportedly contained confidentiality restrictions similar to the Agreement. (D.I. 38 at 2) Defendant states that the supply agreement "would have governed the terms of the parties' obligations for the purchase, manufacture, sale and delivery of the spinners."[8] (Id. at 15) Ball sent plaintiff a marked-up copy of the proposed supply agreement noting his objections to its terms, but did not sign.[9] (Id. at 3) Plaintiff asserts that it divulged all of its confidential information and proprietary technology to defendant in the subsequent design and manufacturing phase. (D.I. 48 at 9)

Plaintiff claims that defendant delivered to it the prototype spinner about a month after the date promised. (Id.) On or about January 7, 2003, plaintiff took the prototype spinner

[7]A copy of a $7227.50 check to defendant is attached to the affidavit of Mathis. (D.I. 48)

[8]The court was not provided a copy of the supply agreement in the current record.

[9]Mathis testified that "there were obviously no guidelines governing this relationship" between the parties. (D.I. 39, ex. A at 128)

5

to a motorcycle show in New York, and subsequently began receiving orders for its spinners. (Id. at 9) Plaintiff states that there was great excitement and "a lot of buzz" about its new spinners at the show. (Id.) Defendant began manufacturing plaintiff's spinners for these new orders. (Id.) According to plaintiff, Ball received inquiries for plaintiff's spinners, and asked plaintiff if defendant could make spinners for some of its customers, including Harley Davidson. (D.I. 48 at 9) Plaintiff declined Ball's invitation because plaintiff "already was marketing its spinners." (Id.)

Defendant agreed to make 54 sets of spinners for plaintiff. Plaintiff states that defendant agreed to deliver all 54 sets by late April 2003, if plaintiff agreed to pay defendant "over $90,000" in addition to its deposit. (D.I. 48 at 10) Plaintiff agreed, and paid defendant over $100,000 in total. (Id.) At defendant's request, plaintiff sent defendant its order list and customer shipping addresses. (Id.) Plaintiff claims that the spinners were not sent by late April 2003 as promised, and plaintiff told defendant that its customers were "furious" and that time was of the essence. (Id.) Plaintiff also claims that it instructed defendant to ship 20 spinners with plaintiff's name and logo, but they were eventually shipped "in RC logo boxes, making it appear to the recipients the spinners were [defendant's] product rather than [plaintiff's] product." (Id.)

6

Plaintiff asserts that it sent defendant a letter on July 2, 2003 canceling the contract, requesting return of $31,096.80,[10] and demanding return of all confidential information and proprietary technology given to defendant.[11]  (D.I. 48 at 11) Defendant does not dispute that it never made or delivered 34 of the 54 sets of spinners commissioned by plaintiff.  (D.I. 50 at 5)  Defendant contends that it possesses no proprietary technology regarding the spinners, because plaintiff's spinner technology was openly known.  (D.I. 38 at 11-12; D.I. 50 at 2-3)

According to plaintiff, defendant now sells "the same spinner designed by [plaintiff] and on which [plaintiff] has patents," and has made over $1 million in profits, resulting in lost profits and irreparable harm to plaintiff's reputation. (D.I. 48 at 12)  Plaintiff asserts that defendant did not make spinners prior to its dealings with plaintiff, and that plaintiff paid for the tooling necessary to manufacture the spinners.  (Id. at 11)

## III.   STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

---

[10]Plaintiff alleges that it "paid in full" for 54 sets. (D.I. 48 at 11)

[11]This letter does not appear in the parties' submissions.

7

genuine issue as to any material fact and that the moving party
is entitled to judgment as a matter of law." Fed. R. Civ. P.
56(c). The moving party bears the burden of proving that no
genuine issue of material fact exists. See Matsushita Elec.
Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10 (1986).
"Facts that could alter the outcome are 'material,' and disputes
are 'genuine,' if evidence exists from which a rational person
could conclude that the position of the person with the burden of
proof on the disputed issue is correct." Horowitz v. Fed. Kemper
Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal
citations omitted).

If the moving party has demonstrated an absence of material
fact, the nonmoving party then "must come forward with 'specific
facts showing that there is a genuine issue for trial.'"
Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The
court will "view the underlying facts and all reasonable
inferences therefrom in the light most favorable to the party
opposing the motion." Pennsylvania Coal Ass'n v. Babbitt, 63
F.3d 231, 236 (3d Cir. 1995). The mere existence of some
evidence in support of the nonmoving party, however, will not be
sufficient for denial of a motion for summary judgment; there
must be enough evidence to enable a jury reasonably to find for
the nonmoving party on that issue. See Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 249 (1986). If the nonmoving party

8

fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In other words, the court must grant summary judgment if the party responding to the motion fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof. See Omnipoint Comm. Enters., L.P. v. Newtown Township, 219 F.3d 240, 242 (3d Cir. 2000) (quoting Celotex, 477 U.S. at 323).

## IV. DISCUSSION

### A. Breach of Contract

#### 1. Manufacture of spinners

Plaintiff alleges that defendant breached the parties' agreement to manufacture spinners when it failed to: (1) "timely deliver to plaintiff 54 sets of spinners for which plaintiff had paid"; and (2) "return to plaintiff $31,096.80 for spinners defendant failed to deliver to plaintiff."[12]  (D.I. 1 at 8) There was no written agreement between the parties relating to defendant's manufacture of spinners for plaintiff; the supply agreement was provided by plaintiff, but never signed.  (D.I. 38

_____

[12]Defendant argues that Kentucky law should apply to this portion of plaintiff's breach of contract claim, insofar as it does not arise under the Agreement.  (D.I. 38 at 13, n.7) Defendant also submits that "there is no material difference between Kentucky and Delaware substantive law on the relevant portions of the UCC."  (D.I. 50 at 5, n.3)  As such, the court need not address choice of law with respect to this claim.

9

at 2-3) Nevertheless, there is no dispute that defendant agreed to manufacture 54 sets of spinners for plaintiff and performed its obligation in part.[13]  (D.I. 50 at 4-5)

Plaintiff has presented in its papers five cancelled checks to defendant, totaling $101,748.00, including the $7227.50 deposit.[14]  (D.I. 48) In addition to the deposit, plaintiff alleges that defendant agreed to produce 54 sets of spinners for $80,000.  (D.I. 1 at 6) Mathis testified that this $80,000 price reflected the price of the spinners, while the balance paid to defendant was for setup, tooling the machines, and designs. (D.I. 39, ex. A at 88-89) Rivers stated that defendant actually promised to make the wheels with spinners for a total of $85,000, not $80,000.  (D.I. 39, ex. B at 222-225) Both Mathis and Rivers confirmed that plaintiff was obligated to pay about $2400 per set of spinners.  (Id., ex. A at 90-91; id., ex. B at 223) In either case, $80,000 or $85,000 would not have been sufficient for 54

---

[13]Defendant's argument that plaintiff's breach of contract claim is precluded under the statute of frauds is without merit. (D.I. 38 at 14-15) Part performance is a recognized exception to the statute of frauds, as part performance constitutes substantial evidence of the existence of the agreement.  See Aubrey Rogers Agency, Inc. v. AIG Life Ins. Co., 55 F. Supp. 2d 309, 316 (D. Del. 1999) (citing Quillen v. Sayers, 482 A.2d 744 (Del. 1984)).

[14]The copies are attached to the affidavit of Mathis.  (D.I. 48)

10

pairs at $2400 per pair.[15]

On the present record, plaintiff has failed to carry its
burden to prove that there is a genuine issue for trial on these
breach of contract claims.  In response to defendant's motion,
plaintiff has put forth no factual evidence whatsoever to support
its assertions that it "paid in full" for 54 sets of spinners,
and that defendant owes plaintiff "$31,096.80 for spinners
[defendant] failed to deliver to [plaintiff]."  (D.I. 48 at 11,
14)  There is no clear indication of what amount plaintiff owed
defendant for tooling and set-up, as compared to the actual
spinners.  Even assuming all of plaintiff's money was allocated
towards spinners - an assumption unjustified by the present
record - the $101,748.00 plaintiff paid is still less than the
over $130,000 required for 54 sets of spinners at $2400 per set.
The only contemporaneous business records before the court
support defendant's argument that plaintiff only partially paid
for its order, which excused defendant's further performance of
its obligation to make and deliver the remainder of plaintiff's
spinners.[16]  (D.I. 38 at 13-14)  On this record, there is

_____

[15]Rivers later testified that the $2400 set was the "lowest
cost" spinner wheel set available from defendant, and that other
wheels available to plaintiff with its spinners cost "over
$3000."  (D.I. 39, ex. B at 235)  Using the $3000 number only
emphasizes defendant's point that plaintiff could not have paid
in full for 54 sets of spinner wheels.

[16]See 6 Del. C. § 2-511(1) ("Unless otherwise agreed tender
of payment is a condition to the seller's duty to tender and

11

insufficient evidence from which a jury could reasonably find for plaintiff.

## 2.   Plaintiff's confidential information and proprietary technology

Plaintiff alleges that defendant breached the Agreement when it "failed to return to plaintiff its confidential information and proprietary technology," and used such information "for purposes other than manufacturing plaintiff's invention."   (D.I. 1 at 8)   Plaintiff also claims that defendant breached the Agreement by stealing plaintiff's spinner idea for its own, selling plaintiff's spinners under its name, and contacting plaintiff's customers to sell spinners directly to them.   (D.I. 48 at 15)

In support of its motion, defendant asserts that it "did not receive any design or engineering information from plaintiff" and, consequently, designed and engineered the spinners on its own.   (D.I. 38 at 3-4)   And although plaintiff concedes that defendant was engaged "to design and engineer the spinners" (Id., ex. E at 12), the Agreement specifically states that any information or technology developed "on behalf of [plaintiff]" relating to spinners shall be exclusively owned by plaintiff. (Id., ex. C)

Even giving plaintiff the benefit of the Agreement, still,

complete any delivery."); Ky. Rev. Stat. § 355.2-511(1) (same).

in order to withstand defendant's motion for summary judgment, plaintiff must come forward and specifically identify the "design or engineering information" appropriated by defendant.[17] This, plaintiff has failed to do[18] and, therefore, no genuine issues of material fact have been raised by the record at bar.

## B. Plaintiff's Fraud and Intentional Interference with Contractual Relations Claims

Plaintiff alleges that defendant "falsely represented it needed [plaintiff's] detailed order list and customer shipping addresses so that [defendant] could ship the spinners directly to [plaintiff's] customers," which defendant shipped in its own logo boxes. (Id. at 10, 16) Plaintiff claims that it relied on this misrepresentation, which resulted in detriment to plaintiff and increased sales to defendant of over $1 million.[19] (Id.; D.I. 1 at 9) With respect to its intentional interference claim,

---

[17]Plaintiff has not specifically asserted (and, therefore, the court does not address the question) that the "idea" of spinners for motorcycles, in and of itself, is sufficiently proprietary information upon which to base its claims.

[18]Plaintiff has belatedly provided a signed affidavit of Rivers, which only vaguely identifies "drawings [he] gave to [defendant]," and fails to indicate exactly what "information [he] was sharing about the spinning rims" with defendant. (D.I. 52)

[19]Plaintiff also alleges that defendant "falsely represented it would not use [plaintiff's] confidential information and proprietary technology for any purpose other than to manufacture spinners for [plaintiff]." (D.I. 48 at 16; D.I. 1 at 9) For reasons already discussed with respect to plaintiff's breach of contract claim, plaintiff has also failed to meet its burden regarding this fraud allegation.

13

plaintiff claims that defendant:  (1) intentionally prevented it from doing business when it failed to deliver 34 out of 54 sets of spinners; (2) "purposely and improperly induced or otherwise purposely caused some of [plaintiff's] current customers and prospective customers (such as Harley Davidson) not to enter into or continue a current or prospective contractual relationship with [plaintiff]; and (3) told these third parties not to purchase spinners from plaintiff.  (D.I. 48 at 18)

Plaintiff has offered no evidence in support for any of the foregoing claims.  With respect to its fraud claims, plaintiff's responsive papers are devoid of any evidence tending to show the purported falsity of defendant's representation that defendant needed to ship plaintiff's spinners directly to its customers. Further, plaintiff points to no record evidence of defendant's intent and/or knowledge relating to this representation.  (D.I. 48 at 16-17)  Having failed to put forward facts regarding these necessary elements,[20] plaintiff can not withstand summary

---

[20]Defendant argues that Kentucky law should apply to plaintiff's fraud and intentional interference (tort) counts. (D.I. 38 at 13 n.7)  In both Kentucky and Delaware, a plaintiff must demonstrate the existence of a false representation of fact, as well as intent to induce reliance on that false representation, in order to prevail on a fraud claim.  Compare S.C. Johnson & Son, Inc. v. Dowbrands, Inc., 167 F. Supp. 2d 657, 674 (D. Del. 2001) (citation omitted), with Burklow v. Baskin-Robbins USA, Co., 274 F. Supp. 2d 899, 908 (W.D. Ky. 2003) (citations omitted). Similarly, in both jurisdictions, a claim of intentional interference requires proof that defendant intentionally acted to interfere with an actual or prospective agreement.  Compare Ethypharm S.A. France v. Bentley Pharms.,

14

judgment on its fraud claims.

With respect to plaintiff's intentional interference claim, plaintiff has not cited any evidence of record which would substantiate its claims that defendant's actions caused plaintiff's business relationships with any of its actual or prospective customers to fail.  Plaintiff identifies no specific customers, describes no specific contracts or lost business opportunities, and does not provide any record evidence relating to defendant's intent and/or knowledge of any interference. Plaintiff's assertion that defendant is selling plaintiff's spinners as defendant's own (id. at 18) is insufficient to withstand summary judgment.  Notably, Mathis testified that

> [t]here was a rumor going around in the industry that people were contacting [defendant] and [defendant] was telling them that they were going to be producing the spinners so don't buy from [plaintiff].  This was just a rumor we were hearing.  I mean we never confront[ed] [Ball] about that.

(D.I. 39, ex. A at 123:9-14)  The evidence of record does not raise a genuine issue of material fact related to plaintiff's claim of intentional interference.

## V. CONCLUSION

Based on the analysis above, defendant's motion for summary

---

Inc., 388 F. Supp. 2d 426, 435 (D. Del. 2005) (citations omitted), with Marcus & Millichap Real Estate Inv. Brokerage Co. v. Skeeters, 395 F. Supp. 2d 541, 552-53 (W.D. Ky. 2005) (citations omitted).  The court need not address choice of law, insofar as plaintiff fails to meet its burdens under either standard.

15

judgment (D.I. 37) is granted.[21]  An appropriate order shall
issue.

---

[21]The parties' motions in limine are denied as moot.  (D.I.
53, 55)

16